*Appeal No. 15-16142*

---

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

---

PUBLIC INTEGRITY ALLIANCE, INC.,
an Arizona nonprofit membership corporation, *et al.*

*Plaintiffs and Appellants,*

vs.

CITY OF TUCSON,
a chartered city of the State of Arizona, *et al.*,

*Defendants and Appellees.*

---

On Appeal From the United States District Court
for the District of Arizona
Hon. Cindy K. Jorgenson
Case No. 4:15-cv-00138-CKJ

---

## OPENING BRIEF OF APPELLANTS

---

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Kory A. Langhofer – Arizona Bar No. 024722
Thomas J. Basile – Arizona Bar No. 031150
Roy Herrera Jr. – New York Bar No. 4772430
One East Washington Street, Suite 2400
Phoenix, Arizona 85004
Telephone: 602.382.4040
Facsimile: 602.382.4020
*Attorneys for Plaintiffs-Appellants*

# **Table of Contents**

**Page**

TABLE OF AUTHORITIES ................................................................. iii

CORPORATE DISCLOSURE STATEMENT OF
     PLAINTIFF/APPELLANT PUBLIC INTEGRITY ALLIANCE, INC. ....... 1

INTRODUCTION .................................................................................. 2

STATEMENT OF JURISDICTION...................................................... 3

    I.    Basis of the District Court's Jurisdiction ............................ 3

    II.   Basis of Appellate Jurisdiction........................................... 3

    III.  Timeliness of Appeal ......................................................... 4

STATEMENT OF THE ISSUES........................................................... 4

PERTINENT PROVISIONS OF LAW ................................................. 4

    I.    U.S. Constitution, Amend. XIV, Section 1 ........................ 4

    II.   Tucson City Charter, Chapter XVI, Section 9 ................... 4

    III.  Tucson City Charter, Chapter XVI, Section 5 ................... 5

STATEMENT OF THE CASE............................................................... 5

    I.    Nature of the Case ............................................................. 5

    II.   History of the Proceedings ................................................. 6

    III.  Disposition by the District Court ...................................... 8

STATEMENT OF FACTS ..................................................................... 8

SUMMARY OF THE ARGUMENT ................................................... 10

ARGUMENT ....................................................................................... 13

    I.    Standard of Review .......................................................... 13

          A. The District Court's Conclusions Are Reviewed De Novo ......... 13

          B. The Hybrid System Is Subject to Strict Scrutiny ........... 14

    II.   The Hybrid System Denies the Appellants Their Right to Vote ....... 16

          A.    The City as a Whole Is the Relevant "Geographical Unit"
              in Both the Primary and General Elections ............................ 16

1. The "Geographical Unit" Is Fixed Throughout the Election Cycle ................................................. 19

    a. The Primary and General Elections Are of Equal Constitutional Dignity .............................. 20

    b. A Mutable "Geographical Unit" Would Vitiate the Right to Vote .................................... 22

B. The Arguments for Permitting Mutable Geographic Units Are Erroneous and Unpersuasive ............................ 24

    1. The Hybrid System Is Not a "Residency Requirement" .................................................. 25

        a. The Hybrid System Discriminates Among Residents of the Fixed Geographical Unit .......... 25

        b. Candidate Residency Requirements Are Not Constitutionally Equivalent to Voter Residency Requirements ................................... 29

    2. Secession Cases Are Distinguishable ........................... 30

    3. Protectorate Cases Are Distinguishable ....................... 32

    4. Judicial Election Cases Are Inapposite ......................... 34

C. The Hybrid System Fails Strict Scrutiny ................................ 35

D. The City Cannot "Cancel Out" Equal Protection Violations Over the Course of Multiple Elections ................. 37

III. Alternatively, the Hybrid System Fails Rational Basis Review ........ 40

IV. Pending Any Amendment to the City Charter, City Council Elections Should Be Conducted on a Ward-Only Basis ................... 42

REQUEST FOR ATTORNEYS' FEES AND COSTS ......................................... 45

STATEMENT OF RELATED CASES .................................................... 45

CONCLUSION .................................................................... 45

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE APPELLATE PROCEDURES 32(A) ........................................... 47

CERTIFICATE OF SERVICE ........................................................ 48

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alliance for the Wild Rockies v. Cottrell,*
   632 F.3d 1127 (9th Cir. 2011) ...........................................................13

*Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity,*
   950 F.2d 1401 (9th Cir. 1991) ...........................................................13

*Attorney Gen. of Territory of Guam on Behalf of All U.S. Citizens*
   *Residing in Guam Qualified to Vote Pursuant to Organic Act v.*
   *United States,*
   738 F.2d 1017 (9th Cir. 1984) ...........................................................33

*Avery v. Midland Cnty., Tex.,*
   390 U.S. 474 (1968)...........................................................................15

*Ayers-Schaffner v. DiStefano,*
   37 F.3d 726 (1st Cir. 1994) ...............................................................39

*Bullock v. Carter,*
   405 U.S. 134 (1972)...........................................................................21

*Burdick v. Takushi,*
   504 U.S. 428 (1992)...........................................................................15

*Burns v. Fortson,*
   410 U.S. 686 (1973)...........................................................................30

*Burns v. Richardson,*
   384 U.S. 73 (1966).............................................................................44

*Carrington v. Rash,*
   380 U.S. 89 (1965).............................................................................26

*Cecelia Packing Corp. v. U.S. Dept. of Agric./Agric. Mktg. Serv.,*
   10 F.3d 616 (9th Cir. 1993) ...............................................................18

*City of Herriman v. Bell,*
   590 F.3d 1176 (10th Cir. 2010) .............................................30, 31, 32

*City of Tucson v. State,*
  273 P.3d 624 (Ariz. 2012) ...................................................10, 16, 26

*Clements v. Fashing,*
  457 U.S. 957 (1982)........................................................................29

*Dallas County v. F.D. Reese,*
  421 U.S. 477 (1975)...................................................................29, 30

*Dudum v. Arntz,*
  640 F.3d 1098 (9th Cir. 2011) ....................................................15, 36

*Duncan v. Coffee Cnty., Tenn.,*
  69 F.3d 88 (6th Cir. 1995) .................................................................7

*Dunn v. Blumstein,*
  405 U.S. 330 (1972)...................................................................30, 41

*Dusch v. Davis,*
  387 U.S. 112 (1967)...................................................................29, 30

*Evans v. Cornman,*
  398 U.S. 419 (1970)...............................................................27, 28, 42

*Examining Bd. of Engineers, Architects & Surveyors v. Flores de
  Otero,*
  426 U.S. 572 (1976)........................................................................34

*Gomez v. City of Watsonville,*
  863 F.2d 1407 (9th Cir. 1988) .........................................................45

*Gray v. Sanders,*
  372 U.S. 368 (1963)................................................................*passim*

*Green v. City of Tucson,*
  340 F.3d 891 (9th Cir. 2003) ...........................................................16

*Harper v. Va. State Bd. of Elections,*
  383 U.S. 663 (1966)...................................................................24, 35

*Harris v. McRae,*
  448 U.S. 297 (1980)........................................................................14

*Hill v. Stone*,
 421 U.S. 289 (1975)..................................................................36

*Holshouser v. Scott*,
 335 F. Supp. 928 (M.D.N.C. 1971) ...................................34

*Holt Civic Club v. City of Tuscaloosa*,
 439 U.S. 60 (1978)..............................................................32, 33

*Hosford v. Ray*,
 806 F. Supp. 1297 (S.D. Miss. 1992) ...............................41

*Hussey v. City of Portland*,
 64 F.3d 1260 (9th Cir. 1995) ...............................18, 36, 37

*Igartua De La Rosa v. United States*,
 229 F.3d 80 (1st Cir. 2000)..................................................33

*Kramer v. Union Free Sch. Dist. No. 15*,
 395 U.S. 621 (1969)..............................................26, 35, 36, 42

*Lemons v. Bradbury*,
 538 F.3d 1098 (9th Cir. 2008) ...........................................16

*Lewis v. Guadagno*,
 445 F. App'x 599 (3d Cir. 2011) ........................................30

*Little Thunder v. State of S.D.*,
 518 F.2d 1253 (8th Cir. 1975) ............................................28

*Locklear v. N.C. State Bd. of Elections*,
 514 F.3d 1152 (4th Cir. 1975) ..............................................7

