Case No. 15-16142

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

PUBLIC INTEGRITY ALLIANCE, INC.,
an Arizona nonprofit membership corporation, *et al.*,

*Plaintiffs/Appellants*,

vs.

CITY OF TUCSON,
a chartered city of the State of Arizona, *et al.*,

*Defendants/Appellees*.

APPEAL FROM UNITED STATES DISTRICT COURT
DISTRICT OF ARIZONA

D.C. No. 4:15-cv-00138-CKJ

# APPELLEES' ANSWERING BRIEF

MICHAEL G. RANKIN
City Attorney
DENNIS P. McLAUGHLIN,
Arizona State Bar No. 00197
Principal Assistant City Attorney
P.O. Box 27210
Tucson, Arizona 85726-7210
Telephone: (520) 791-4221
Fax: (520) 623-9803
*Attorneys for Defendants/Appellees*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES..................................................................................iiiii

STATEMENT OF THE ISSUE ................................................................................1

STATEMENT OF THE CASE .................................................................................1

STATEMENT OF FACTS.......................................................................................2

SUMMARY OF THE ARGUMENT ........................................................................5

STANDARD OF REVIEW .....................................................................................7

ARGUMENT...........................................................................................................8

I.   THE CITY'S ELECTORATE, ACTING THROUGH THE CITY'S
     CHARTER, IS FREE TO SPECIFY THE CITY'S WARDS AS THE
     ELECTION DISTRICTS FOR ITS PRIMARY ELECTIONS WHILE
     CONDUCTING CITYWIDE GENERAL ELECTIONS. ................................8

     A.   States and localities have both sovereignty and "vast leeway" in governing
          themselves..............................................................................................12

     B.   This sovereignty and vast leeway extends to how they elect officers........12

     C.   States and localities are free to set the terms and conditions for elections,
          including primary and general elections for their officers........................13

     D.   The City's electorate exercises these powers through their Charter. .........15

     E.   In regulating their elections, states and localities are free to designate
          election districts with corresponding residency qualifications, which need
          only have a rational basis........................................................................15

     F.   Once the City has granted an election, and designated the election district
          specific to that election, one person, one vote requirements then apply
          within that district for that election.........................................................21

     G.   The one person, one vote doctrine is not intended to, and does not, give
          a voter any right to demand that an election be held, or to vote in any
          particular election because he or she voted in another. .........................23

     H.   The one person, one vote doctrine also does not prevent the state's
          structuring of elections to give different constituencies a voice. ..........24

i

II.  THE CITY'S PRIMARY ELECTION IS A SEPARATE AND DISTINCT ELECTION, FOR WHICH THE CITY MAY USE DIFFERENT RESIDENCY REQUIREMENTS...............................................................26

III.  PLAINTIFFS ACKNOWLEDGE THE CITY'S SOVEREIGNTY OVER ITS ELECTIONS AND ELECTORAL DISTRICTS IN ALL SITUATIONS BUT THE ONE THEY ACTUALLY FIND THEMSELVES IN, AND RELY COMPLETELY ON A MISINTERPRETATION OF *GRAY V. SANDERS* TO TRY TO CREATE A NONEXISTENT SAFE HARBOR...30

IV.  CASES WHERE THIS IDENTICAL ISSUE WAS RAISED CONFIRM THE CITY'S FREEDOM TO USE DIFFERENT ELECTION DISTRICTS FOR ITS PRIMARY. ...................................................................36

V.  CASES DECIDED BY THE SUPREME COURT AND THIS COURT IN THE FREEDOM OF ASSOCIATION CONTEXT ALSO CONFIRM THAT STATES AND LOCALITIES CONTROL THEIR NOMINATING PROCESS, NOT PARTIES OR INDIVIDUAL VOTERS. .........................43

VI.  PLAINTIFFS HAVE WAIVED THEIR STATE CLAIMS ON APPEAL......47

VII. PLAINTIFFS HAVE NO BASIS TO SEEK A WARD-ONLY GENERAL ELECTION IN 2015....................................................................48

CONCLUSION.......................................................................................50

STATEMENT OF NO RELATED CASES ....... **Error! Bookmark not defined.**51

CERTIFICATE OF COMPLIANCE.....................................................53

CERTIFICATE OF MAILING................................................................54

# TABLE OF AUTHORITIES

**Cases**

*Alaskan Independence Party v. Alaska*,
    545 F.3d 1173 (9th Cir. 2008).................................................. 8, 15, 19, 45, 46, 47

Alsup v. Mayhall,
    208 F.Supp. 713 (S.D. Ala. 1962)..........................................................37

*American Party of Texas v. White*,
    415 U.S. 767 (1974) ..............................................................................28

*Avery v. Midland County, Texas*,
    390 U.S. 474 (1968) ....................................................................... 11, 23

*Board of Sup'rs of Maricopa County v. Superior Ct.*,
    4 Ariz. App. 110 (1966)..........................................................................26

*Boyd v. State of Nebraska ex rel. Thayer*,
    143 U.S. 135 (1892) ..............................................................................13

*Bullock v. Carter*,
    405 U.S. 134 (1972) ..............................................................................15

*Buntman v. City of Phoenix*,
    32 Ariz. 18 (1927) .................................................................................15

*Burdick v. Takushi,*
    504 U.S. 428 (1992) ............................................................ 8, 18, 19, 20, 46, 47

*California Democratic Party v. Jones,*
    530 U.S. 567 (2000) ................................................................................4

*Carlson v. Wiggins*,
    675 F.3d 1134 (8th Cir. 2012)................................................................17

*Carrington v. Rash*,
    380 U.S. 89 (1965) ....................................................................... 14, 16, 22

*Cipriano v. City of Houma,*
  395 U.S. 701 (1969) .......................................................................22

*City of Herriman v. Bell,*
  590 F.3d 1176 (10th Cir. 2010) ..................................... 16, 19, 20, 40

*City* of *Phoenix v. Kolodziejski,*
  399 U.S. 204 (1970) .......................................................................22

*City of Tucson v. State,*
  229 Ariz. 172 (2012) ........................................... 2, 3, 15, 49

*Clingman v. Beaver,*
  544 U.S. 581 (2005) .......................................................................29

*Dallas County, Alabama v. Reese,*
  421 U.S. 477 (1975) .......................................................................11

*Dunn v. Blumstein,*
  405 U.S. 330 (1972) .......................................................................14

*Dusch v. Davis,*
  387 U.S. 112 (1967) ............................................................ 5, 10, 11

*Eberle v. City of Anaheim,*
  901 F.2d 814 (9th Cir. 1990) .........................................................48

*Ellingson v. Burlington N., Inc.,*
  653 F.2d 1327 (9th Cir. 1981) .......................................................48

*Evans v. Cornman,*
  398 U.S. 419 (1970) .......................................................................22

*Fidell v. Board of Elections,*
  343 F.Supp. 913 (E.D.N.Y.) *aff'd* 409 U.S. 972 (1972) .......................30

*Fortson v. Dorsey,*
  379 U.S. 433 (1965) ........................................................................3

*Fortson v. Morris*,
  385 U.S. 231 (1966) ................................................................ 24, 31, 32

*Fulani v. League of Women Voters Educ. Fund*,
  882 F.2d 621 (2d Cir. 1989) ................................................................ 28

*Gordon v. Lance*,
  403 U.S. 1 (1971) ................................................................ 25

*Gray v. Sanders*,
  372 U.S. 368 (1963) ....... 6, 9, 10, 11, 16, 21, 22, 30, 31, 32, 33, 35, 36, 37, 41, 42

*Green Party of State of New York v. Weiner*,
  216 F.Supp.2d 176 (S.D.N.Y. 2002) ................................................................ 27

*Green v. City of Tucson*,
  340 F.3d 891 (9th Cir. 2003) ................................................................ 7, 22, 23, 33, 41

*Greenwood v. F.A.A.*,
  28 F.3d 971 (9th Cir. 1994) ................................................................ 47, 48

*Hardley v. Junior Coll. Dist of Metro. Kansas City, Mo.*,
  397 U.S. 50 (1970) ................................................................ 11, 14

*Harris v. McRae*,
  448 U.S. 297 (1980) ................................................................ 13

*Hill v. Stone*,
  421 U.S. 289 (1975) ................................................................ 7, 17, 19

*Holshouser v. Scott*,
  335 F. Supp. 928 (M.D.N.C. 1971) *aff'd* 409 U.S. 807 (1972) 8, 36, 38, 39, 40, 41

*Holt Civic Club v. City of Tuscaloosa*,
  439 U.S. 60 (1978) ................................................................ 7, 8, 14, 16, 17, 18, 19, 20, 40

*Hunter v. Pittsburgh*,
  207 U.S. 161 (1907) ................................................................ 25

*Kopczynski v. The Jacqueline,*
  742 F.2d 555 (9th Cir.1984).............................................................47

*Kramer v. Union Free Sch. Dist. No. 15,*
  395 U.S. 621 (1969) ............................................................... 17, 22

*Kyle v. Daniels,*
  198 Ariz. 304 (2000) ..................................................................26

*Lassiter v. Northampton County. Bd. of Elections,*
  360 U.S. 45 (1959) .....................................................................14

*Lefkovits v. State Board of Elections,*
  400 F.2d 1005 (N.D. Ill. 1975), *aff'd* 424 U.S. 901 (1976)..................25

*Lightfoot v. Eu,*
  964 F.2d 865 (9th Cir. 1992)......................................... 8, 19, 45, 46, 47

*Lucas v. Forty-Fourth Gen. Assembly of State of Colo.,*
  377 U.S. 713 (1964) ....................................................................32

*Luther v. Borden,*
  48 U.S. 1 (1849) ........................................................................50

*Mandel v. Bradley,*
  432 U.S. 173 (1977) ...................................................................40

*McPherson v. Blacker,*
  146 U.S. 1 (1892) ......................................................................14

*Miller v. Fairchild Indus., Inc.,*
  797 F.2d 727 (9th Cir.1986)...........................................................47

*Minor v. Happersett,*
  21 Wall. 162 (1875) ...................................................................12

*Moorman v. Wood,*
  504 F. Supp. 467 (E.D. Ky. 1980).....................................................17

*Mrazek v. Suffolk Cnty. Bd. of Elections*,
    630 F.2d 890 (2d Cir. 1980)...................................................................... 33, 34, 35