*Mixon v. State of Ohio*,
 193 F.3d 389 (6th Cir. 1999) ..............................................18

*Montano v. Lefkowitz*,
 575 F.2d 378 (2d Cir. 1978) ...............................................39

*Nader v. Brewer*,
 531 F.3d 1028 (9th Cir. 2008) ......................................36, 37

*Newberry v. United States*,
256 U.S. 232 (1921)..................................................................20

*Nw. Envtl. Def. Ctr. v. Bonneville Power Admin.*,
477 F.3d 668 (9th Cir. 2007) .................................................44

*Perfect 10, Inc. v. Amazon.com, Inc.*,
508 F.3d 1146 (9th Cir. 2007) ...............................................13

*Reynolds v. Sims*,
377 U.S. 533 (1964)................................................................15

*Rogers v. Lodge*,
458 U.S. 613 (1982)................................................................44

*San Antonio Indep. Sch. Dist. v. Rodriguez*,
411 U.S. 1 (1973) ..............................................................14, 27

*Smith v. Allwright*,
321 U.S. 649 (1944)..........................................................16, 20

*Stokes v. Fortson*,
234 F. Supp. 575 (N.D. Ga. 1964) ....................................34, 35

*Thornburg v. Gingles*,
478 U.S. 30 (1986)..................................................................44

*United States v. Classic*,
313 U.S. 299 (1941)..........................................................20, 21

*United States v. Lang*,
149 F.3d 1044 (9th Cir. 1998) ...............................................14

*United States v. O'Toole*,
236 F. 993 (S.D. W.Va. 1916) ...............................................20

*Weber v. Shelley*,
347 F.3d 1101 (9th Cir. 2003) ...............................................15

*Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*,
758 F.3d 1069 (9th Cir. 2014) ...............................................13

*Yick Wo v. Hopkins*,
118 U.S. 356 (1886) ............................................................. 14

**Statutes**

28 U.S.C. § 1291 ........................................................................... 3

28 U.S.C. § 1331 ........................................................................... 3

28 U.S.C. § 1367(a) ....................................................................... 3

42 U.S.C. § 1983 ........................................................................... 6

42 U.S.C. § 1988 ......................................................................... 45

Ariz. Rev. Stat. § 9-821.01(C) .................................................... 44

**Other Authorities**

Ariz. Const. art. VII, § 15 ........................................................... 44

Fed. R. App. P. 3 and 4(a)(1) ....................................................... 4

Fed. R. Civ. P. 65(a)(2) ................................................................ 8

Tucson City Charter ................................................. 2, 4, 5, 7, 8, 9, 30, 44

United States Constitution ............................................................ 4

## CORPORATE DISCLOSURE STATEMENT OF PLAINTIFF/APPELLANT
## PUBLIC INTEGRITY ALLIANCE, INC.

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Plaintiff-Appellant Public Integrity Alliance, Inc. submits its Corporate Disclosure Statement.

Public Integrity Alliance, Inc., is an Arizona nonprofit membership corporation. There are no parent corporations or publicly-held corporations that own 10% or more of Public Integrity Alliance, Inc.'s stock.

**INTRODUCTION**

The City of Tucson employs a highly unorthodox method of electing its City Council. Partisan primaries are held separately in each of the City's six wards by only the voters living in the appropriate ward, followed by a citywide general election in which the wards' nominees are elected or rejected by all Tucson voters on an at-large basis (the "<u>Hybrid System</u>").[1] It is undisputed that City Councilmembers elected through the Hybrid System represent *<u>all</u>* electors of Tucson, not simply the ward in which they were nominated. **The Hybrid System results in this unconstitutional paradox: Each City Councilmember is the elected representative of every City voter—but each City Councilmember is nominated through a primary election process that necessarily excludes more than *eighty percent* of his or her constituents.**

Because the City Councilmembers represent the entire city, the City-as-a-whole is "the geographical unit for which a representative is to be chosen…[and] all who participate in the election are to have an equal vote….wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963). The Hybrid System denies duly qualified Tucson electors the right to vote in primary elections for their citywide representatives, and is not a narrowly tailored

---

[1] The Hybrid System is codified at Chapter XVI, Section 9 of the Tucson City Charter.

means of advancing any compelling state interest. Accordingly, it is unconstitutional under the Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution.

Plaintiffs/Appellants Public Integrity Alliance, Inc. (the "<u>Alliance</u>"), and Bruce Ash, Fernando Gonzales, Ann Holden, Lori Oien, and Ken Smalley (the "<u>Individual Appellants</u>" and, together with the Alliance, the "<u>Appellants</u>"), brought suit in the United States District Court for the District of Arizona to invalidate the Hybrid System. The trial court entered judgment denying declaratory and injunctive relief. This appeal followed.

## STATEMENT OF JURISDICTION

### I.   <u>Basis of the District Court's Jurisdiction</u>

Because the Appellants' claims arise under the Constitution and laws of the United States, the district court had subject matter jurisdiction over those causes of action pursuant to 28 U.S.C. § 1331. The district court exercised supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) over the Appellants' claims arising under the Arizona Constitution.

### II.   <u>Basis of Appellate Jurisdiction</u>

This appeal is from a final decision of the United States District Court of the District of Arizona, and therefore this Court has jurisdiction pursuant to 28 U.S.C. § 1291.

## III.    Timeliness of Appeal

The district court entered a final judgment and order denying Appellants' request for declaratory and injunctive relief on May 20, 2015. Appellants filed a timely notice of appeal on June 5, 2015 pursuant to Fed. R. App. P. 3 and 4(a)(1).

## STATEMENT OF THE ISSUES

Does the Equal Protection Clause permit the City to exclude certain registered voters from the primary election for a citywide representative, based solely on the location of such voters' residence within the City?

## PERTINENT PROVISIONS OF LAW

The following provisions of the United States Constitution and the Tucson City Charter are pertinent to this appeal:

## I.    U.S. Constitution, Amend. XIV, Section 1

All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the state wherein they reside. No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

## II.    Tucson City Charter, Chapter XVI, Section 9

Beginning in the year 1930, and continuing thereafter, the mayor shall be nominated from and elected by the voters of the city at large, and the councilmen shall be nominated each from, and by the respective voters of, the ward in which he resides, and shall be elected by the voters of the city at large.

### III.    **Tucson City Charter, Chapter XVI, Section 5**

Candidates for the office of mayor and councilman [councilmen] of the city shall be duly qualified electors under the laws of the State of Arizona and under the provisions of this Charter, and shall have resided within, and have been a qualified elector of, the City of Tucson for not less than three (3) years immediately prior to becoming a candidate, except that time of residence in any area and being a qualified elector thereof shall be counted as residence and electoral qualifications within the City of Tucson one (1) year after said area becomes annexed to the city. Any candidate for councilman shall have resided in his respective ward or annexed area at least one (1) year prior to his becoming a candidate, unless such residence has been shortened by the redistricting of the city as to wards.

## STATEMENT OF THE CASE

### I.    **Nature of the Case**

This case concerns the constitutionality of the Hybrid System and related remedial issues.

The Appellants argue, in short, that the Hybrid System violates the Equal Protection Clause of the Fourteenth Amendment. Their argument relies on the premise that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote…wherever their home may be in that geographical unit." *Gray*, 372 U.S. at 379. Because Tucson City Council members undisputedly are elected on a citywide basis and represent all denizens of Tucson, the "geographical unit for which a [City Council] representative is to be chosen" is the city as a whole. The Fourteenth Amendment guarantees each Tucson voter a right to participate in all

facets of the electoral process – to include primary elections – on an equal basis with every other elector.

The City argues (and the district court held) that *Gray* did not preclude the City from designating different "geographical units" for the primary and general elections for the same office in the same election cycle. This formulation of *Gray* (a) is irreconcilable with the Supreme Court's instruction that the geographical unit corresponds to the office to be elected and necessarily is fixed throughout the election cycle, (b) disregards the constitutional parity of the primary and general elections, and (c) is fundamentally inconsistent with modern voting rights jurisprudence.

While the City may permissibly utilize an entirely ward-based or an entirely at-large method of electing its City Council going forward, its use of the Hybrid System – which entails denying eligible Tucson electors the right to participate in primary elections for their own representatives – is not narrowly tailored to advance any compelling state interest. Declaratory and injunctive relief is necessary to guarantee the right to equal protection in connection with the upcoming November 2015 general election for City Council.