*Nader v. Schaffer*,
    417 F. Supp. 837 (D.Conn.) *aff'd,* 429 U.S. 989 (1976) ......................................4, 29

*New York State Bd. of Elections v. Lopez Torres*,
    552 U.S. 196 (2008) .............................................................. 15, 42, 43, 44, 45, 46

*Newberry v. United States*,
    256 U.S. 232 (1921) ................................................................................ 26, 27, 28

*Oregon v. Mitchell*,
    400 U.S. 112 (1970) .........................................................................................13

*Pope v. Williams*,
    193 U.S. 621 (1904) .........................................................................................14

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ................................................................................... 11, 23

*Rodriguez v. Popular Democratic Party*,
    457 U.S. 1 (1982) ................................................................................. 12, 13, 23

*Sailors v. Board of Educ. of Kent County*,
    387 U.S. 105 (1967) ................................................................................... 12, 24

*San Antonio Independent School Dist. v. Rodriguez*,
    411 U.S. 1 (1973) ...........................................................................................13

*St. Louis County, Mo. v. City of Town & Country*,
    590 F. Supp. 731 (E.D. Mo. 1984).........................................................................17

*Smith v. Allwright*,
    321 U.S. 649 (1944) ........................................................................................27

*Stokes v. Fortson*,
    234 F. Supp. 575 (N.D. Ga. 1964) ......................................... 36, 37, 38, 39, 40, 41

*Strode v. Sullivan,*
   72 Ariz. 360 (1951) .................................................................15

*Storer v. Brown*, 415 U.S. 724, 735 (1974) ........................................ 27, 28

*Sugarman v. Dougall*,
   413 U.S. 634 (1973) .............................................................12

*Town of Lockport, New York v. Citizens for Community Action at the Local Level,*
   *Inc.*, 430 U.S. 259 (1977) ...................................................25

*United States v. Classic*,
   313 U.S. 299 (1941)…………………………………………………27, 28

*United States v. O'Toole*,
   236 F. 993, 995 (S.D. W.Va. 1916) *aff'd sub nom. United States v. Gradwell*, 243
   U.S. 476 (1917) ......................................................... 26, 28

*Williams v. Rhodes*,
   393 U.S. 23 (1968) ...............................................................32

*Ziskis v. Symington*,
   47 F.3d 1004 (9th Cir. 1995) ........................................... 4, 29, 41

**Constitutional Provisions**

United States Constitution, Article I, § 4 ................................................27
Arizona Constitution, Article 7, § 10. ..............................................4, 29
Arizona Constutition, Article 13, § 2 ...................................................15

**Tucson Charter Provisions**

Tucson Charter, Ch. III, § 1 ...............................................................2
Tucson Chapter, Ch. XVI, §§ 8, 8.1...................................................3
Tucson Charter, Ch. XVI, § 9 ........................................ 2, 3, 4, 48

**Statutes**

A.R.S. § 16-467(B) .........................................................................4
A.R.S. § 9-821.01(C) ......................................................................49

**Rules**

Fed.R.App.P. 28(a)(5) .....................................................................47

## STATEMENT OF THE ISSUE

Given the plenary power over elections possessed by states and localities, does the City violate equal protection by having a primary election in which the qualified party electors from each ward nominate that party's council member candidate from that ward, and then having an at large general election where the entire City electorate chooses council members from the parties' nominees from each ward?

## STATEMENT OF THE CASE

Appellees respond to and supplement the Appellants' Statement of the Case as follows:

1.       Section I of Appellants' Statement of the Case is simply argument, to which Appellees respond in the Argument section of this Response Brief.

2.       In reviewing materials for this Response Brief, the City has first noticed that the District Court's Order and Judgment both refer to the "Due Process Clause" rather than the "Equal Protection Clause." ER 12, lines 12-13; ER 13, line 2; ER 14. The Equal Protection Clause was the actual basis of Appellants' claim in the District Court and their appeal to this Court. The City is certain that this is merely a scrivener's error, does not intend that it affect or delay the proceedings in this Court, and wishes to timely proceed in this Court. But the City also wishes to make this Court aware of the mistake, so that this Court can take any action it deems appropriate.

**<u>STATEMENT OF FACTS</u>**

Tucson Charter, Ch. III, § 1 provides for government of the City of Tucson through a unitary mayor and council, but with each council member also residing in a geographically distinct ward:

> The government of said city shall be vested in a mayor and a council of six (6) members, one (1) from each ward. They shall be nominated, elected, and have such powers and duties as are provided by this Charter.

Tucson Charter, Ch. XVI, § 9, the provision at issue here, provides that council members will be nominated by the respective voters of their wards of residence but elected at large:

> Beginning in the year 1930, and continuing thereafter, the mayor shall be nominated from and elected by the voters of the city at large, and the councilmen shall be nominated each from, and by the respective voters of, the ward in which he resides, and shall be elected by the voters of the city at large.

It is undisputed that because they are ultimately selected in an at-large election in which all qualified electors of the City are eligible to participate, "Tucson council members, although nominated by ward, represent the entire city." *See* ER 102, 105 [Complaint], ¶¶ 27, 34; ER 93, 94 [Answer], ¶¶ 17, 23; Supplemental Excerpts of Record (SER) 24; *City of Tucson v. State*, 229 Ariz. 172, 179 ¶ 44, 273 P.3d 624, 631 (2012). To paraphrase the United States Supreme Court:

> Each [ward's council member] must be a resident of that [ward], but since his tenure depends upon the [City]-wide electorate he must be vigilant to serve the interests of all the people in the [City], and not

merely those of people in his [ward]; thus in fact he is the [City]'s and not merely the [ward's council member].

*Fortson v. Dorsey*, 379 U.S. 433, 438, (1965) [City changes in brackets].

But it is also clear from Charter Chapter XVI, § 9 that in the City's case, wards are not mere districts of residence for council members, but rather charter-defined electoral jurisdictions in their own right, used for the nomination by a separate party primary election in each ward of one candidate who then becomes part of that party's slate of six candidates for the Citywide partisan general election. So that these separately defined electoral jurisdictions comply with the Fourteenth Amendment, the Charter requires that the wards contain, as nearly as possible, the same total population, and provides for periodic ward redistricting to assure compliance with that requirement. Tucson Charter, Ch. XVI, §§ 8, 8.1. Plaintiffs admit that the City's wards are in fact "composed of substantially equal populations." *See* Compl. ¶ 20; Mot. at 3.

As previously stated, both the ward-based primary elections and the at-large general elections are partisan: the primary selects nominees for particular political parties and the general election ballot identifies candidates by party affiliation. *City of Tucson v. State*, 229 Ariz. at 173 ¶ 2, 273 P.3d at 625. At the City's primary election, persons resident in the ward and registered with a political party qualified for

representation on the ballot may vote, but only in their own party's primary,[1] using their party's separate ballot. Tucson Charter, Ch. XVI, § 9; A.R.S. § 16-467(B). Any person who is registered as no party preference or independent as the party preference or who is registered with a political party that is not qualified for representation on the ballot may also vote in the primary election of any one of the political parties that is qualified for the ballot. A.R.S. § 16-467(B); ARIZ. CONST. Art 7, § 10. Thus, the City's primary in each ward consists not of the ward electorate voting as a whole, but rather a separate election for each party qualified for the ballot.

Having nominations through primary elections in each ward, using separate ballots for each party, allows the party electorates in each of those wards to make their own choice of a nominee, and simultaneously acts as a guarantee for the City electorate as a whole that each ward's nominee actually has support among the party members within that ward. Moreover, since nominees compete in the general election only against other candidates nominated in the same ward, *see* Compl. ¶ 24, ward nominations also help assure that each ward has a local representative on the council, and, conversely, that the full Mayor and Council has members who are aware of each ward's issues, problems, and views. According to the United States Supreme Court,

---

[1] Any outside attempt to force a qualified party to include voters from another qualified party as eligible voters in its primary would run afoul of not only Article 7, § 10 of the Arizona Constitution, but also federal decisions prohibiting such a result. *See California Democratic Party v. Jones,* 530 U.S. 567 (2000); *Ziskis v. Symington*, 47 F.3d 1004 (9th Cir. 1995); *Nader v. Schaffer*, 417 F. Supp. 837 (D.Conn.), *summarily aff'd,* 429 U.S. 989 (1976).

and reading "ward" for "borough" and "local" for "rural," the City has a valid interest in ward residency for the council members on its unitary governing body:

> The principal and adequate reason for providing for the election of one councilman from each borough is to assure that there will be members of the City Council with some general knowledge of rural problems to the end that this heterogeneous city will be able to give due consideration to questions presented throughout the entire area.

*Dusch v. Davis*, 387 U.S. 112, 116 (1967).

Ten weeks after the City's primary election, the City holds its general election. Here, the candidates nominated by the party electorates in the various wards compete against candidates nominated by other parties, with the winner from each ward actually elected to office. The entire City electorate thus gets to choose all of its council members from among the nominees from each ward. Plaintiffs concede that "all qualified electors in the City of Tucson may participate" in this at-large general election. *See* ER 102 [Complaint], ¶¶ 24, 26; SER 21.

## SUMMARY OF THE ARGUMENT

The rational basis standard applies here (Standard of Review, p. 7). The City's electorate is free to specify the City's wards as the election districts for its primary elections while conducting Citywide general elections (Argument, § I, p. 8). States and localities are sovereign and have "vast leeway" in governing themselves, which extends to how they elect officers (§ I(A), p. 12 ). They are free to set the terms and conditions for elections, including primary and general elections for their officers (§§

5

I(B), (C), pp. 12, 13). The City's electorate exercises these powers through its Charter (§ I(D), p. 15). In regulating its elections, the City is free to designate rationally based election districts and residency qualifications (§ I(E), p. 15).

When the City grants an election, and designates the election district for that election, one person, one vote requirements apply within that district for that election (§ I(F), p.21). But the one person, one vote doctrine does not allow voters to demand that an election be held, or to vote in one election because he or she voted in another (§ I(G), p. 23), nor does it prevent the state's structuring of elections to give different constituencies a voice (§ I(H), p. 24). The City's primary election is a separate and distinct election, for which the City may use different residency requirements (§ II, p. 26).