## II.    <u>History of the Proceedings</u>

On April 6, 2015, Appellants filed a Complaint in the United States District Court for the District of Arizona seeking relief pursuant to 42 U.S.C. § 1983 and

alleging violations of the Fourteenth Amendment of the United States Constitution,[2] and Article II, §§ 13 (Equal Privileges and Immunities Clause) and 21 (Free and Equal Elections Clause) of the Arizona Constitution.[3]  Excerpts of Record ("ER") 98-127.  On the same date, the Appellants moved for a preliminary injunction prohibiting the Appellees from enforcing or relying upon Chapter XVI, Section 9 of the Tucson City Charter in connection with the 2015 Tucson City Council elections and any future election for that office, and to conduct elections on a wholly ward-based or wholly at-large basis pending an amendment to the City Charter.  ER 133.

---

[2]    Appellants initially pleaded alternative claims of vote denial and vote dilution under the Fourteenth Amendment.  The latter cause of action was founded on the premise that each Council member represents only the ward in which he or she was nominated; expanding the franchise in the general election to those who are not constituents of a Council member thus would unconstitutionally dilute the votes of electors residing in the ward.  *See generally Duncan v. Coffee Cnty., Tenn.*, 69 F.3d 88, 94 (6th Cir. 1995); *Locklear v. N.C. State Bd. of Elections*, 514 F.3d 1152, 1154 (4th Cir. 1975).  Because the parties agree that each Council member represents the City as a whole, however, the vote dilution claim is moot, and Appellants accordingly assented to its dismissal.

[3]    Although the Appellants' motion for preliminary relief was grounded only in their federal constitutional claims, the district court also disposed of the state law counts.  Because the relevant provisions of the Arizona Constitution are at least as expansive as their counterparts in the Fourteenth Amendment, the arguments presented herein apply in equal force to the Appellants' state constitutional claims, which provide an independent basis for reversing the district court's decision.

On April 29, 2015, the Appellees filed an Answer to the Complaint and a Response to the motion for a preliminary injunction. ER 90-97, 133. On May 5, 2015, Appellants submitted their Reply brief. ER 133.

On May 8, 2015, the district court heard oral arguments. ER 32-87. The parties agreed that because no material fact was in dispute, the hearing on the pending motion for preliminary relief should be consolidated with a trial on the merits, pursuant to Fed. R. Civ. P. 65(a)(2).

## III.  <u>Disposition by the District Court</u>

On May 20, 2015 the district court entered a final judgment and order concluding that the Hybrid System placed only "reasonable, nondiscriminatory restrictions" on the Individual Appellants' right to vote that were justified by the City's "important regulatory interests." ER 12. It accordingly denied the Appellants' requests for injunctive relief. *Id.*

On June 5, 2015 the Appellants timely filed a notice of appeal. ER 15-31. On June 19, 2015 this Court subsequently granted the Appellants' unopposed motion to expedite appellate proceedings.

## STATEMENT OF FACTS

The material facts are few and undisputed. Pursuant to Chapter XVI, Section 8 of its Charter, the City of Tucson is divided into six wards composed of substantially equal populations; one seat on the six-member City Council is

allotted to each ward, and a candidate for the City Council must reside in the ward from which he or she seeks to be nominated. *See* Tucson City Charter ch. III, § 1; ch. XVI, §§ 5, 9. The four year terms of the City Council members are staggered, and elections are held on a biennial basis in odd-numbered years. *See id.* ch. XVI, §§ 3-4. Candidates for the seats allotted to Ward 1, Ward 2 and Ward 4 will run in 2015, while elections for the seats designated to Ward 3, Ward 5 and Ward 6 will next be held in 2017. The candidates nominated in the ward-based primaries then compete in an at-large general election in which all registered voters in the City of Tucson may participate. ER 92-93, 102. Every voter may select one candidate for each of the three City Council seats appearing on the general election ballot. *Id.* A ward's nominees compete in the general election only against other candidates nominated in the same ward. *Id.*

Each of the Individual Appellants is a resident and qualified elector of the City of Tucson. ER 91, 99-100, 117-18, 120-21, 123-24, 126-27. The Alliance is a non-profit membership corporation organized under the laws of the State of Arizona. ER 115. Its purpose is to advance policies that promote ethics, transparency, and accountability in government, as well as to advocate and promote the protection of voting rights and the integrity of the electoral process. *Id.* Its members include duly registered voters in the City of Tucson. *Id.*

## SUMMARY OF THE ARGUMENT

This case is controlled by a single, simple maxim of equal protection: "Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote . . . wherever their home may be in that geographical unit." *Gray*, 372 U.S. at 379. Notably, the City concurs that "Tucson council members, although nominated by ward, represent the entire city, just as do council members elected at large in other cities." *City of Tucson v. State*, 273 P.3d 624, 631 (Ariz. 2012); ER 89, 93, 102. Because the relevant "geographical unit" of representation thus is the city as a whole, the City unconstitutionally denies the right to vote when, through operation of the Hybrid System, it excludes otherwise eligible Tucson electors from voting in primary elections for citywide representatives based solely on the location of "their home . . . in that geographical unit." *Gray*, 372 U.S. at 379.

The district court acknowledged the controlling language in *Gray*—but evaded it by reasoning that the relevant case law does not expressly demand that "the same geographical unit must apply to corresponding primary and general elections." ER 8. It accordingly concluded that the City could permissibly designate one geographical unit for the primary election (*i.e.*, a particular ward) and another (*i.e.*, the city as a whole) in the general election, and limit participation in the former only to residents of that ward.

The district court's holding profoundly misapprehends the import of *Gray* and is thoroughly incongruous with contemporary voting rights jurisprudence. Properly understood, *Gray* and its progeny envisage a tripartite symmetry between (1) the constituents of an elected office, (2) the geographical unit it encompasses, and (3) the residence of qualified electors. Specifically, the "geographical unit" is denoted by the "*representative to be chosen*," *Gray*, 372 U.S. at 379 (emphasis added), not the particular *election contest* (*e.g.*, primary versus general) at issue. The government in turn may condition the franchise on *bona fide* residence within that geographic constituency.

The district court's reasoning upends this carefully wrought cornerstone of equal protection, asserting instead that the government has virtual *carte blanche* to decouple the office to be elected from the constituency it represents by designating different "geographical units" for each of the primary and general elections – and thereby limit the franchise to only the electors residing in the geographic area blessed with a primary election. The result is not only a derogation of the primary election's equal constitutional dignity, but a license for the government to exclude duly registered voters from the nomination of candidates who undisputedly represent them. The paradigm adopted by the district court would countenance electoral arrangements that are deeply dissonant with every intuitive understanding of equal protection, and is impossible to reconcile with modern "one man, one

vote" jurisprudence. Similarly, the district court's reliance on cases confronting substantively different electoral arrangements (*e.g.*, secession referenda and protectorate jurisdictions) or invoking outmoded conceptions of equal protection are likewise unavailing.

Further, even if the Hybrid System's limitations on the primary election franchise could be accurately characterized as "residency requirements," they plainly are not reasonable. *Bona fide* residency restrictions protect the integrity of the electoral process and ensure a basic cohesiveness of the political community. Because the City permits *all* City voters to cast a ballot for *all* City Council candidates in the general election – and indeed acknowledges that Council members represent *all* City residents – there is no constitutionally sound reason for excluding them from nominating contests. Even if a given ward's residents possess substantive and singular "interests" not shared by other City voters, this concern may be rationally redressed by use of a ward-by-ward system of electing the Council and/or retention of a ward residency requirement for candidates.

Importantly, the City remains free to elect its City Council on either a wholly at-large or wholly ward-only basis; the City may set its "geographical unit" as either the City-as-a-whole or as individual wards, and limit participation in both the primary *and* general elections to residents within that unit—but once the boundaries of a geographical unit are set, all voters within that unit are

constitutionally entitled to equal participation. Whether the Hybrid System is replaced by a ward-only basis of representation or an entirely at-large method of election ultimately should be resolved by Tucson voters through a duly enacted Charter amendment. In the interim, however, the City's use of ward-only primaries in the August 2015 nominations – compounded with more general constitutional and policy considerations favoring localized election units – counsel that the November 2015 general election be conducted on a ward-only basis.