Plaintiffs acknowledge the City's sovereignty over its elections and electoral districts in all situations but the one they actually find themselves in, and rely completely on a misinterpretation of *Gray v. Sanders* to try to create a nonexistent safe harbor (§ III, p. 30).

Cases where this identical issue was raised confirm the City's freedom to use different election districts in its primary and general elections (§ IV, p. 35), while cases decided by the Supreme Court and this Court in the Freedom of Association context also confirm that states and localities control their nominating process, not parties or individual voters (§ V, p. 43).

Plaintiffs have waived their state law claims on appeal ((§ VI, p. 47), and have no basis to seek a ward-only general election in 2015 (§ VII, p. 48). The District Court reached the correct results in its Order and Judgment, and this Court should affirm both in all respects (Conclusion, p. 50).

## STANDARD OF REVIEW

The City agrees that this Court reviews *de novo* the District Court's dismissal of Plaintiffs' equal protection claim, and reviews the District Court's denial of injunctive relief for abuse of discretion. OB 13 [Argument, § I(A)].

The City strongly disagrees, however, that the operation of its election system here is subject to strict scrutiny based on Plaintiffs' claim. OB 14-16 [Argument, § I(B)]. To the contrary, this Court should analyze the operation of the City's election system, as challenged by Plaintiffs, under a rational basis standard, for all the following reasons:

1. The Appellants' challenge is to the City's residency requirements for elections, *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60, 70-71 (1978); *Hill v. Stone*, 421 U.S. 289, 297 (1975) (specifically excepting residency requirements from strict scrutiny), and, simultaneously, to geographical distinctions the City is making between groups of electors not similarly situated. *Green v. City of Tucson*, 340 F.3d 891 (9th Cir. 2003).

2. Cases dealing with the identical issue, and summarily affirmed by the Supreme Court, have applied a rational basis standard. *Holshouser v. Scott*, 335 F. Supp. 928 (M.D.N.C. 1971) *aff'd*, 409 U.S. 807 (1972).

The City notes that rather than analyze the situation under *Holt*, the district court used a "lesser burden" analysis under *Burdick v. Takushi,* 504 U.S. 428 (1992), finding that the reasons for the City's residency requirements in ward primaries were important regulatory interests sufficient to justify the "reasonable, nondiscriminatory restrictions" upon Plaintiff's Fourteenth Amendment rights. ER 10-11, *citing Burdick*. While the district court reached the correct ultimate result, and thus the final outcome is the same here as it would be under *Holt*, the City believes that residency requirements should be tested under *Holt*'s rational basis standard, since no right to vote that could be burdened was ever granted. See § I(E) below.

The City also notes that even if this Court were to find that strict scrutiny applies under *Burdick*, the City's primary system would survive it. *Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1177, 1180 (9th Cir. 2008); *Lightfoot v. Eu*, 964 F.2d 865, 878 n.2 (9th Cir. 1992).

## ARGUMENT

## I. THE CITY'S ELECTORATE, ACTING THROUGH THE CITY'S CHARTER, IS FREE TO SPECIFY THE CITY'S WARDS AS THE ELECTION DISTRICTS FOR ITS PRIMARY ELECTIONS WHILE CONDUCTING CITYWIDE GENERAL ELECTIONS.

Plaintiffs' equal protection challenge in this case puts them on an extremely narrow tightrope, and leaves them essentially no room for maneuver. Plaintiffs admit that "the City may permissibly utilize an entirely ward-based or an entirely at-large method of electing its City Council…." Opening Brief (OB) 6, 12. Plaintiffs also admit that if the City does "set its 'geographical unit' as either the City-as-a-whole or as individual wards," it can "limit participation in both the primary *and* general elections to residents within that unit." OB 12. Both of these statements echo the very precedent that City will discuss below, and the City agrees with both of them.

Yet Plaintiffs then claim that, notwithstanding the plenary City control over elections and electoral districts that Plaintiffs have just conceded, the City's voters cannot provide in their Charter that they will nominate their party candidates for council member in ward-only elections, then elect their council member at large,. Rather, say Plaintiffs, the City must both nominate and elect by ward, or both nominate and elect at large.

Plaintiffs stake everything on their own misinterpretation of the Supreme Court's statement in *Gray v. Sanders,* 372 U.S. 368 (1963), that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote…whenever their home may be in that geographical unit." OB 6; *Gray,* 372 U.S. at 379. According to Plaintiffs,

"[b]ecause Tucson City Council members undisputedly are elected on a citywide basis, the 'geographical unit for which a [City Council] representative is to be chosen' is the city as a whole." OB 5. And this "geographical unit corresponds to the office to be elected and necessarily is fixed throughout the election cycle." OB 6.

For ease of reference, the City will refer to this argument throughout this Response Brief as "Plaintiffs' *Gray* argument."

Obviously, the City will respond to Plaintiffs' *Gray* argument in detail below. What is important to note initially is that in making this argument, Plaintiffs cannot possibly complain that they are harmed by the City's at-large general elections, and do not do so. Plaintiffs expressly do not challenge the validity of the City's residency requirement for candidates. OB 30. It is undisputed (and the district court correctly found) that all City voters can vote for all council members in the general election, and that the wards that council members are of substantially equal populations. ER 1, 2. In the district court, Plaintiffs also admitted that "city bodies elected on at-large basis but subject to district-based candidacy requirements do not implicate 'one person, one vote' concerns." SER 29. This is indeed true, even where the populations of the district may vary, which is not the case with the City's substantially equal wards. *Dusch v. Davis,* 387 U.S. 112 (1967) (four members elected at large without regard to residence; seven

members elected at large, with each of seven required to reside in one of the seven boroughs);[2] *Hardley v. Junior Coll. Dist of Metro. Kansas City, Mo.,* 397 U.S. (50, 58-59 (1970) ("Since all the officials in [*Dusch*] were elected at large, the right of each voter was given equal treatment."); *Dallas County, Alabama v. Reese*, 421 U.S. 477 (1975) (four members elected at large, each from one of our residency district).

Given the clear constitutionality of the City's at-large general election, taken on its own, the only real question facing this Court is whether the City's voters, acting through their Charter, can choose to use a different electoral district, namely their wards, for the primary elections they use to nominate their council member candidates. The answer to that question, correctly answered by the district court

---

[2] In this Court, as in the district court, Plaintiffs seek to rely on the statement in *Dusch* that "different conclusions might follow" if the districts served as "the basis…for voting or representation," rather than merely the situs of candidates' residence. OB 29; SER 29-30 (quoting *Dusch*, 387 U.S. at 15). But on our facts here, this argument is flawed. Considering *all* the law that will be cited in this Response Brief, and the specific time and context in which *Dusch* and *Dallas County* were decided, it is clear that the only contrast the *Dusch* court wished to draw was with a hypothetical primary or general election system based on districts of unequal population, resulting in either unequal representation (*Reynolds v. Sims*, 377 U.S. 533 (1964) (state legislative bodies); *Avery v. Midland County, Texas*, 390 U.S. 474 (1968) (local legislative bodies)), unequal weighting of votes (*Gray v. Sanders*, *supra*), or both. Here, by contrast, it is undisputed that the City's wards are of substantially equal population, and nothing in *Dusch* or *Dallas County* is intended to or does prevent the City from utilizing those wards in a ward-based primary election system feeding into a Citywide general election, with both elections fully complying with the one person, one vote doctrine.

based on the law the City presented to it and will now present to this Court, is clearly "yes."

**A.    States and localities have both sovereignty and "vast leeway" in governing themselves.**

The Supreme Court recognizes "a State's constitutional responsibility for the establishment and operation of its own government." *Sugarman v. Dougall*, 413 U.S. 634, 648 (1973). "Save and unless the state, county, or municipal government runs afoul of a federally protected right, it has vast leeway in the management of its internal affairs." *Sailors v. Board of Educ. of Kent County*, 387 U.S. 105, 109 (1967). "Viable local governments may need many innovations, numerous combinations of old and new devices, great flexibility in municipal arrangements to meet changing urban conditions. We see nothing in the Constitution to prevent experimentation." *Sailors*, 387 U.S. at 110-11.

**B.    This sovereignty and vast leeway extends to how they elect officers.**

The "vast leeway," "great flexibility," and ability to "experiment" possessed by states and localities specifically extends to control over voting and election. In *Rodriguez v. Popular Democratic Party*, 457 U.S. 1 (1982), the Supreme Court stated:

> …[T]his Court has often noted that the Constitution "does not confer the right of suffrage upon any one," *Minor v. Happersett*, 21 Wall. 162, 178, 22 L.Ed. 627 (1875), and that "the right to vote, *per se*, is not a constitutionally protected right," *San Antonio Independent*

School Dist. v. Rodriguez, 411 U.S. 1, 35, n. 78, 93 S.Ct. 1278, 1298, n. 78, 36 L.Ed.2d 16 (1973).

*Rodriguez*, 457 U.S. at 9. And in *Harris v. McRae*, 448 U.S. 297 (1980), the Supreme Court specifically stated that "the Constitution of the United States does not confer the right to vote in state elections." *Harris*, 448 U.S. at 322 n. 25.

Thus, the sovereignty of State and local governments specifically includes "the power to regulate elections," and even more specifically "the power to determine within the limits of the Constitution *the qualifications of their own voters for state, county, and municipal offices and the nature of their own machinery for filling local public offices*." *Oregon v. Mitchell*, 400 U.S. 112, 124-25 (1970) (footnote omitted and emphasis added) (Black, J.); *see also id.* at 201-02 (Harlan, J.), 293-94 (Stewart, J.). "Each state has the power to prescribe the qualifications of its officers, *and the manner in which they shall be chosen*." *Boyd v. State of Nebraska ex rel. Thayer*, 143 U.S. 135, 161 (1892) (emphasis added). "[W]e have previously rejected claims that the Constitution compels a fixed method of choosing state or local officers or representatives." *Rodriguez*, 457 U.S. at 9. "Absent some clear constitutional limitation, [states and localities are] free to structure [their] political system[s] to meet [their] "special concerns and political circumstances[.]" *Rodriguez,* 457 U.S. at 13-14 (original text referring to Puerto Rico).