## ARGUMENT

### I. <u>Standard of Review</u>

#### A. The District Court's Conclusions Are Reviewed *De Novo*

The district court's decision disposed only of pure questions of law, *i.e.*, whether the Hybrid System violates the federal and/or Arizona Constitutions, and is reviewed *de novo* by this Court. *See Wells Fargo & Co. v. ABD Ins. & Fin. Servs., Inc.*, 758 F.3d 1069, 1071 (9th Cir. 2014). Although a district court's denial of injunctive relief is subject to reversal only for abuse of discretion, *Perfect 10, Inc. v. Amazon.com, Inc.*, 508 F.3d 1146, 1157 (9th Cir. 2007), "[a]n abuse of discretion will be found if the district court based its decision 'on an erroneous legal standard.'" *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (internal citation omitted); *see also Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1405 (9th Cir. 1991) ("We review de novo the correctness of the legal standards employed by the district

court.").  All material facts are undisputed, and the district court's adjudication of the legal merits of the Appellants' claims is entitled to no deference on appeal.  *See United States v. Lang*, 149 F.3d 1044, 1046 (9th Cir. 1998) ("[P]ure legal questions are ones for which we have an institutional advantage over district courts.").

### B.    The Hybrid System Is Subject to Strict Scrutiny

The right to vote is "regarded as a fundamental political right, because preservative of all other rights."  *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). As a product of the Equal Protection Clause strand of the Supreme Court's "fundamental rights" jurisprudence, the essence of the right is "to participate in state elections on an equal basis with other qualified voters whenever the State has adopted an elective process for determining who will represent any segment of the State's population."  *See San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 35 n.78 (1973); *see also Harris v. McRae*, 448 U.S. 297, 322 (1980) ("[I]f a State adopts an electoral system, the Equal Protection Clause of the Fourteenth Amendment confers upon a qualified voter a substantive right to participate in the electoral process equally with other qualified voters").  "[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as

effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).[4]

Courts have devised a two-tiered approach for evaluating encumbrances on the franchise. When a regulatory burden on voting rights is "severe," "it must be 'narrowly drawn to advance a state interest of compelling importance.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal citation omitted). By contrast, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (internal citation omitted); *see also Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003) (affirming the applicability of *Burdick*'s "balancing test" to voting rights claims).

Although federal courts have not formulated an exhaustive enumeration of "severe" burdens as contradistinguished from "reasonable" restrictions, this Court has instructed that the former are denoted by measures that deny an eligible voter "an opportunity to cast a ballot at the same time and with the same degree of choice among candidates available to other voters." *See Dudum v. Arntz*, 640 F.3d

---

[4] The Fourteenth Amendment constrains local governments to the same extent as their state-level counterparts. *See Avery v. Midland Cnty., Tex.*, 390 U.S. 474, 480 (1968) ("The actions of local government are the actions of the State. A city, town, or county may no more deny the equal protection of the laws than it may abridge freedom of speech, establish an official religion, arrest without probable cause, or deny due process of law.").

1098, 1109 (9th Cir. 2011).   More specifically, "regulations that unreasonably deprive some residents in a geographically defined governmental unit from voting in a unit wide election" are *per se* strictly scrutinized.  *Green v. City of Tucson*, 340 F.3d 891, 899-900 (9th Cir. 2003); *see also Lemons v. Bradbury*, 538 F.3d 1098, 1104 (9th Cir. 2008).   "[T]he same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election." *Smith v. Allwright*, 321 U.S. 649, 664 (1944).

## II.  The Hybrid System Denies the Appellants Their Right to Vote

### A.  The City as a Whole Is the Relevant "Geographical Unit" in Both the Primary and General Elections

Because the ability to select any given ward's City Council member is vested in *all* qualified electors of Tucson by means of an at-large general election, the City as a whole is necessarily the relevant "geographical unit" for purposes of assessing the City's adherence to its equal protection obligations.  Indeed, the Arizona Supreme Court has expressly found that "Tucson council members, although nominated by ward, represent the entire city, just as do council members elected at large in other cities," *see City of Tucson*, 273 P.3d at 631, a characterization with which the City agrees.  ER 89, 93, 102.

Importantly, the germane "geographical unit" for denoting a state or municipality's equal protection obligations is the one "for which a representative is to be chosen." *See Gray*, 372 U.S. at 379.   In other words, once a state or

16

municipality designates a particular constituency for a given representative, the corresponding geographic ambit is the applicable "unit" for assessing equal protection challenges. The ability to cast a vote for a candidate is the nexus establishing a "representative" relationship.

*Gray*, which adjudicated the constitutionality of Georgia's county-based method for deciding primary election contests, aptly illustrates the point. Although voters within each county undisputedly were accorded equal treatment in the electoral process, the Court nevertheless deemed the scheme constitutionally infirm because of the discriminatory effect it exerted across counties. Notably, the Court's analysis was founded in the premise that because the offices on the ballot (*i.e.*, statewide positions) were subject to a vote of the statewide electorate in the general election – and thereby functioned as representatives of the entire state – the relevant "geographical unit" was the state as a whole, not any particular county in isolation. It necessarily follows that all aspects of the electoral process pertaining to that office, to include the procedures for nominating candidates, must be open to *all* qualified electors on equal terms. *See Gray*, 372 U.S. at 381 ("[O]nce the class of voters [for a given office] is chosen and their qualifications specified, we see no constitutional way by which equality of voting power may be evaded.").

While few cases have elucidated the "geographical unit" concept, the existing precedents have conformed to the principle enunciated in *Gray*, namely,

that once a state or municipality has designated an office as the representative of a given constituency, the corresponding geographical area is the operative "unit" for equal protection purposes. *See, e.g.*, *Mixon v. State of Ohio*, 193 F.3d 389, 405 (6th Cir. 1999) ("If the municipal school boards [which represented both Cleveland and its surrounding suburbs] were elected [rather than appointed] bodies and only the Cleveland residents could vote in the school board election, the relevant geographical entity would be the municipal school district" and strict scrutiny would apply to any exclusion of suburban voters.); *Cecelia Packing Corp. v. U.S. Dept. of Agric./Agric. Mktg. Serv.*, 10 F.3d 616, 624 (9th Cir. 1993) (citing cases in which "the officials elected . . . exercise general governmental power over the entire geographic area served by the elected body" and noting that "[l]imitations on voting in this type of election generally are reviewed under a strict scrutiny standard"); *cf. Hussey v. City of Portland*, 64 F.3d 1260 (9th Cir. 1995) (invaliding under strict scrutiny ordinance that afforded subsidy to certain voters within area to be annexed but not to others, finding that it "severely and unreasonably interferes with the right to vote").

The City's choice to elect Council members on a citywide, at-large basis necessarily forges a representational nexus between each Council member and every Tucson elector, regardless of his or her ward of residence. By designating the city as a whole as the "geographical unit for which a representative is to be

chosen," *see Gray*, 372 U.S. at 379, the City must ensure equal treatment of all Tucson voters in all facets of the electoral process, to include the primary election.

### 1. The "Geographical Unit" Is Fixed Throughout the Election Cycle

Because the "geographical unit" is defined by the representative office to be elected, the district court's holding that the City may designate different geographical units at different points in the *same* election cycle for the *same* office is fatally flawed. Notably, the district court accepted the key premises that (a) the primary and general elections are of equal constitutional importance, and (b) "the geographical unit is tethered to the office to be elected rather than the timing of the election," ER 7—but nevertheless concluded that "*Gray* did not specify that corresponding primaries must necessarily be the same geographical unit as a general election." *Id.* This syllogism is not only internally inconsistent but profoundly at variance with modern voting rights doctrine, and would enervate constitutional bulwarks safeguarding the franchise. The constitutional equivalence of the primary and general elections, and the necessity of ensuring *Gray*'s continued vitality, foreclose the district court's acceptance of a mutable geographical unit.

### a. The Primary and General Elections Are of Equal Constitutional Dignity

Integral to the City's arguments in the district court was the notion that because a primary election is merely a "nominating device" and a separate contest from the general election, encumbrances on the right to participate are subject to lesser constitutional scrutiny. The federal cases the City has cited for this proposition – most of which are nearly a century old – embody an anachronistic conception of nominating processes that subsequent cases have decisively repudiated. *E.g., Newberry v. United States*, 256 U.S. 232 (1921);[5] *United States v. O'Toole*, 236 F. 993 (S.D. W.Va. 1916). While the district court acknowledged the modern precept that "the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election," *Smith*, 321 U.S. at 664, its analysis implicitly depended upon the doctrinal obsolescence advocated by the Appellees.