**C.      States and localities are free to set the terms and conditions for elections, including primary and general elections for their officers.**

State and local power extends to deciding when and under what specific conditions elections will be held. "The right to vote intended to be protected [by the 14th Amendment] refers to the right to vote as established by the laws and constitution of the state." *Lassiter v. Northampton County. Bd. of Elections*, 360 U.S. 45, 51, (1959); *McPherson v. Blacker*, 146 U.S. 1, 39 (1892). "In other words, the privilege to vote in a state is within the jurisdiction of the state itself, to be exercised as the state may direct, and upon such terms as to it may seem proper, provided, of course, no discrimination is made between individuals, in violation of the Federal Constitution." *Pope v. Williams*, 193 U.S. 621, 632 (1904). "The States have long been held to have broad powers to determine the conditions under which the right of suffrage may be exercised," *Carrington v. Rash*, 380 U.S. 89, 91 (1965); *Lassiter*, 360 U.S. at 50 (1959), and may "impose voter qualifications and regulate access to the franchise in other ways." *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Thus, "a State may, in certain cases, limit the right to vote to a particular group or class of people. *Hadley v. Junior Coll. Dist. of Metro. Kansas City, Mo.*, 397 U.S. 50, 58-59 (1970). And, specific to our case here, it may define the geographical limits of the electoral districts to be used for any particular election and limit the vote to those residing within that district. *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978).

Obviously, State and local governments can exercise these powers in the context of primary as well as general elections for their officers. "[T]he mechanism of

[primary] elections is the creature of state legislative choice." *Bullock v. Carter*, 405 U.S. 134, 140-41 (1972). When the States gives a party the right to have its candidates appear with party endorsement on the general-election ballot, "the State acquires a legitimate governmental interest in ensuring the fairness of the party's nominating process, enabling it to prescribe what that process must be." *New York State Bd. of Elections v. Lopez Torres*, 552 U.S. 196, 203 (2008); *see also Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1176 (9th Cir. 2008) (quoting *Lopez Torres*).

**D.    The City's electorate exercises these powers through their Charter.**

The City can avail itself of all of the above-cited powers. The City's voters control and determine the method and manner of their own local elections through their Charter, which is authorized under Article 13, § 2 of the Arizona Constitution. The Charter empowers the City to determine "who shall be its governing officers and how they shall be selected." *City of Tucson v. State*, 229 Ariz. at 180 ¶ 45, 273 P.3d at 632; *Strode v. Sullivan,* 72 Ariz. 360, 368 (1951). The City's Charter provisions are "equivalent to an act of the Legislature granting the powers set forth therein." *Buntman v. City of Phoenix*, 32 Ariz. 18, 26, 255 P. 490, 493 (1927).

**E.    In regulating their elections, states and localities are free to designate election districts with corresponding residency qualifications, which need only have a rational basis.**

One of the most fundamental ways that states and localities are empowered to control their elections is through voter residency qualification, which come into existence when the state or locality designates the geographical boundaries of the election jurisdiction to be used for that election. States and localities have "*unquestioned* power to impose reasonable residence restrictions of the availability of the ballot." *Carrington*, 380 U.S. at 91 (emphasis added). "All who participate in the election are to have an equal vote," but only "[o]nce the geographical unit for which a representative is to be chosen is designated" so that "the class of voters is chosen and their qualifications specified." *Gray v. Sanders*, 372 U.S. 368, 379-80, 381 (1963); *Hadley*, 397 U.S at 59. Thus, residency qualifications immediately distinguish between those who do or do not live within the election district the state has defined for a particular election, and therefore can or cannot vote.

The geographical unit in which residency is required for voting by a state or locality can be the whole of the overall jurisdiction. *See*, *e.g.*, *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978). That is the case in the City's general election, where the "representative to be chosen" is the council member.

Or the geographical unit can be a subunit or portion of a larger jurisdiction, such as the City's wards in its primary election, where the "representative to be chosen" in any particular party's election is that party's nominee. *See, e.g., City of Herriman v. Bell*, 590 F.3d 1176 (10th Cir. 2010) (vote on proposed school district limited to

residents of existing district residing in boundaries of proposed new district); *St. Louis County, Mo. v. City of Town & Country*, 590 F. Supp. 731 (E.D. Mo. 1984) (vote limited to county residents residing within portion of county to be annexed); *Moorman v. Wood,* 504 F. Supp. 467 (E.D. Ky. 1980) (vote limited to city residents living in portion of city affected by proposed deannexation/annexation). This is the case in the City's ward primary elections, where the "representative to be chosen" is the party's nominee from that ward.

Residency qualifications are not subject to strict scrutiny. *Hill v. Stone*, 421 U.S. 289, 297 (1975); *Kramer v. Union Free Sch. Dist. No. 15,* 395 U.S. 621, 625, (1969); *Carlson v. Wiggins*, 675 F.3d 1134, 1139 (8th Cir. 2012). Rather, residency qualifications are analyzed under a rational basis standard. *Holt,* 439 U.S. at 70-71.

*Holt* involved an equal protection challenge to state statutes that subjected an unincorporated area to the police powers of Tuscaloosa, the neighboring municipality, without granting residents of the unincorporated area the right to vote in Tuscaloosa elections. *Id.* at 61-62. The plaintiffs claimed that the statutes infringed their fundamental right to vote and argued for strict scrutiny. The Supreme Court rejected both the claim and the argument for strict scrutiny. As the Supreme Court stated, the "line heretofore marked by [our] voting qualifications decisions coincides with the geographical boundary of the governmental unit at issue." *Id.* at 70. "No decision of this Court has extended the 'one man, one vote' principle to

individuals residing beyond the geographic confines of the governmental entity concerned, be it the State or its political subdivisions." *Id.* at 68.

Plaintiffs already admit that *Holt* applies if the City elects its City Council on either a wholly at-large or wholly ward-only basis. Their brief states that "the City may set its 'geographical unit" as either the City-as-a-whole or as individual wards, and limit participation in both the primary *and* general elections to residents within that unit." OB 12. But if *Holt* applies in those situations, it must also apply when the City's Charter provides for two different districts in two different elections.

Plaintiffs seek to distinguish *Holt* as what they choose to term a mere "protectorate case." OB 32-33. This is not correct. *Holt* is universally applicable to any state or local elections, and fatal to Plaintiff's claim here. The Plaintiffs' position is exactly analogous to that of the plaintiffs in *Holt*. Where the voters in Holt were unable to vote in a city election because they resided outside the city boundaries, those here are not able to vote in other ward elections because they reside outside those wards.

The City notes that rather than analyze the situation under *Holt*, the district court went directly to an analysis under *Burdick v. Takushi,* 504 U.S. 428 (1992), finding that the reasons for the City's residency requirements in ward primaries were important regulatory interests sufficient to justify the "reasonable, nondiscriminatory restrictions" upon Plaintiff's Fourteenth Amendment rights. ER 10-11, *citing Burdick*,

504 U.S. at 428. While the district court reached the correct ultimate result, and thus the final outcome is the same here as it would be under *Holt*, the City does not believe that its residency requirements should be analyzed under *Burdick*, which applies where regulatory burdens are placed on those voters or candidates *who reside in the designated election district and thus are geographically eligible to participate in an election*. In the case of persons residing outside the designated election district, no right to vote is granted in the first place. Thus, in such a case, residency requirements like the City's should simply be analyzed using a rational basis test, which is easily met here. *Holt*, *supra*; *Hill v. Stone*, *supra*.[3]

The Tenth Circuit's decision in *Herriman* contains a superb review and analysis of the law applicable here. *Id.*, 590 F.3d at 1184-88. It reconfirms the principles set forth in *Holt*, specifically confirming that *Holt*'s rational basis standard applies where the designated voting jurisdiction in which residency is required is a subunit of a larger governmental unit, as is the case with the City ward-based primaries. *Herriman*, 590 F.3d at 1190. And while it does not involve candidate elections, *Herriman* also sets forth general principles directly relevant to the City's use of ward primaries before its at-large general election:

_____

[3] Note also that if this Court finds that *Burdick* does apply, and also that strict scrutiny is warranted here (which the City denies), this Court has twice held that primaries such as the City's survive even strict scrutiny under *Burdick*. *Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1177, 1180 (9th Cir. 2008); *Lightfoot v. Eu*, 964 F.2d 865, 878 n.2 (9th Cir. 1992). See § V below.

19

1. "[S]tates have considerable leeway in discriminating against voters residing in *different* governmental units or electoral districts even when the outcome of a particular election affects them." *Id.* at 1186.

2. "In addition, the state has the right to draw different boundaries for voting purposes—and we generally defer to these delineations—as long as the separate units further reasonable government objectives." *Id.* at 1185.

3. "[T]he Supreme Court has consistently upheld laws that give different constituencies different voices in elections." *Id.* at 1184.

Thus, that Plaintiffs may be affected by the outcomes of other ward primaries does not mean that the City must allow them to vote in those primaries. *Holt*, 439 U.S. at 69; *Herriman*, 590 F.3d at 1186 (point 1 above). And if the City's voters choose to utilize a primary under their Charter, the rationality of the residency requirements/electoral boundaries they set for that primary can rest on benefiting themselves as well as the parties. *See Burdick*, 504 U.S. at 439 (state's actions in structuring primaries benefited both public and parties). Here, the City's use of ward primaries followed by a Citywide general election furthers the reasonable governmental objectives set forth above in the Statement of Facts and correctly recognized (albeit as "regulatory interests" under *Burdick*) by the District Court's Order. ER 10-11, *see Herriman*, 590 F.3d at 1185 (point 2 above). Use of ward primaries also gives its ward voters a specific voice in its elections. *Herriman*, 590 F.3d. at 1184 (point 3 above).

Plaintiffs claim that the City must utilize one or the other of these electoral districts in both its primary and general elections, or be subject to strict scrutiny across

the two different elections. But, the well settled law regarding City powers over election residency and geography calls for a rational basis standard, does not allow for strict scrutiny across two different elections, and supports the City's sovereign ability to utilize its current system, which creates different residency requirements (and thus electoral jurisdictions) for the primary and general elections. Nothing in the Fourteenth Amendment creates a voter right, or City responsibility, to have the same residency requirement or geographic unit in two different elections.