By holding that the government may simply declare for the primary election a different "geographical unit" for the *same* office and exclude from the primary election voters entitled to cast a ballot for that office in the general election, the district court necessarily relegated the primary election to lesser constitutional

---

[5]     Indeed, the central holding of the *Newberry* plurality, to wit, that congressional primaries were not "elections" within the meaning of Article I, § 4, was overturned by a majority of the Court twenty years later. *See United States v. Classic*, 313 U.S. 299, 317 (1941).

standing. Underlying the *Gray* Court's invalidation of the county-unit primary system was a conviction that "[t]he concept of political equality . . . extends to all phases of state elections . . . [and] there is no indication that homesite or occupation affords a permissible basis for distinguishing between qualified voters within the State." 372 U.S. at 380. The Supreme Court's longstanding position that limitations on primary voting are as constitutionally significant as restrictions impairing the general election franchise is founded in a recognition that voters' choices in the general election are profoundly intertwined with, and often conditioned on, the primary process. *See United States v. Classic*, 313 U.S. 299, 318 (1941) ("[T]his right of participation [in the nominating process] is protected just as is the right to vote at the election, where the primary is by law made an integral part of the election machinery, whether the voter exercises his right in a party primary which invariably, sometimes or never determines the ultimate choice of the representative."); *Bullock v. Carter*, 405 U.S. 134, 146-47 (1972) (rejecting argument that filing fee's application only to the primary mitigated the constitutional injury, noting that "the primary election may be more crucial than the general election" in deciding electoral outcomes).

Under the Hybrid System, a primary voter in, *e.g.*, Ward 1 is denied the opportunity to participate in the nomination of his party's standard bearer in Ward 2, even though that nominee will compete in the citywide general election for the

office of citywide representative.  The obvious inequity of such an arrangement is confirmed by *Gray* and is intrinsically inconsistent with the primary and general elections' equal constitutional dignity.

### b. A Mutable "Geographical Unit" Would Vitiate the Right to Vote

The district court's holding that the government can dictate different geographical units in each of the primary and general elections for the same office representing the same constituency – and thereby disenfranchise large swaths of the general electorate in the primary election – is irreconcilable with the governing case law and also embodies a troubling circularity.  If the government can deny the franchise to constituents of a representative in the primary election by decreeing a different "geographical unit" and casting the restriction as a "residency requirement," it is difficult to discern what independent force the Equal Protection Clause can impart against enactments that discriminate on the basis of voters' homesite.

In this vein, the district court's untethering of the geographical unit from the office to be elected is flatly inconsistent with the prevailing understanding of equal protection in the voting rights context.  A hypothetical illustrates the point.  Suppose a state were to enact a law providing that only half of the state's congressional districts could participate in the primary election for any given U.S. Senate contest, while keeping the general election open to a statewide electorate.

A proper application of *Gray* and its progeny counsel that because each senator ultimately is chosen by a statewide electorate, he or she is a representative of the entire state, and the state as a whole accordingly is the operative "geographical unit." It follows that the state is constrained by the Fourteenth Amendment to ensure that every state resident may participate in every facet of the electoral process – to include the primary election – on the same basis as every other voter. Under the district court's reasoning, however, such an arrangement would be a valid exercise of the state's putative prerogative to unilaterally designate different "geographical units" for different "elections." Indeed, the district court's holding – *i.e.*, that the government may dictate varying "geographical units" for the same office representing the same constituency – would, carried to its logical conclusion, permit the City to hold citywide general elections but designate only a single precinct or street as the "geographical unit" in which the primary election is conducted. Such a theory obviously is constitutionally untenable.

In sum, the Appellants' position, *i.e.*, that the "geographical unit" is a fixed reference point tied to the office to be elected and remains constant throughout the electoral process, is not only compelled by *Gray*, but comports with intuitive notions of the "one person, one vote" precept. Consistent application of the district court's conclusion that the government may by fiat expand or contract the

electorate for a given office in the same election cycle would license electoral arrangements that are logically and doctrinally dissonant with settled equal protection principles. *See generally Harper v. Va. State Bd. of Elections*, 383 U.S. 663, 670 (1966) ("[W]here fundamental rights and liberties are asserted under the Equal Protection Clause, classifications which might invade or restrain them must be closely scrutinized and carefully confined.").

## B. The Arguments for Permitting Mutable Geographic Units Are Erroneous and Unpersuasive

The crux of the district court's holding was its determination that the relevant "geographical unit" can mutate between the primary and general elections. The district court's reasoning was opaque, particularly with respect to the doctrinal nexus between its interpretation of the "geographical unit" concept and the court's adoption of the rational basis standard. It appears, however, that the court implicitly accepted the City's contention that because the "geographical unit" in a given primary election is a particular ward, restricting participation only to ward residents is tantamount to a *bona fide* residency requirement, which typically must satisfy only the forgiving rubric of rationality. As set forth below, however, the Hybrid System is clearly distinguishable from a mere "residency requirement" and cannot plausibly be analyzed under that standard.

Further, while acknowledging that they were not directly controlling of the question presented, the district court deemed "instructive" certain federal

precedents disposing of voting rights claims in the context of secession measures, protectorates, and judicial elections. Those cases, however, presented substantially different factual postures and doctrinal considerations, and are not probative of the question at hand.

So while the exact basis for the district court's decision remains difficult to identify with precision, this brief will address squarely each of the doctrinal arguments raised and cited by the City and the district court.

### 1. The Hybrid System Is Not a "Residency Requirement"

Any characterization of the Hybrid System as a mere "residency requirement" presupposes that the City may designate different "geographical units" in the same election cycle for the same office, an untenable proposition for the reasons discussed *supra* Section II.A. Proper application of *Gray* reveals that the Hybrid System discriminates *among* residents of a unitary geographical unit on the basis of homesite, and thus must receive strict scrutiny. In the same vein, the district court's reliance on Supreme Court precedents pertaining to *candidate* residency requirements – a regulatory creature wholly distinct from *voter* residency restrictions – was fundamentally erroneous.

### a. The Hybrid System Discriminates *Among* Residents of the Fixed Geographical Unit

Because the relevant "geographical unit" in both the primary and general elections is the city as a whole, the Hybrid System is most accurately

conceptualized as effectuating discrimination among residents of a single geographical unit, and thus subject to strict scrutiny. *See Gray*, 372 U.S. at 380; *Kramer v. Union Free Sch. Dist. No. 15*, 395 U.S. 621, 627 (1969) ("[I]f a challenged statute grants the right to vote to some bona fide residents of requisite age and citizenship and denies the franchise to others, the Court must determine whether the exclusions are necessary to promote a compelling state interest.").

To be sure, laws conditioning the franchise on "reasonable residence restrictions" generally are valid. *See Carrington v. Rash*, 380 U.S. 89, 91 (1965). State and local governments possess considerable latitude in delineating initial jurisdictional boundaries and the geographic constituency for a given office. In this vein, the City undoubtedly could designate a separate representative on the City Council for each City-drawn ward and prescribe that an elector must reside in that ward to cast a ballot for the ward's representative in both the primary and general elections.

The City has chosen instead, however, to provide for citywide general elections, thereby rendering each Council member a representative of every Tucson resident. *See City of Tucson*, 273 P.3d at 631. By adopting that model, the City is constitutionally bound to ensure the equal treatment of *all* Tucson residents in *all* facets of the electoral process. *See San Antonio Indep. Sch. Dist.*, 411 U.S. at 36 n.78 (noting "the protected right, implicit in our constitutional system, to

participate in state elections on an equal basis with other qualified voters"). Because "there is no indication in the Constitution that homesite . . . affords a permissible basis for distinguishing between qualified voters within" the geographical unit, *Gray*, 372 U.S. at 380, discrimination among voters based on their location *within* the City – even if formally denominated as a "residency requirement" – constitutes precisely the Equal Protection violation presented in *Gray*.

Implicitly recognizing that states' prerogative to draw jurisdictional boundaries is subordinate to the overriding imperatives of equal protection, the Supreme Court has signaled a jaundiced view of putative "residency requirements" that in practice exact substantial burdens on the franchise. *See Evans v. Cornman*, 398 U.S. 419 (1970). At issue in *Evans* was a Maryland statute that defined "residents" for voting purposes as excluding denizens of a federal enclave located within the state. As a threshold matter, the Court noted that "before th[e] right [to vote] can be restricted, the purpose of the restriction and the assertedly overriding interests served by it must meet close scrutiny." *Id.* at 422. Rejecting the state's contention that the enclave residents did not possess a "substantial interest" in the state's governance and policy decisions, the Court noted that they were "just as interested in and connected with electoral decisions" as residents of Maryland

proper and were constitutionally entitled to equal treatment in the electoral realm. *Id.* at 426.