> **F.** **Once the City has granted an election, and designated the election district specific to that election, one person, one vote requirements then apply within that district for that election.**

Once the state or locality has chosen to hold an election, and specified the particular electoral district that it will use for that particular election, the Fourteenth Amendment's Equal Protection Clause then creates what have become commonly known as "one person, one vote" requirements that attach and apply *within that particular district for that particular election*. Again, "[a]ll who participate in the election are to have an equal vote," but only "[o]nce the geographical unit for which a representative is to be chosen is designated." *Grays*, 372 U.S. at 379-80.

The first of these "one person, one vote" requirements is that all eligible voters residing within the electoral district specified for the particular election must be permitted an equal right to vote in that election. *See*, *e.g.*, *Kramer v. Union*

*Free Sch. Dist. No. 15*, 395 U.S. 621, 626-27 (1969) (striking down New York statute that limited franchise in certain school districts to owners or lessees of taxable realty (or their spouses) and parents or guardians of children in public schools). [4] In this Court's words, "[t]he state cannot "unreasonably deprive some residents in a geographically defined governmental unit from voting in a unit wide election." *Green v. City of Tucson*, 340 F.3d 891, 899 (9th Cir. 2003).

A second "one person, one vote" requirement is that all votes cast within the electoral district that has been specified for that particular election must be counted and weighted equally. Thus, in *Gray*, *supra*, the Supreme Court struck down Georgia's county unit primary election system, which gave every qualified voter one vote, but in counting votes, weighted rural votes more heavily than urban votes and weighted some small rural counties more heavily than other larger rural

---

[4] *See also Carrington v. Rash*, 380 U.S. 89, 91-93 (1965) (striking down Texas statute that prohibited military service members from ever acquiring a voting residence in Texas so long as they remained in service); *Evans v. Cornman,* 398 U.S. 419, 421 (1970) (striking down Maryland statute that disqualified residents living in a federal enclave from voting in Maryland elections even though they were residents of the state and within state boundaries); *City* of *Phoenix v. Kolodziejski,* 399 U.S. 204, 208-13, 90 S.Ct. 1990, 26 L.Ed.2d 523 (1970) (holding that franchise in city general-obligation bond elections could not be limited to property-holding taxpayers); *Cipriano v. City of Houma,* 395 U.S. 701, 706, 89 S.Ct. 1897, 23 L.Ed.2d 647 (1969) (holding that franchise in city revenue bond election could not be limited to property owners).

counties.[5]  Again in this Court's words, the state cannot "contravene the principle of 'one person, one vote' by diluting the voting power of some qualified voters within the electoral unit."  *Green*, 340 F.3d at 900.

As previously stated, and as is clear from the case law, these very narrow and specific "equal voting power" requirements apply only once the state has decided that an election will occur and only within the particular geographical electoral district the state has defined for that specific election.  The Supreme Court has consistently refused to extend them beyond their intended limits.

> **G.  The one person, one vote doctrine is not intended to, and does not, give a voter any right to demand that an election be held, or to vote in any particular election because he or she voted in another.**

Thus, nothing in the Equal Protection Clause or its one person, one vote jurisprudence creates any constitutional "right" in any elector to demand that the state allow an election to occur when it has not previously authorized one.  For example, in *Rodriguez, supra*, the Supreme Court held that Puerto Rico voters had no right, under the federal constitution generally or the Equal Protection Clause specifically, to demand that a legislative vacancy be filled through an election involving them and all other eligible voters within the affected legislative district,

---

[5]  A related, contemporaneous line of Supreme Court cases dealing with redistricting and apportionment holds that elected legislators must represent approximately equal numbers of voters at both the state level, *Reynolds v. Sims*, 377 U.S. 533 (1964), and the local level. *Avery v. Midland County, Texas*, 390 U.S. 474 (1968).

rather than through the interim appointment process provided in Puerto Rico's election statutes. *Rodriguez*, 457 U.S. at 14.

Likewise, just because the state has chosen to allow an elector to participate in an election as one phase of a political process, nothing in equal protection jurisprudence requires the state to authorize, or allow the elector to participate in, another election relating to the same process. For example, in *Sailors*, *supra*, the Supreme Court held that Michigan did not violate equal protection by providing that while its local school boards would be directly elected, its county school boards would not be directly elected, but rather appointed at a meeting of delegates from those local school boards, with each local board having one vote irrespective of population. *Sailors*, 387 U.S. at 106-07, 111.

Likewise, in *Fortson v. Morris*, 385 U.S. 231 (1966), the Supreme Court held that where no candidate for governor had received a majority of votes at the general election, Georgia did not violate equal protection by applying an article of its constitution providing that its legislature would elect the governor from the two persons having the highest number of votes, rather than attempting to craft and utilize a runoff election process.

### H. The one person, one vote doctrine also does not prevent the state's structuring of elections to give different constituencies a voice.

At the same time, given the state's broad powers over elections, nothing in equal protection jurisprudence prevents a state or locality from structuring its

elections so as to give different electoral constituencies each a specific voice in the election process, so long as all can vote and have their votes count equally with other voters in their particular election district in any election(s). Indeed, this is permissible even in the same election. Thus, the state or locality can decide that the result of a given election will be determined by counting the total votes cast by the combined electorates of two different electoral districts, meaning that one electorate can effectively outvote the other as a body. *Hunter v. Pittsburgh*, 207 U.S. 161 (1907). Conversely, the state or locality can mandate that approval of a ballot measure will require the separate, simultaneous approval of two electorates in two different electoral districts, whether or not the total combined vote is in favor of the measure. *Town of Lockport, New York v. Citizens for Community Action at the Local Level, Inc.*, 430 U.S. 259 (1977). And the state can even mandate that a supermajority of votes is necessary for approval of a ballot measure, *Gordon v. Lance*, 403 U.S. 1 (1971), or even for judicial retention. *Lefkovits v. State Board of Elections*, 400 F.2d 1005 (N.D. Ill. 1975), *aff'd* 424 U.S. 901 (1976).

Applying all the principles illustrated by these various cases here, it is clear that the City has extremely broad power to regulate its primary and general elections, and specifically to determine the election districts to be used in each of those separate elections, so long as it allows all voters in each particular district in

each separate election an equal opportunity to vote and then weights all their votes equally.

## II. THE CITY'S PRIMARY ELECTION IS A SEPARATE AND DISTINCT ELECTION, FOR WHICH THE CITY MAY USE DIFFERENT RESIDENCY REQUIREMENTS.

The City's primary and general elections are not a single election, but rather separate and distinct elections. Both federal and Arizona precedent confirm this. The primary election system as practiced in Arizona is a nominating device substituting for party caucuses and conventions. *Board of Sup'rs of Maricopa County v. Superior Ct.*, 4 Ariz. App. 110, 111, 417 P.2d 744, 745 (1966). The primary serves a different and much more limited function than the general election:

> [T]he primary election serves a different function in our system. It is a competition for the party's nomination, no more, no less, and does not elect a person to office but merely determines the candidate who will run for the office in the general election. …. In contrast, a general election actually determines which candidate will hold the office.

*Kyle v. Daniels*, 198 Ariz. 304, 306 ¶ 10, 9 P.3d 1043, 1045 (2000) (citation omitted).

The federal courts have come to the identical conclusion. "[Primaries] are in no sense elections for an office but merely methods by which party adherents agree upon candidates whom they intend to offer and support for ultimate choice by all qualified electors." *Newberry v. United States*, 256 U.S. 232, 250 (1921). "The nomination by a political party, whether by caucus, convention, or primary, is nothing more than an indorsement and recommendation of the nominee to the suffrage of the electors at

large." *United States v. O'Toole*, 236 F. 993, 995 (S.D. W.Va. 1916) *aff'd sub nom.*

*United States v. Gradwell*, 243 U.S. 476 (1917).  Indeed, each party's primary is in

effect a distinct, separate election in itself.  *Green Party of State of New York v.*

*Weiner*, 216 F.Supp.2d 176, 192 (S.D.N.Y. 2002) (different technologies for casting an

counting votes could be utilized in the different parties' primary elections)

A primary is certainly an "election" for purposes of Article I, § 4 of the

Constitution, *United States v. Classic*, 313 U.S. 299, 316-21 (1941), and for prevention

of racial discrimination, *Smith v. Allwright,* 321 U.S. 649, (1944).  And where the

state chooses to utilize a primary, it is an "integral part of the entire election process,"

*Storer v. Brown*, 415 U.S. 724, 735 (1974).  But the primary is simply the first of two

"steps," *Classic*, 313 U.S. at 316-17, or the "initial stage in a two-stage process."

*Storer*, 415 U.S. at 735.

The Supreme Court in *Newberry* made clear that the selection of a designated

party candidate, by primary or otherwise, is not part of the general election:

> If it be practically true that under present conditions a designated party
> candidate is necessary for an election—a preliminary thereto—
> nevertheless his selection is in no real sense part of the manner of holding
> the election.  This does not depend upon the scheme by which candidates
> are put forward.  Whether the candidate be offered through primary, or
> convention, or petition, or request of a few, or as the result of his own
> unsupported ambition does not directly affect the manner of holding the
> election.

*Newberry*, 256 U.S. at 257.

Thus, a primary is an election separate and distinct from the general election, producing only a party endorsement rather than an elected official, and therefore subject to conditions separate and distinct from those for the general election:

> In passing statutes regulating primary elections, a state recognizes the important fact that candidates go into the general elections with indorsements of political parties, *and it merely provides the conditions upon which that indorsement is to be received.*

*O'Toole*, 236 F. at 995 (emphasis added).

But the City's power to set "conditions" for a separate and distinct primary brings us right back to the City's plenary power over elections, ability to create different residency qualifications for the primary election than exist for the general election, and sovereign ability to utilize its fully constitutional current system.

Plaintiffs claim that the federal cases the City has cited for the separateness of the primary and general election "are nearly a century old" and "embody an anachronistic conception of nominating processes that subsequent cases have decisively repudiated." OB at 20. As far as the separateness of primaries, this certainly is not correct. Like *Classic* and *Storer*, *supra*, all of the relevant case law decided since *Newberry* and *O'Toole* only reaffirms the continuing validity of their holdings that primaries are separate and distinct. *See*, *e.g.*, *Fulani v. League of Women Voters Educ. Fund*, 882 F.2d 621, 630 (2d Cir. 1989) (recognizing distinctions between the "primary phase" and the "general election phase" of the contest for the presidency).