In the same vein, the City's decision to permit *all* Tucson voters to choose *every* ward's Council member in the general election reflects that all Tucson voters are represented by every City Council member and share a common and undifferentiated interest in electoral outcomes. *Cf. Little Thunder v. State of S.D.*, 518 F.2d 1253, 1255-56 (8th Cir. 1975) (holding that residents of unorganized counties, who were governed by officials elected in adjacent organized counties, had right to vote for those officials, reasoning that "[t]he state urges the limitation is justified since nothing more than a geographic residency requirement is imposed. This view is too simplistic. . . . Geographic residency requirements are permissible when they are designed to insure that only voters who have a substantial interest in the outcome of elections will participate. Here, however, as plaintiffs urge, each of the unorganized counties and the organized county to which it is attached form a single unit of local government." (internal citations omitted)). Any attempt to avert the attendant constitutional obligation of equal protection in both the primary and general elections is accordingly subject to strict scrutiny, regardless of the label affixed.

**b.** **Candidate Residency Requirements Are Not Constitutionally Equivalent to Voter Residency Requirements**

In support of its application of rational basis review, the district court cited the Supreme Court's decision in *Dusch v. Davis*, 387 U.S. 112 (1967) and *Dallas County v. F.D. Reese*, 421 U.S. 477 (1975), which, as characterized by the district court, "held that an at-large general election for a government body with district-based candidate residency requirements did not implicate 'one person, one vote' concerns." ER 7.

The district court's reasoning, however, elides a critical constitutional distinction between residency requirements governing *candidates* and those encumbering *voters*. Notably, the *Dusch* Court emphasized that the residency requirement at issue was "merely . . . the basis of residence for candidates, not for voting or representation," adding that "different conclusions might follow" for restrictions implicating the latter. 387 U.S. at 115-16.

The City dismisses this passage as directed only to the prospect of malapportioned districts, but the broader doctrinal landscape illustrates that candidate and voter residency requirements are two distinct species of regulations. Indeed, courts consistently have sustained durational residency requirements for candidates that would be unconstitutional if applied to voters. *Compare Clements v. Fashing*, 457 U.S. 957, 967-68 (1982) (sustaining two-year waiting period for

justices of the peace who wish to seek legislative office, adding that "we [have] upheld a 7-year durational residency requirement for candidacy"); *Lewis v. Guadagno*, 445 F. App'x 599, 603 (3d Cir. 2011) (upholding four-year residency requirement for candidates, noting that "the Supreme Court has rejected the argument that an individual has a fundamental right to candidacy") *with Dunn v. Blumstein,* 405 U.S. 330, 344 (1972) (invalidating under strict scrutiny a statute that required voters to reside in state for a year and in county for three months as a precondition to voting); *Burns v. Fortson*, 410 U.S. 686, 687 (1973) ("[T]he 50-day [voter durational residency requirement] approaches the outer constitutional limits in this area.").  Importantly, the City Charter requires candidates for City Council to have resided in the City for at least three years and in their ward for at least one year (*see* City Charter ch. XVI, § 5); such a restriction is consistent with *Dusch* and *Dallas County*, and the Appellants do not challenge its validity.

Those cases, however, have no bearing on the constitutionality of the Hybrid System, which operates as a direct restraint on the exercise of the franchise by individual *voters*, not on candidates.

### 2.    Secession Cases Are Distinguishable

The City has relied heavily on the Tenth Circuit's decision in *City of Herriman v. Bell*, 590 F.3d 1176 (10th Cir. 2010) (upholding a rule that permitted only the residents of the potentially succeeding area to vote on succession), in

support of its contention that the Hybrid System's restrictions are merely "residency requirements" controlled by the rational basis rubric. While noting that the case was not on-point, the district court nevertheless deemed it "instructive." ER 7. These invocations of *Herriman*, however, are misplaced for at least three reasons.

**First**, *Herriman* actually reiterated the precept articulated in *Gray* and its progeny, *i.e.*, that "[w]hen a state law discriminates among eligible voters within the *same* electoral district, strict scrutiny applies, and compelling governmental interests must justify restrictions on the franchise." *Id.* at 1185-86. **Second**, "[t]he equal protection principles applicable in gauging the fairness of an election involving the choice of legislative representatives . . . are of limited relevance . . . in a 'single-shot' referendum," such as the secession measure at issue in *Herriman*. *See id.* at 1187 (quoting *Town of Lockport v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259, 266 (1977)). **Third**, and most significantly, cases featuring annexation or secession measures are *sui generis*, and not probative of the equal protection obligations entailed in candidate elections. Annexation and secession are exercises in dissolving existing geographical electoral units and constituting entirely new ones, and thus are intrinsically different from the application of equal protection directives in the context of static geographical boundaries. Further, to the extent an analogy can be forged, *Herriman* decidedly

does not license a *carte blanche* prerogative to declare new geographical units for the same office and same constituency in the same election cycle. Indeed, *Herriman* held merely that the vote on a proposed secession from an existing school district could be limited to those who would be residing in the new breakaway district – *i.e.*, those who would live in the new geographical unit for which new school board representatives would be chosen – a holding consonant with *Gray*.

### 3. Protectorate Cases Are Distinguishable

For similar reasons, *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978), in which the Supreme Court held that residents of an unincorporated area outside the boundaries of Tuscaloosa did not have a constitutional right to vote in city elections despite being subject to certain municipal laws, does little to illuminate the issues in this case. *Holt* simply recapitulates that the Fourteenth Amendment does not impose on any municipality an anterior obligation to accord elected representation to those living under its auspices. If a city designates a representative for a given constituency, however, all eligible voters residing within that unit must be permitted to participate in all aspects of the electoral process on equal terms. *See id.* at 68 (recounting cases invalidating restrictions on the franchise of "individuals who were physically resident within the boundaries of the governmental entity concerned"). Aware of the unique constellation of facts

presented in *Holt*, the Court signaled the limited precedential value of its holding, noting that its disposition hinged largely on the limited nature of the governmental powers exerted over the protectorate. *See id.* at 72 n.8 ("We do not have before us, of course, a situation in which a city has annexed outlying territory in all but name, and is exercising precisely the same governmental powers over residents of surrounding unincorporated territory as it does over those residing within its corporate limits." (citing *Evans* and *Little Thunder*)).

Doctrinally, *Holt* and other cases involving narrow "protectorate" authority stand for the proposition that, in very rare instances, the geographical unit that elects a body (and within which voting rights must be equal) may be narrower than the elected body's territorial jurisdiction or authority. Cases denying the franchise in presidential elections to residents of U.S. territories or protectorates, for example, reflect the critical distinction between the jurisdictional reach of an elected body's laws from the geographical unit that elects the body. *See, e.g.*, *Attorney Gen. of Territory of Guam on Behalf of All U.S. Citizens Residing in Guam Qualified to Vote Pursuant to Organic Act v. United States*, 738 F.2d 1017, 1019 (9th Cir. 1984); *Igartua De La Rosa v. United States*, 229 F.3d 80, 83 (1st

Cir. 2000).[6]  The latter is the touchstone in delineating a state or municipality's equal protection obligations.

### 4.  Judicial Election Cases Are Inapposite

Finally, both the City and the district court have cited *Stokes v. Fortson*, 234 F. Supp. 575 (N.D. Ga. 1964), which countenanced a scheme similar to the Hybrid System in the context of judicial elections.[7]  *Stokes*, however, is unpersuasive for at least three reasons.  **First**, the Georgia court's ruminations on whether such hybrid voting arrangements transgress equal protection demands was pure *dicta*; the court's core holding was that "one man, one vote" has no application to judicial elections.  *See* 234 F. Supp. at 577.  **Second**, the case must be placed in its proper historical context; rendered by a Southern court during the civil rights era barely a year after the Supreme Court's seminal ruling in *Gray*, the decision grappled with

---

[6]  Although the cases were resolved on Article II grounds rather than the plaintiffs' Equal Protection Clause claims, the courts' dispositions implicitly incorporate a conclusion that the relevant geographical unit for Equal Protection purposes is not the geographical ambit over which presidential authority extends. *See Examining Bd. of Engineers, Architects & Surveyors v. Flores de Otero*, 426 U.S. 572, 600 (1976) ("It is clear . . . that the protections accorded by either the Due Process Clause of the Fifth Amendment or the Due Process and Equal Protection Clauses of the Fourteenth Amendment apply to residents of Puerto Rico.").