For example, we now know that the City's voters need not allow primaries at all. *American Party of Texas v. White*, 415 U.S. 767, 781-82 (1974) (state may prescribe party use of either primaries or conventions to select nominees who appear on the general-election ballot). But they can also mandate them. *California Democratic Party v. Jones*, 530 U.S. 567, 572 (2000) ("State may require parties to use the primary format for selecting their nominees, in order to assure that intraparty competition is resolved in a democratic fashion."}. The optional nature of primaries as preliminaries to general elections, and the ability of states and localities to have them or not have them, emphasizes their separateness from general elections.

Moreover, the City's primary is not only offset in time from its general election by two months, but it would now be constitutionally impossible for the City to try to replicate its general election electorate at its partisan primary elections. The City cannot force a party that has qualified for the ballot to include voters from another qualified party as eligible voters in its primary. *See* ARIZ. CONST., Art. 7, § 10; *California Democratic Party v. Jones,* 530 U.S. 567 (2000); *Ziskis v. Symington*, 47 F.3d 1004 (9th Cir. 1995); *Nader v. Schaffer*, 417 F. Supp. 837 (D.Conn.), *summarily aff'd,* 429 U.S. 989 (1976). At the same time, the Supreme Court has upheld the type of enforced separation of the voters of qualified parties in primary elections that Arizona and the City actually practice. *Clingman v. Beaver*,

544 U.S. 581 (2005) (upholding, against freedom of association challenge, Oklahoma's semiclosed primary system, under which only party's members and independents could vote in its primary).

The federal courts also do not require primary elections to necessarily have all the voting components of general elections, such as absentee balloting. *Fidell v. Board of Elections*, 343 F.Supp. 913 (E.D.N.Y.) *aff'd mem.*409 U.S. 972 (1972) (New York did not have to provide absentee balloting in primary elections).

Thus, modern federal case law only confirms the Supreme Court's longstanding view that primary and general elections are two separate elections, for which the City may designate two different election districts.

**III. PLAINTIFFS ACKNOWLEDGE THE CITY'S SOVEREIGNTY OVER ITS ELECTIONS AND ELECTORAL DISTRICTS IN ALL SITUATIONS BUT THE ONE THEY ACTUALLY FIND THEMSELVES IN, AND RELY COMPLETELY ON A MISINTERPRETATION OF *GRAY V. SANDERS* TO TRY TO CREATE A NONEXISTENT SAFE HARBOR.**

Plaintiffs admit the City's broad powers over elections, and ability to condition voting in the electoral districts designated for those elections, if the City uses the same district for both primary and general elections. OB 6, 12. Plaintiffs have even admitted to this Court that one person, one vote must be analyzed in the context of each particular election: "An equal protection injury is inflicted whenever an otherwise eligible voter is deprived of the right to participate on equal

terms in *any* aspect of *any* **single** election in the geographical unit." OB 38 (emphasis by italics in original; emphasis by bolding supplied),

Yet Plaintiffs' *Gray* argument seeks to deny these same broad powers as actually exercised by the City's voters in creating the City's present election system, and the correspondingly narrow reach of the one person, one vote doctrine. Plaintiffs' *Gray* argument is simply incorrect. The one person, one vote cases do not require that the City use the same electoral district for its primary and general elections.

First, Plaintiffs misinterpret the wording and context of the *Gray* quote itself. *Gray* was a statewide primary election for offices that would eventually also be elected statewide. The "geographical unit" for both the primary and general election happened to be the same in that case, but the only "representative…to be chosen" in that primary election was the party nominee for the general election. For City voters, meanwhile, both the "geographical unit for which a representative is to be chosen" and the "representative…to be chosen" are different in the City's primary and general elections, by Charter definition. At the primary, the "geographical unit" is the ward, and the "representative…to be chosen" is the party nominee for that ward. At the general election, the "geographical unit" is the City as a whole, and the "representative[s]…to be chosen" are the council members.

Second, Plaintiffs ignore the Supreme Court's own subsequent statements about *Gray*, which show that is created no such requirement as Plaintiffs claim. "The *Gray* case…did no more than to require the State to eliminate the county-unit machinery from its election system." *Fortson,* 385 U.S. at 235 (Black, J., opinion of the court). As further explained by Justice Black:

> That case, as was emphasized, had to do with the equal right of 'all who participate in the election,' 372 U.S. at 379, 83 S. Ct., at 808, to vote and have their votes counted without impairment or dilution. But as the Court said, 372 U.S. at 378, 83 S. Ct., at 807, the case was only a voting case.'

*Fortson v. Morris,* 385 U.S. at 233.

Thus, *Gray* simply "sustained the right of a voter to cast a ballot whose numerical weight is the equal of that of any other vote cast within the jurisdictional in questions." *Williams v. Rhodes*, 393, U.S. 23, 52 (1968) (Stewart J., dissenting). It was about "the 'weighting' or 'diluting' of votes case within any electoral unit." *Lucas v. Forty-Fourth Gen. Assembly of State of Colo.,* 377 U.S. 713, 744 (1964) (Steward J., dissenting). The "jurisdiction in question" or "electoral unit" that justice Steward speaks of is the "geographical unit" which the state has "designated" for that specific election, which in turn creates "the class voters" who are protected in that election. *See Gray,* 372 U.S. at 379-80, 381. In the City's case, it is the ward for the primary election, and the City as a whole for the general election.

Third, Plaintiffs' *Gray* argument is completely inconsistent with the body of Supreme Court case law set forth in § I above regarding the broad state powers over elections, electoral districts, and primaries, as well as the correspondingly narrow focus of the "one person, one vote" cases. Specifically, it reads "one person, one vote" doctrine to extend to more than one election, and to grant a right to vote where none has been authorized by the state. Neither of these things can or do actually occur under "one person, one vote," and the Supreme Court has made that clear in multiple cases subsequent to *Gray*. Trying to make one person, one vote extend across elections is not only inconsistent with state power over elections, but also makes particularly little sense in the case of partisan primary and general elections, since a partisan primary by its nature has a wholly different electorate (and candidates) than a general election.

This Court and the Second Circuit have likewise contradicted Plaintiffs' *Gray* argument. In *Green v. City of Tucson,* this Court made clear that the "one person, one vote" cases are concerned with "the equal treatment of voters in a given electoral unit." *See Green,* 340 F.3d at 900. That electoral unit is obviously designated by the state or locality and, as is the case for the City here, may be different in different elections.

Likewise, according to the Second Circuit, "The one-person, one-vote doctrine. . . does not create rights and privileges beyond th[e] warranty of

mathematical equivalency of votes." *Mrazek v. Suffolk Cnty. Bd. of Elections*, 630

F.2d 890, 898 (2d Cir. 1980). *Mrazek* also involved an equal protection claim, and

is effectively the mirror image of this case. Whereas here the Plaintiffs seek to

claim a one person, one vote violation so that they can vote in ward elections

where they are not currently permitted to vote, the Mrazek plaintiffs sought to

make the same claim to *prevent* participation in the district nomination process by

persons outside their district. :

> Appellants allege, in essence, that their voting rights are violated by
> the participation of non-resident party members in the selection of
> candidates for political office in their district. Such interference, in
> their view, contravenes the one-person, one-vote doctrine. We
> disagree.

*Mrazek,* 630 F.2d at 898.

The Second Circuit affirmed the district court's dismissal of the plaintiffs'

complaint, holding that one person, one vote simply had no application in this

situation:

> The fact that state law and party charter contemplate a procedure
> impinging upon the autonomy of local subdivisions to select non-
> party candidates may, in the view of some political scientists or social
> theorists, be regrettable, but such a mechanism is not violative of the
> guarantee of one-person, one-vote.
>
> This is simply because however diluted the votes of local party
> members may be by outsider intervention into non-party nominations
> for their state representatives, *their own votes, within the affected
> districts, remain entirely equal. The one-person, one-vote doctrine
> requires no more, and does not create rights and privileges beyond
> this warranty of mathematical equivalency of votes.*

***

>The claim at bar is simply that the equal protection clause is violated by any substantial input which non-resident party members may have in the endorsement of non-party candidates for state office in other political districts. *This misconceives the one-person, one-vote principle: that doctrine assures voter equality, not local autonomy or a particular allocation of political power. In short, appellants have invoked a constitutional principle which is inapposite to the evil of which they complain.*

*Mrazek*, 630 F.2d at 898 (emphasis supplied).

One person, one vote is equally inapplicable where, as here, Plaintiffs seek to vote in elections that the City's electorate has never authorized them to vote in. One person one vote always must be analyzed in the context of one particular election, not the overall process. *Gray* and the other "one person, one vote" cases do not help Plaintiffs here, because Plaintiffs do not (and cannot) claim either: (1) a City refusal to allow them to vote equally with other voters in the elections they are participating in; or (2) any dilution or unfair weighting of votes within the electoral districts the City currently uses for either its primary or general elections.

Rather, Plaintiffs seek to claim a brand new equal protection "right" that would ignore the City electorate's well settled power and choice under its Charter to set different, rationally based geographical residency requirements in its primary and general elections (§ I above) and instead would force the City to use the same electoral district in its primary and general elections.

This leads us to the final basis for contradicting Plaintiffs' *Gray* argument, namely specific contradictory precedent on the identical issue.

## IV. CASES WHERE THIS IDENTICAL ISSUE WAS RAISED CONFIRM THE CITY'S FREEDOM TO USE DIFFERENT ELECTION DISTRICTS FOR ITS PRIMARY.

Thus far, the City has shown that Plaintiff's *Gray* argument fails when analyzed from the perspective of the City's sovereign power over its elections generally and over its election districts and primaries specifically.

But Plaintiff's argument is also contradicted by directly applicable precedent that has decided the identical issue presented here. In both *Holshouser v. Scott*, 335 F. Supp. 928 (M.D.N.C. 1971) *aff'd*, 409 U.S. 807 (1972) and *Stokes v. Fortson*, 234 F. Supp. 575 (N.D. Ga. 1964), state law provided that judges should be nominated from their respective districts and elected in the general election by statewide vote. The plaintiffs in both cases claimed violations of equal protection, citing the "one person, one vote" cases. *Stokes*, 234 F. Supp. at 577; *Holshouser*, 335 F. Supp. at 930. They also both specifically complained that in the general election the choice of the district voters in the primary election might be overridden by the state electorate. *Stokes*, 234 F.Supp. at 576; *Holshouser*, 335 F.Supp. at 933. The plaintiff's claim in *Holshouser* was even framed identically to the Plaintiffs' claim here.