[7]  The City also cited a second district court opinion, *Holshouser v. Scott*, 335 F. Supp. 928 (M.D.N.C. 1971), which disposed of the same issue (*i.e.*, whether "one person, one vote" extends to judicial elections) and echoed the *Stokes* court's *dicta* on the general subject.  The flaws in *Stokes* discussed above extend in equal measure to *Holshouser*.

the still-nascent concept of "one man, one vote" at a time when voting rights jurisprudence was still in a transitional state of flux.[8] **Third**, the decision's cursory observations concerning the conformance of Georgia's hybrid system to "one man, one vote" principles is ultimately incorrect. As discussed *supra* Section II.A, a more careful and comprehensive consideration of *Gray* – as crystallized by the passage of time and subsequent case law – confirms that the "geographical unit" is a fixed reference point tied to the office to be elected; it cannot be altered by the government midway through an election cycle to disenfranchise segments of the general electorate in the primary election.

## C. The Hybrid System Fails Strict Scrutiny

Properly conceived, the Hybrid System discriminates among duly registered electors of a single geographical unit (*i.e.*, the City as a whole) in ward-only primaries, and thus is subject to strict scrutiny. *See Kramer*, 395 U.S. at 627. Indeed, the abrogation of any voter's "opportunity to cast a ballot at the same time and with the same degree of choice among candidates available to other voters" is

---

[8] The 1960s saw a slew of decisions that incrementally repudiated prior cases espousing a more historically oriented understanding of the Equal Protection Clause and its original intent. It was not until 1966 – two years after *Stokes* – did the Supreme Court explicitly acknowledge the tectonic movement in its jurisprudence. *See Harper*, 383 U.S. at 669 ("[T]he Equal Protection Clause is not shackled to the political theory of a particular era…Notions of what constitutes equal treatment for purposes of the Equal Protection Clause do change."); *id.* at 681 (Harlan, J., dissenting) (contending that "the Court has departed from long-established standards governing the application of [the Equal Protection] clause").

the distinguishing attribute of a "severe" burden warranting strict scrutiny. *See Dudum*, 640 F.3d at 1109.

The City cannot demonstrate that its Hybrid System represents the most narrowly tailored means of advancing a compelling interest.[9] Presumably, ward-based primaries are designed to induce closer ties between ward residents and "their" representative on the City Council, and thereby enhance democratic responsiveness. As an initial matter, courts have generally foreclosed attempts to limit participation in the electoral process to those possessing a putatively distinct interest in the outcome. *See, e.g.*, *Kramer*, 395 U.S. at 632 (invalidating law limiting participation in school board elections to parents of schoolchildren and those who owned or rented property in the district, reasoning that even assuming the state can restrict voting only to those with a particular interest, the statute "does not meet the exacting standard of precision we require of statutes which selectively distribute the franchise"); *Hill v. Stone*, 421 U.S. 289 (1975) (holding that bond issue for construction of library was not a true "special interest" election and thus did not justify exclusion of non-property owners); *see also Hussey*, 64 F.3d at 1266

---

[9] The City has consistently presupposed that the Hybrid System need only satisfy rational basis review; it has never proffered any argument that the arrangement would survive heightened scrutiny. Notably, the application of strict scrutiny almost always results in the invalidation of enactments that severely infringe the right to vote. *See generally See Nader v. Brewer*, 531 F.3d 1028, 1040 (9th Cir. 2008) (commenting that strict scrutiny places a "heavy burden" on the state, and striking down residency requirements for petition circulators and filing deadline).

(holding that "promoting stability of neighborhoods and aligning service and tax boundaries" were not "compelling" interests that could justify disparate treatment).

Further, even if fostering greater accountability to ward residents is a "compelling" interest, the more narrowly tailored alternative is plainly to provide for purely ward-based elections. That candidates may be – and sometimes are – rejected in the general election by voters in "their" ward yet propelled into office by votes cast in other wards (*see* ER 93, 103) belies any contention that the Hybrid System is a narrowly tailored means of fortifying democratic localism. *See Nader v. Brewer*, 531 F.3d 1028, 1038 (9th Cir. 2008) ("We conclude that the state did not meet its burden of showing that this residency requirement is narrowly tailored to further the state's compelling interest in preventing fraud."); *Hussey*, 64 F.3d at 1266 (invaliding ordinance linking subsidy to citizens' votes, reasoning that even if there were an underlying compelling state interest, the ordinance was not "narrowly tailored" to advance it).

### D. The City Cannot "Cancel Out" Equal Protection Violations Over the Course of Multiple Elections

In the same vein, any contention that the Hybrid System mitigates or averts constitutional injury on the grounds that every voter has an opportunity to participate in one ward's primary is specious for two reasons.

**First**, the notion that no equal protection violation occurs so long as every voter is disenfranchised to an equal extent misapprehends the nature of the right to

vote. Given the premise that every Council member represents the entire electorate of the city, it is untenable to suggest that the denial of a Ward 6 resident's right to cast a primary election ballot for his preferred Ward 1 nominee in 2015 is somehow remedied by denying a Ward 1 resident the same prerogative in Ward 6's primary two years hence. An equal protection injury is inflicted whenever an otherwise eligible voter is deprived of the right to participate on equal terms in *any* aspect of *any* single election in the geographical unit.[10] Indeed, courts have adopted a decidedly skeptical view of the notion that a state or municipality can somehow "cancel out" equal protection infractions over the course of multiple elections. Concluding that a New York statute permitting party officials from outside the relevant congressional district to participate in nomination decisions in

---

[10]     Although not material to the merits of the Appellants' vote denial claims, the staggered nature of the City Council elections vividly underscores the gravity of the City's equal protection violations. If it is accepted that every Council member represents the entire city, the wholesale exclusion of a Ward 6 voter, such as Individual Appellant Mr. Smalley, from the 2015 primary elections cannot plausibly be characterized as anything other than an arrant denial of the franchise. *See Gray*, 372 U.S. at 380 ("[T]here is no indication in the Constitution that homesite…affords a permissible basis for distinguishing between qualified voters within" the jurisdiction). It is no answer to point out that Mr. Smalley will be permitted to vote in one of the three primaries held in 2017. As noted above, Appellants are aware of no case holding that a state or locality can remedy an equal protection violation as to one subset of the population by inflicting a corresponding injury on other citizens at a future time. For the same reason, the equal protection problem posed by the Hybrid System would not be ameliorated by holding simultaneous primaries in all six wards; if every Council member is a citywide representative, then *each* City elector is entitled to participate on equal terms in *each* nominating election.

special elections violated Article I, Section 2 of the Constitution, the Second Circuit opined:

> We are not impressed by the argument . . . that any injury inflicted on the voters in the 21st C.D. by the participation of persons elected from other districts is compensated by the potential reciprocal ability of persons elected by voters in the 21st C.D. to inflict injury on the voters in other Congressional districts when, as and if special elections should be held there.

*Montano v. Lefkowitz*, 575 F.2d 378, 387 n.15 (2d Cir. 1978). The First Circuit espoused a similar sentiment when invalidating a city's plan to limit participation in a curative primary election only to those voters who had cast a ballot in the prior invalid election. Rejecting the notion that "the ability to vote in the general election [was] a satisfactory alternative for those voters not allowed to vote in the primary," the court noted that "the candidate of their choice may have been excluded in the preliminary election from which they were barred." *Ayers-Schaffner v. DiStefano*, 37 F.3d 726, 731 n.5 (1st Cir. 1994). Thus, any attempt to sustain the Hybrid System on a theory of aggregating and "canceling out" constitutional injuries is without merit.