> The plaintiff contends that these judges must be nominated and elected by either a district-wide or statewide primary and general

election and that a combination of the two as embodied in the statutes in question denies the voters of the state, individually and collectively, the equal protection of the laws.

*Holshouser*, 335 F. Supp. at 930.

The district court in *Stokes*, applying *Gray* exactly as it should be applied, first analyzed the two elections separately and found no one person, one vote violation in either of them:

In the first place, we are unable to discern any discrimination among voters or unequal weighting of votes of the sort condemned by the one man-one vote principle. Indeed, plaintiffs concede that there is no discrimination in either the nomination process or the election process considered separately. The vote of each person in the statewide election is equal; the electors of every judicial circuit are permitted to vote for the nominees from every judicial circuit. Also, the vote of each person in the judicial circuit is equal in the nominating process.[1] Since every man's vote counts the same, the fact that the statewide electorate may override the choice of the circuit in no way offends the principles of Baker v. Carr and its progeny. See Alsup v. Mayhall, S.D.Ala., 1962, 208 F.Supp. 713.

*Stokes*, 234 F. Supp. at 577.

Plaintiffs incorrectly call the above quoted statement *dicta* (OB 34). But it was only *after* this initial finding of no violation that the *Stokes* court went on to say that "even assuming some disparity in voting power, the one man-one vote doctrine, applicable as it now is to selection of legislative and executive officials, does not extend to the judiciary." *Id*. Moreover, after this secondary finding, the Court also undertook the appropriate rational basis analysis for the equal protection claim actually being made—that the use of different districts in the two elections

violated equal protections—and rejected the claim, concluding that "this system is a rational one, designed to achieve legitimate state objective [sic]." *Stokes*, 234 F. Supp. At 578.

Seven years later, the *Holshouser* court first quoted the *Stokes* language above. It then concluded, as had the *Stokes* court, that one person, one vote did not apply to the judiciary. Finally, it likewise undertook a rational basis analysis that included a portion tracking the *Stokes* finding of no one person, one vote violation exactly:

> There has been no showing of arbitrary and capricious action by the legislature or that the distinctions, if any, between the citizens and voters are invidious. The plaintiff says his vote cast in the primary election is diluted, and indeed may be overridden by the general election vote. He does not contend that there is discrimination in either the nomination process or the election process when considered separately, but says the statute which permits nomination by district and election statewide, serves or achieves no useful or legitimate state purpose, and is invidious discrimination and violative of the Equal Protection Clause. We are unable to find discrimination among voters or an unequal weighing of votes which would amount to arbitrary or capricious action or invidious distinctions. The vote of each person in the statewide election is equal and the voters of every judicial district are permitted to vote for the nominees from all districts. The vote of each person in the judicial district is equal in the primary election. Since every person's vote counts the same in each election the fact that in a statewide election the voters may override the choice of a district in the primary election does not constitute arbitrary and capricious or invidious distinctions.

*Holshouser*, 335 F. Supp. at 933.

As had the *Stokes* court before it, the *Holshouser* court then concluded that "there is a reasonable basis for the election procedure established and it serves and achieves a legitimate state purpose and is not arbitrary and capricious." *Id*. The district court's decision in *Holshouser* was summarily affirmed by the Supreme Court. *Holshouser v. Scott,* 409 U.S.807 (1972).

Plaintiffs seek to incorrectly distinguish these cases on the basis that they both stated that one person, one vote does not apply to the judiciary. OB 34. The district court likewise incorrectly focused on "the fact that the election was for the judiciary rather than a legislative or executive official." ER 6 at lines 11-12 (*see also id*. at lines 19-20). With the greatest respect to the district court, this attempted distinction is not valid here. It would only apply if one first accepts Plaintiffs' own flawed theory, not the actual claim that they are bringing, the same one that was actually analyzed and rejected in *Stokes* and *Holshouser*. Plaintiffs have (and make) no valid one person, one vote claim here, just as none existed in either *Stokes and Holshouser*. Plaintiffs do not allege an inability to vote in the elections the City has actually authorized them to vote in, or that their votes did not count equally in those elections. So whether *Stokes* and *Holshouser* involved judicial or legislative elections is not important to their precedential value here. Rather, the real (and only) equal protection claim by Plaintiffs here is exactly the

same one that existed in both those cases, and with appropriate insertions from our facts can be stated identically to the way it was in *Holshouser*:

> The plaintiff[s] contend[] that these [council members] must be nominated and elected by either a [ward] or [city]wide primary and general election and that a combination of the two as embodied in the [charter provisions] in question denies the voters of the state, individually and collectively, the equal protection of the laws.
> The issue being the same, and—unlike a one person, one vote claim—

independent of the judicial or legislative nature of the office involved in the two elections, the result—and the rational basis test used to reach it—should be exactly the same here. There is no equal protection violation here, and these two cases are direct precedent for it.

Note, that *Stokes* and *Holshouser* long predate both *Holt* and *Herriman*, *supra*, but dovetail perfectly with their holdings that a rational basis test should apply to this situation, as well as providing provide direct precedent for this Court to find that no equal protection violation has occurred here.

Moreover, from the City's perspective, *Holshouser*'s summary affirmance by the Supreme Court takes it beyond on-point precedent and makes it binding on this Court. "Summary affirmances…without doubt reject the specific challenges presented in the statement of jurisdiction and…prevent lower courts from coming to opposite conclusions on the precise issues presented and necessarily decided by those actions." *Mandel v. Bradley*, 432 U.S. 173, 176 (1977). Given the identical nature of the challenge here to that in *Holshouser*, this standard is met here.

But even if this Court disagrees with the City's position that *Mandel* makes *Holshouser* binding on the Court in this case, it should nonetheless choose to apply the analysis and rational basis test used in *Holshouser*, just as it has applied other summarily affirmed district court cases in the primary and municipal incorporation election contexts. *See Ziskis v. Symington*, 47 F.3d 1004, 1005-06 (9th Cir. 1995) (primary); *Green v. City of Tucson*, 340 F.3d 891, 902 (9th Cir. 2003) (incorporation). *Green* is particularly instructive as a template/precedent because in that case, just as can and should occur here, the summarily affirmed case was not only used to confirm this Court's independent analysis, but also to specifically contradict the plaintiffs' spurious one person, one vote claims:

> This limiting language [regarding summary affirmances], however, does not undermine the precedential value of *Adams* for the case at bar because the district court's reasoning in *Adams* was essential to its holding. If the Supreme Court's voting rights cases had extended to the geographical distinction drawn in Colorado's annexation statute, then strict scrutiny would have applied and the Colorado statute would likely have been struck down. In affirming the district court decision in *Adams,* the Supreme Court necessarily approved the district court's determination that the voting rights cases were inapplicable and that rational basis scrutiny was the proper standard of review. We similarly conclude that rational basis scrutiny applies.

*Green*, 340 F.3d at 902.

The very same principle applies here.  As potentially important as the direct on-point precedential value of *Stokes* and *Holshouser* is the simple fact that if *Gray* actually said what Plaintiffs say it says, these contemporaneous cases could never

41

have been analyzed and decided as they were. Rather than simply analyzing the equality of the vote in each election, and finding no violation, the two district courts would have had to discuss and apply the "fact" (as it would exist in our hypothetical scenario) that *Gray* not only required equal voting rights in any single election, but also required the same election districts in all phases of an election cycle. That these cases did not do so shows that Plaintiffs' *Gray* argument is simply incorrect and untenable.

To the same effect is the Supreme Court's own decision in *New York State Board of Elections v. Lopez-Torres*, 552 U.S. 196 (2008), which involved a First Amendment freedom of association challenge to New York's method for selecting nominees for supreme court justice. Under the New York system, party voters in legislative districts elect delegates at a primary. Those delegates go to a convention and nominate candidates, who then run in the general election held within a much larger judicial district encompassing a number of those legislative districts, where all judicial district voters can vote. In other words, as here, the election jurisdictions differ in size in the two elections, smaller in the primary, larger in the general, but with the difference of an intervening delegate convention to do the actual nominations.

The Supreme Court upheld the constitutionality of the New York system, rejecting the plaintiffs claim that the system violated their rights to freedom of association and should be replaced by a direct primary in the judicial district.

If Plaintiff's *Gray* argument were correct, then a claim that equal protection required that the same election district be used for the primary and general elections should have been an obvious one for the plaintiffs to bring in *Lopez-Torres*, and for the Supreme Court to recognize and enforce. In fact, no such claim was made by the plaintiffs, and no such requirement mentioned by the Court. To the contrary, the Supreme Court was not bothered in the least by New York's nominating system, which does *not* use electoral districts of the same size for the primary and general elections that were at issue in that case.

## V. CASES DECIDED BY THE SUPREME COURT AND THIS COURT IN THE FREEDOM OF ASSOCIATION CONTEXT ALSO CONFIRM THAT STATES AND LOCALITIES CONTROL THEIR NOMINATING PROCESS, NOT PARTIES OR INDIVIDUAL VOTERS.

As shown previously (pp. 10-11), the City's at-large general election, seen on its own, is clearly constitutional. Since the entire City electorate gets to choose all of its council members from among the nominees from each ward, Plaintiffs cannot possibly complain that they are harmed by it, and do not do so. Moreover, Plaintiffs admit that they do not object to the City electorate's continued use of the at-large general election, so long as the City also uses an at-large primary election. OB 6, 12.

In essence then, Plaintiffs here are arguing, through an equal protection claim, that the primary system the City currently has should be declared unconstitutional and replaced with one that the Plaintiffs like better. But in the context of First Amendment freedom of association claims by candidates or parties, both the Supreme Court and this Court already have made clear that this is not a valid constitutional claim. States and localities control their nominating process, not parties or individual voters. As the City will now show, the principles of these cases apply to Plaintiffs' equal protection claim here as much as a freedom of association case.