**Second**, even if the law accepted the concept of "offsetting" constitutional injuries, the facts in this case would not support application of such a theory. For the City to persuasively argue that, over time, every City voter has equal influence over the composition of City Council, the Court would be required to assume that (a) every City voter participates in an even number of elections cycles, so that

every voter is denied the right to vote in primary elections an equal number of times; (b) in between election cycles, no City voter moves from a ward that held a primary election in the most recent election cycle to one that did not, or *vice versa*; and (c) redistricting, which occurs every ten years and necessarily will not track the four year terms of City Councilmen, does not cause voters to shift from a ward that held a primary election in the most recent election cycle to one that did not, or *vice versa*. There is no evidence in the record to support such assumptions, presumably because they are plainly not true. And without such assumptions, it cannot be argued as a factual matter that the Hybrid System affects all voters equally over time.

For these reasons, this Court should not be the first to embrace the idea of "offsetting" constitutional violations.

## III. Alternatively, the Hybrid System Fails Rational Basis Review

For the reasons discussed in Section II.B.1 above, the Hybrid System cannot be plausibly conceptualized as a *bona fide* residency requirement. Even if it were, however, it is not rationally related to any governmental interest.

While federal courts rarely have had occasion to explicate the constitutional justifications for *bona fide* (as opposed to durational) residency restrictions, it appears they are undergirded by two cognizable state interests. First, residency regulations may safeguard the integrity of the electoral process by forestalling

voter fraud.  *See Dunn*, 405 U.S. at 345.  There obviously is no plausible anti-fraud rationale for excluding any duly registered Tucson elector from other wards' primary elections.  Second, a "requirement of bona fide residence may be necessary to preserve the basic conception of a political community . . . ."  *Id.* at 343-44.

Consequently, if the City were to adopt a ward-only mode of Council elections, it undoubtedly could impose a uniform ward residency requirement in both the primary *and* general elections in furtherance of this end.  Instead, however, the Hybrid System permits *all* Tucson electors to participate in the election of *every* ward's Council member in the general election, which wholly defeats the ostensible objective of limiting the "political community" to the ward. In this context, denial of the franchise in primary elections is plainly irrational.

Indeed, a federal district court reached a similar conclusion after evaluating a statute allowing voters of an independent city to participate in elections for certain branches of the county's school district administration but not others.  The court opined that such an arrangement "defies logic.  One cannot rationalize why the executive arm of the county school administration should be elected by the [city] voters, who have no interest in the district, while the legislative and judicial arms of that same educational agency should be elected without the participation of the [city] voters."  *Hosford v. Ray*, 806 F. Supp. 1297, 1307 (S.D. Miss. 1992).

41

Analogous reasoning disposes of the City's argument here. If every Council member is a citywide representative chosen in a citywide election, there is no rational reason for excluding certain voters from certain primary elections based solely on their homesite within the City.

Similarly, any contention that ward-based primaries are necessary to ensure full and effective representation of each ward's interests on the Council is likewise unavailing. The same end is already secured by the City's imposition of a ward residency requirement for candidates, which is undisputedly constitutional. More fundamentally, because every City Council member is a representative of every Tucson elector, the City cannot limit the primary election franchise to only a subset of voters on the premise that they possess a "special" or "heightened" interest in the primary election outcome. *See Kramer*, 395 U.S. at 632 (holding that school board elections could not be limited only to parents of school children and those who own or rent property in the district); *see also Evans*, 398 U.S. at 432 ("All too often, lack of a 'substantial interest' might mean no more than a different interest, and 'fencing out' from the franchise a sector of the population because of the way they may vote is constitutionally impermissible." (internal citation omitted)).

## IV. <u>Pending Any Amendment to the City Charter, City Council Elections Should Be Conducted on a Ward-Only Basis</u>

A finding that the Hybrid System is unconstitutional will revert to the City's voters the decision whether to utilize a wholly ward based or entirely at-large

system for electing its City Council in the future. The parties agree that the Court could order the placement of a referendum measure on the November 2015 ballot presenting the choice to the electorate. ER at 76, 83-84. Should the Court deem such an order appropriate, it should remand the case to the district court for expedited proceedings concerning the wording of any such measure and other logistical details.

Pending an amendment to the City Charter, however, the November 2015 City Council general election and all such future elections should be conducted on a ward-only basis for three reasons. **First**, as discussed above in Section II, the identity of the relevant geographical unit (*i.e.*, a particular ward versus the city as a whole) is itself constitutionally immaterial; the constitutional injury derives from designating *different* geographical units in each of the primary and general elections for the *same* office within the *same* election cycle. Thus, because the August 2015 primary elections for Ward 1, Ward 2 and Ward 4 will be limited only to qualified electors within the respective wards, equal protection guarantees require that the geographical unit (*i.e.*, the ward) remain constant in the general election as well.

**Second**, while neither the federal nor Arizona constitutions compels district-only elections to the exclusion of at-large contests, the former traditionally have been deemed more conducive to equalizing the opportunity to effectuate electoral

outcomes and ensuring responsive government. *See Rogers v. Lodge*, 458 U.S. 613, 616 (1982) ("At-large voting schemes . . . tend to minimize the voting strength of minority groups by permitting the political majority to elect *all* representatives of the district. A distinct minority . . . may be unable to elect any representatives in an at-large election, yet may be able to elect several representatives if the political unit is divided into single-member districts."); *Burns v. Richardson*, 384 U.S. 73, 89 (1966) (indicating that multimember and at-large elections may "operate to minimize or cancel out the voting strength of racial or political elements of the voting population"); *Thornburg v. Gingles*, 478 U.S. 30, 47 (1986).

**Third**, Arizona law exhibits a significant preference for closely connecting candidates with their local political subdivisions, districts, or wards. *See* Ariz. Const. art. VII, § 15 (local candidate residency requirement); Ariz. Rev. Stat. § 9-821.01(C) (requiring ward-based primary elections). Ordering ward-only elections in Tucson, rather than all at-large elections, would more fully effectuate the expressed policy preferences of Arizona voters.

Accordingly, this Court (or, alternatively, the district court on remand) should exercise its broad remedial authority to provide that City Council elections be conducted on a ward-only basis unless and until Chapter XVI, Section 9 of the City Charter is amended to conform to Fourteenth Amendment directives. *See Nw.*

*Envtl. Def. Ctr. v. Bonneville Power Admin.*, 477 F.3d 668, 680 (9th Cir. 2007) ("[W]here the public interest is involved, 'equitable powers assume an even broader and more flexible character than when only a private controversy is at stake.'" (internal citations omitted)).

## REQUEST FOR ATTORNEYS' FEES AND COSTS

Appellants request an award of reasonable attorneys' fees and costs incurred in prosecuting the district court proceedings and this appeal, pursuant to 42 U.S.C. § 1988, the private attorney general doctrine, and other applicable law. *See Gomez v. City of Watsonville*, 863 F.2d 1407, 1419 (9th Cir. 1988) ("Attorneys' fees can be awarded at the trial or appellate level to prevailing parties under 42 U.S.C. § 1988.").

## STATEMENT OF RELATED CASES

Appellants are aware of no related cases pending in this Court, pursuant to Circuit Rule 28-2.6.

## CONCLUSION

For the aforementioned reasons, Appellants respectfully request that the judgment of the district court be reversed and, to the extent necessary, the case be remanded for expedited proceedings concerning the fashioning of equitable relief in connection with the November 2015 Tucson City Council elections.

Dated: July 6, 2015                 BROWNSTEIN HYATT FARBER
SCHRECK, LLP


By: */s/ Thomas J. Basile*
    Kory A. Langhofer
    Thomas J. Basile
    Roy Herrera Jr.
    One East Washington Street
    Suite 2400
    Phoenix, AZ 85004
    *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE APPELLATE PROCEDURES 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 10,594 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii). As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count of the word-processing system used to prepare this brief in preparing this certificate.

The undersigned also certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14 point Times New Roman font.


Dated: July 6, 2015                    BROWNSTEIN HYATT FARBER
                                       SCHRECK, LLP


                                       By: */s/ Thomas J. Basile*
                                          Kory A. Langhofer
                                          Thomas J. Basile
                                          Roy Herrera Jr.
                                          One East Washington Street
                                          Suite 2400
                                          Phoenix, AZ  85004
                                          *Attorneys for Plaintiffs-Appellants*

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 6, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States District Court of Appeals for the Ninth Circuit using the appellate CM/ECF System.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system to the following registrants:

Richard M. Rollman – rollman@bossefunklaw.com

Michael G. Rankin – mike.rankin@tucsonaz.gov

Dennis McLaughlin – dennis.mclaughlin@tucsonaz.gov

By:  *s/ Thomas J. Basile*