In its recent *Lopez-Torres* decision, which upheld New York's chosen judicial nomination system as constitutional and rejected the plaintiffs' attempt to change it, the Supreme Court stated that when the State gives a party the right to have its candidates appear with party endorsement on the general-election ballot, "the State acquires a legitimate governmental interest in ensuring the fairness of the party's nominating process, enabling it to prescribe what that process must be." *Lopez Torres*, 552 U.S. at 203. The Court also specifically rejected the idea that a freedom of association can be used as a tool for plaintiffs to try to "have a certain degree of influence in the party" or—in the case of candidates—"a fair chance of prevailing in their parties' candidate-selection process." *Id*. at 203-04.

*Lopez Torres* also makes a broader legal point: The federal courts are not going to get involved in arguments over what is the "best" or the "fairest" method

of party nomination of candidates, or whether the state has achieved those goals in particular instances. Nor are they going to intervene to increase a given candidate's, party leader's, voter's, or group of voters' influence regarding the nomination of candidates. These simply are not constitutional issues, but rather legislative decisions for the State or City. *See Lopez Torres*, 552 U.S. at 204-09. Here, the City's voters have rationally chosen a system which gives a voice to two groups of voters: ward voters in the primary and all City voters in the general election. As in *Lopez Torres*, that system should be upheld.

This Court has twice decided freedom of association challenges to primaries required by the state. Both cases raised the specific issue of whether "a state categorically has the power to determine the method by which a party nominates a candidate." *Lightfoot v. Eu*, 964 F.2d 865, 872 (9th Cir. 1992). In *Lightfoot* itself, the issue was whether California could require political parties to nominate their candidates in primaries rather than conventions: "The Party's challenge…is about…the State's power to regulate…how [the Party}goes about nominating its candidates. *Id*. at 872.

Likewise, in *Alaskan Independence Party v. Alaska*, 545 F.3d 1173, 1176 (9th Cir. 2008), the plaintiff political party wanted a convention rather than the required primary, and requested a declaratory judgment "that political parties themselves, and not the State of Alaska, have the right to determine how their

candidates to appear on Alaska election ballots are to be selected, and that the State of Alaska must allow a political party to select its candidates for the general election ballot in a manner acceptable to the political party," *Id.* at 1176.

In both cases, this Court rejected the challenges and held that "the State's interest in enhancing the democratic character of the election process overrides whatever interest the Party has in designing its own rules for nominating candidates." *Lightfoot*, 964 F.2d at, 873; *Alaskan Independence Party*, 545 F.3d at 1178. And in both cases, this Court also found that the state's primary election law was justified by compelling state interests, and sufficiently narrowly tailored, and thus would withstand even strict scrutiny under *Burdick*. *Lightfoot*, 964 F.2d at 868 n.2; *Alaskan Independence Party*, 545 F.3d at 1177, 1180.

Given *Lopez Torres*, *Lightfoot*, and *Alaskan Independence Party*, neither the actual Plaintiffs here nor the Republican Party could ever win this case if it was brought as a First Amendment freedom of association case. That is very likely why the plaintiffs here include individuals and a non-profit corporation but not the party, and why Plaintiffs make an equal protection claim.

By the same token, this Court can and should also apply those three cases as precedent in this equal protection case. Like them, this case involves a direct challenge to the City's primary system, which seeks to impose an alternative

method of nomination. But it is even more attenuated because here the individual voters cannot even claim interference with party's freedom of association.

Also, the same *Burdick* analysis and standards apply to the assertion of both First and Fourteenth Amendment claims, *Burdick*, 504 U.S. at 434. So if a primary can withstand a *Burdick* analysis based on a First Amendment claim, it will also withstand it based on a Fourteenth Amendment claim.

The City's primary, like California's in *Lightfoot* and Alaska's in *Alaskan Independence Party*, will survive any level of scrutiny under *Burdick*. Thus, this Court can apply its cases analyzing challenges to the state's chosen nomination process to reject either a freedom of association claim under the First Amendment or, as here, Plaintiffs' equal protection claim under the Fourteenth Amendment.

## VI. PLAINTIFFS HAVE WAIVED THEIR STATE CLAIMS ON APPEAL.

In the District Court, Plaintiffs' Complaint also alleged certain state law claims. However, on appeal, Plaintiffs' Statement of the Issues in their opening brief refers only to the federal "Equal Protection Clause," not to any state law claims. OB 4. Moreover, the only reference in Plaintiffs' Opening Brief to their state law claims below is in their footnote 3 (OB 7), which merely states:

> Although the Appellants' motion for preliminary relief was grounded only in their federal constitutional claims, the district court also disposed of the state law counts. Because the relevant provisions of the Arizona Constitution are at least as expansive as their counterparts in the Fourteenth Amendment, the arguments presented herein apply in equal force to the Appellants' state constitutional claims, which provide an independent basis for reversing the district court's decision.

Plaintiffs have waived their state law claims on appeal.

This Court will "review only issues which are argued specifically and distinctly in a party's opening brief." *Greenwood v. F.A.A.*, 28 F.3d 971, 977 (9th Cir. 1994); *Miller v. Fairchild Indus., Inc.,* 797 F.2d 727, 738 (9th Cir.1986); *see also Kopczynski v. The Jacqueline,* 742 F.2d 555, 560 (9th Cir.1984) (claims of error on appeal "must be specific"); Fed.R.App.P. 28(a)(5) (appellant's brief shall contain a "statement of the issues presented for review"). This Court also "will not manufacture arguments for an appellant, and a bare assertion does not preserve a claim…." *Greenwood,* 28 F.3d at 977. The City will likewise not further discuss these issues, to avoid any possibility that this Court will consider them to have been raised in *this* brief. *See Eberle v. City of Anaheim*, 901 F.2d 814, 818 (9th Cir. 1990); *Ellingson v. Burlington N., Inc.*, 653 F.2d 1327, 1332 (9th Cir. 1981).

## VII. PLAINTIFFS HAVE NO BASIS TO SEEK A WARD-ONLY GENERAL ELECTION IN 2015.

At least twice in their Opening Brief, Plaintiffs assert that they do not care whether the City conducts both of its elections as ward-only or Citywide. OB 6, 12.

Yet Plaintiffs also twice specifically ask that this Court order that the City conduct a ward-only general election in 2015, OB 13, 42-44. In addition, they ask for a further order "that City Council elections be conducted on a ward-only basis unless and until Chapter XVI, § 9 of the City Charter is amended to conform to Fourteenth Amendment directives." OB 44.

Consistent with their real strategy, Plaintiffs did not seek a stay in this case from either the District Court or this Court. Thus, the City's August 2015 ward-only primary election is proceeding as normal. And with admirable if predictable timing, Plaintiff's Opening Brief now argues:

> Thus, because the August 2015 primary elections for Ward 1, Ward 2 and Ward 4 will be limited only to qualified electors within the respective wards, equal protection guarantees require that the geographical unit (i.e., the ward) remain constant in the general election as well.

OB 43.

Plaintiffs further argue that ward-only elections "traditionally have been deemed more conducive to equalizing the opportunity to effectuate electoral outcomes and ensuring responsive government" and will more "closely connect[] candidates with their local political subdivision[].[6] OB 44.

While the latter two arguments actually provide useful additional rational bases for the City's current ward-only primaries, none of these arguments provide a basis to seek a ward-only general election in 2015. First and most obviously, Plaintiffs have no valid equal protection claim here. The City's current system is constitutional and can continue to operate. Moreover, as previously discussed (pp.

---

[6] One of the statutes plaintiffs cite in support of this argument is A.R.S. § 9-821.01(C). But this statute is specifically not applicable to the City, as it conflicts with the City's Charter in a matter of purely local concern, namely elections. *See City of Tucson v. State*, 229 Ariz. 172 (2012).

10-11, 42-43), the City's general election is by itself perfectly constitutional, and Plaintiffs have not challenged it. Assuming *arguendo* there were a need for relief, and especially given how (and when) Plaintiffs have chosen to proceed in this litigation, a far more equitable (hypothetical) exercise of this Court's remedial powers would have this Court (or the District Court) looking to change the City's primary election to an at-large election starting in 2017, not interfering with its lawful general election now. But again, this is all academic. This Court does not need to change a system that is perfectly constitutional as it stands.

## CONCLUSION

The Supreme Court provides an excellent final response to Plaintiffs' flawed claim and theory, in language written almost 170 years ago but still perfectly relevant today:

> And certainly it is no part of the judicial functions of any court of the United States to prescribe the qualification of voters in a State, giving the right to those to whom it is denied by the written and established constitution and laws of the State, or taking it away from those to whom it is given; nor has it the right to determine what political privileges the citizens of a State are entitled to, unless there is an established constitution or law to govern its decision.

*Luther v. Borden*, 48 U.S. 1, 41 (1849).

The District Court reached the correct results in its Order and Judgment, and this Court should affirm both in all respects.

Respectfully submitted this 23rd day of July, 2015.

MICHAEL G. RANKIN
City Attorney


By: s/*Dennis P. McLaughlin*
     Dennis P. McLaughlin
     Principal Assistant City Attorney
     Attorneys for Defendants/Appellees

<u>**STATEMENT OF RELATED CASES**</u>

Pursuant to Ninth Circuit Rule 28-2.6, counsel for Appellees state that they are unaware of any related cases pending in this Court.

RESPECTFULLY SUBMITTED this 23rd day of July, 2015.

MICHAEL G. RANKIN
City Attorney


By: <u>s/*Dennis P. McLaughlin*</u>
Dennis P. McLaughlin
Principal Assistant City Attorney
*Attorneys for Defendants/Appellees*

<u>**CERTIFICATE OF COMPLIANCE**</u>

Pursuant to Ninth Circuit Rule 32 (a), I certify that Appellees' Answering Brief is proportionately spaced, has a typeface of 14 points, and contains 12,886 words.

DATED this 23rd day of July, 2015.

MICHAEL G. RANKIN
City Attorney


By: s/*Dennis P. McLaughlin*
    Dennis P. McLaughlin
    Principal Assistant City Attorney
    Attorneys for *Defendants/Appellants*

**<u>CERTIFICATE OF MAILING</u>**

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit using the appellate CM/EFC system on July 23, 2015.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

MICHAEL G. RANKIN
City Attorney


By:s/*Dennis P. McLaughlin*
    Dennis P. McLaughlin
    Principal Assistant City Attorney
    Attorneys for *Defendants/Appellees*