*Appeal No. 15-16142*

_____

# IN THE UNITED STATES COURT OF APPEALS

## FOR THE NINTH CIRCUIT

_____

PUBLIC INTEGRITY ALLIANCE, INC.,
an Arizona nonprofit membership corporation, *et al.*

*Plaintiffs and Appellants,*

vs.

CITY OF TUCSON,
a chartered city of the State of Arizona, *et al.*,

*Defendants and Appellees.*

_____

On Appeal From the United States District Court
for the District of Arizona
Hon. Cindy K. Jorgenson
Case No. 4:15-cv-00138-CKJ

_____

## REPLY BRIEF OF APPELLANTS

_____

BROWNSTEIN HYATT FARBER SCHRECK, LLP
Kory A. Langhofer – Arizona Bar No. 024722
Thomas J. Basile – Arizona Bar No. 031150
Roy Herrera Jr. – New York Bar No. 4772430
One East Washington Street, Suite 2400
Phoenix, Arizona 85004
Telephone: 602.382.4040
Facsimile: 602.382.4020
*Attorneys for Plaintiffs-Appellants*

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................. ii

INTRODUCTION .............................................................................................. 1

ARGUMENT ....................................................................................................... 3

I.    The Notion That the City Has "Plenary Power" to Designate Different "Geographical Units" for the Same Office in the Same Election Cycle Is Erroneous ....................................................... 3

    A.    Because Council Members Are Citywide Representatives Elected By All Tucson Voters, Exclusions from the Primary Are Not "Residency Requirements" ............................ 4

    B.    The City's Argument Depends upon an Outmoded Theory of the Primary Election's Constitutional Status .......... 10

II.    The Summary Affirmance of *Holshouser* Is Not Controlling of the Issues in this Case ........................................................................ 13

III.    Cases Concerning the Associational Rights of Political Parties Are Irrelevant ...................................................................................... 18

IV.    The City Has Waived Any Additional Argument that the Hybrid System Satisfies Strict Scrutiny ........................................... 21

CONCLUSION .................................................................................................... 22

CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE APPELLATE PROCEDURES 32(A) ........................................................ 24

CERTIFICATE OF SERVICE ............................................................................ 25

i

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aguilar-Turcios v. Holder,*
740 F.3d 1294 (9th Cir. 2014) ...............................................................22

*Alaskan Indep. Party v. Alaska,*
545 F.3d 1173 (9th Cir. 2008) ...............................................................19

*Anderson v. Celebrezze,*
460 U.S. 780 (1983)..........................................................................4, 16

*Andress v. Reed,*
880 F.2d 239 (9th Cir. 1989) .................................................................12

*Baker v. Carr,*
369 U.S. 186 (1962)..........................................................................1, 14

*Bullock v. Carter,*
405 U.S. 134 (1972)................................................................................12

*Burdick v. Takushi,*
504 U.S. 428 (1992)......................................................................4, 5, 7

*Chisom v. Roemer,*
501 U.S. 380 (1991)........................................................................15, 20

*Clem v. Lomeli,*
566 F.3d 1177 (9th Cir. 2009) ...............................................................22

*Crawford v. Marion Cnty. Election Bd.,*
553 U.S. 181 (2008)..................................................................................5

*Davis v. Bandemer,*
478 U.S. 109 (1986)................................................................................17

*Dillenburg v. Kramer,*
469 F.2d 1222 (9th Cir. 1972) ...............................................................17

*Dudum v. Arntz,*
640 F.3d 1098 (9th Cir. 2011) .................................................................6

ii

*Edelman v. Jordan*,
    415 U.S. 651 (1974)..................................................................17

*Gray v. Sanders*,
    372 U.S. 368 (1963).............................................................*passim*

*Green v. City of Tucson*,
    340 F.3d 891 (9th Cir. 2003) ...........................................6, 7

*Holshouser v. Scott*,
    335 F. Supp. 928 (M.D.N.C. 1971) .............................*passim*

*Holt Civic Club v. City of Tuscaloosa*,
    439 U.S. 60 (1978).........................................................4, 8, 9

*Hussey v. City of Portland*,
    64 F.3d 1260 (9th Cir. 1995) ..........................................5, 9

*Jenness v. Fortson*,
    403 U.S. 431 (1971)...........................................................5

*Kyle v. Daniels*,
    9 P.3d 1043 (Ariz. 2000) ...................................................13

*Lightfoot v. Eu*,
    964 F.2d 865 (9th Cir. 1992) ...........................................19

*Little Thunder v. State of S.D.*,
    518 F.2d 1253 (8th Cir. 1975) ....................................7, 8, 9

*Luther v. Borden*,
    48 U.S. 1 (1849) (Taney, C.J.)...........................................1

*Marston v. Lewis*,
    410 U.S. 769 (1973)...........................................................5

*McConnell v. Fed. Election Comm'n*,
    251 F. Supp. 2d 176 (D.D.C. 2003)................................12

*Morse v. Republican Party of Va.*,
    517 U.S. 186 (1996)..........................................................12

*N.Y. State Board of Elections v. Lopez Torres*,
552 U.S. 196 (2008)................................................................20

*Newberry v. United States*,
256 U.S. 232 (1921)........................................................10, 11, 12

*Ohio State Conference of N.A.A.C.P. v. Husted*,
768 F.3d 524 (6th Cir. 2014) ....................................................7

*Republican Party of N.C. v. Martin*,
980 F.2d 943 (4th Cir. 1992) ...................................................15

*Reynolds v. Sims*,
377 U.S. 533 (1964)...............................................................1, 14

*Ripon Soc., Inc. v. Nat'l Republican Party*,
525 F.2d 567 (D.C. Cir. 1975) .................................................15

*Sailors v. Bd. of Educ. of Kent Cnty.*,
387 U.S. 105 (1967)..................................................................9

*Stokes v. Fortson*,
234 F. Supp. 575 (N.D. Ga. 1964).................................14, 15, 16

*Tashjian v. Republican Party of Conn.*,
479 U.S. 208 (1986)................................................................19

*United States v. Classic*,
313 U.S. 299 (1941).............................................................11, 12

*United States v. Gamboa-Cardenas*,
508 F.3d 491 (9th Cir. 2007) ..................................................22

*Voter Info. Project, Inc. v. City of Baton Rouge*,
612 F.2d 208 (5th Cir. 1980) ..................................................15

*Wells v. Edwards*,
409 U.S. 1095 (1973)..............................................................15

**Statutes**

28 U.S.C. § 2281 (1970) .........................................................14

**Other Authorities**

BLACK'S LAW DICTIONARY (10th ed. 2014) ..........................................................16

# INTRODUCTION

The systemic flaw afflicting the City of Tucson's theory of this case is best encapsulated by its own premise that the City possesses "plenary power over elections." Response Brief at 1. This sweeping conception of state power in relation to individual rights is complemented by the City's closing admonition that "it is no part of the judicial functions of any court of the United States to . . . giv[e] [a] right to those to whom it is denied by the written and established constitution and laws of the State." *Id.* at 50 (quoting *Luther v. Borden*, 48 U.S. 1, 41 (1849) (Taney, C.J.)). These now repudiated maxims[1] may have retained enough residual doctrinal force to sustain the Hybrid System at the time of its adoption over eighty years ago. But they are anachronistic artifacts in the modern jurisprudential framework, which is grounded in the principle that "[t]he right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964).

---

[1] Succeeding Justices appear to have echoed Chief Justice Taney's antebellum ruminations in *Luther* only once—in assailing the Court's majority for "revers[ing] a uniform course of decision" and holding that "one man, one vote" claims present justiciable causes of action under the Fourteenth Amendment. *See Baker v. Carr*, 369 U.S. 186, 266, 295 (1962) (Frankfurter, J., dissenting). Indeed, the *Baker* majority decisively repudiated *Luther*'s relevance to claims derived from constitutional provisions adopted two decades later. *See* 369 U.S. at 228 (explaining that *Luther* and similar cases "can have no bearing upon the justiciability of the Equal Protection claim presented in this case").

The Appellants anticipated and addressed at length in their Opening Brief nearly all the arguments posited by the City, and will not reiterate their responses here. Instead, this Reply will proffer only several additional observations concerning the irreconcilable incongruence between the City's arguments and the prevailing understanding of the primary election's equal constitutional standing and the "one man, one vote" principles set forth in *Gray v. Sanders*, 372 U.S. 368 (1963).

The City also raises two new arguments that merit a response. First, the City relies heavily on *Holshouser v. Scott*, 335 F. Supp. 928 (M.D.N.C. 1971), which held that the "one man, one vote" precept is categorically inapplicable to judicial elections and thus was not a viable basis for challenging a method of selecting judges that bore strong factual parallels to the Hybrid System. According to the City, the U.S. Supreme Court's summary affirmance ratified the district court's *dicta* concerning the permissibility of hybrid voting systems, and thus binds the Court in this appeal. The City's reasoning, however, misapprehends not only the actual holding of *Holshouser*, but also the significance and *stare decisis* effect of a summary affirmance.

Second, the City seeks to justify the Hybrid System by constructing an analogy to federal precedents countenancing primary election restrictions implicating voters' and political parties' First Amendment associational rights.

While acknowledging that these cases did not pivot even indirectly on Equal Protection considerations, the City nevertheless attempts to extrude from them a broad, discretionary license to deny the franchise to primary voters.  As explained below, however, the unique First Amendment concerns triggered by the partisan aspects of primary contests are entirely irrelevant to this case, and never have been invoked by any court to sustain measures that deprive primary voters of the franchise solely because of their geographic homesite within an electoral unit.

## ARGUMENT

### I.     The Notion That the City Has "Plenary Power" to Designate Different "Geographical Units" for the Same Office in the Same Election Cycle Is Erroneous

As set forth below, the City's conceptualization of its regulatory prerogatives *vis a vis* the voting rights of individual citizens is impossible to synthesize not only with *Gray* and its progeny, but also with any intuitive understanding of Equal Protection safeguards in the electoral sphere.  Further, the City's argument on this point depends heavily the outmoded and discredited theory that primary contests are not truly "elections" and thereby carry less constitutional significance.

**A.    Because Council Members Are Citywide Representatives Elected By All Tucson Voters, Exclusions from the Primary Are Not "Residency Requirements"**

The City claims for itself a constitutionally unconstrained prerogative to declare different "geographical units" for each of the primary and general elections, and thereby exclude duly registered Tucson voters from the nomination of their citywide representatives on the City Council.  According to the City, the Hybrid System is properly understood as a "residency requirement" that derives from the City's "plenary control over elections" (Response at 9) and the Supreme Court's holding in *Holt Civic Club v. City of Tuscaloosa*, 439 U.S. 60 (1978).

To be sure, courts always have accorded states and municipalities considerable latitude in crafting "reasonable, non-discriminatory restrictions" commensurate with the government's "important regulatory interests."  *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  Because the orderly conduct of elections necessarily entails incidental encumbrances on the exercise of the franchise, modest "restrictions that protect the integrity and reliability of the electoral process itself" generally are permissible.  *Anderson v. Celebrezze*, 460 U.S. 780, 788 n.9 (1983).  For example, important governmental objectives such as preventing voter fraud, ensuring accurate voter registration, and forestalling the confusion and disruption that may attend an unduly cluttered ballot will justify reasonable regulations such as voter identification requirements, limitations on write-in

4

candidates, and certain nomination petition prerequisites or filing fees. *See Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 197 (2008) (voter identification); *Burdick*, 504 U.S. at 439-40 & n. 9 (write-in votes); *Marston v. Lewis*, 410 U.S. 769, 680-81 (1973) (50-day voter residency rule); *Jenness v. Fortson*, 403 U.S. 431, 440-42 (1971) (nomination petitions).

Regulatory impositions on suffrage, however, assume a far different cast when they "seriously interfere with the right to vote." *Hussey v. City of Portland*, 64 F.3d 1260, 1265 (9th Cir. 1995). And if the modern "one person, one vote" can be condensed to a single maxim, it is that all electors "are to have an equal vote –whatever their race, whatever their sex, whatever their occupation, whatever their income, **and wherever their home may be in that geographical unit**" for which a representative is chosen. *Gray*, 372 U.S. at 379 (emphasis added).

The City distinguishes *Gray* (which invalidated Georgia's county-weighted primary election for statewide offices) as directed only to instances of vote dilution across counties of disparate populations, and contends that its reasoning is "inapplicable where, as here, Plaintiffs seek to vote in elections that the City's electorate has never authorized them to vote in." Response at 35. Such a narrow reading of *Gray*, however, wrongly implies that if Georgia had outright excluded voters in certain counties from primary elections for statewide offices, rather than merely diluted the effectiveness of their votes relative to electors elsewhere, its

voting scheme would have been constitutionally permissible. Indeed, in many respects, the Hybrid System is more offensive to Equal Protection tenets than the county-unit system in *Gray*; the City does not simply accord voters in a given ward a disproportionately attenuated influence over the nominations of certain citywide representatives, but rather excludes them from the process entirely. The notion advanced by the City – *i.e.*, that the dilution of certain electors' votes for their representatives on the basis of homesite is more constitutionally noxious than denying them the franchise altogether – is logically untenable and doctrinally unsupportable. *See Dudum v. Arntz*, 640 F.3d 1098, 1109 (9th Cir. 2011) (asserting that all measures that deny an eligible voter "an opportunity to cast a ballot at the same time and with the same degree of choice among candidates available to other voters" are subject to strict scrutiny); *Green v. City of Tucson*, 340 F.3d 891, 899-900 (9th Cir. 2003) (noting that both the deprivation and the dilution of the franchise are "severe" burdens warranting strict scrutiny").

In this vein, the City's characterization of the Hybrid System as simply a "residency requirement" is untenable. According to the City, it is vested with *carte blanche* authority to declare a different "geographical unit" for the primary election, and exclude eligible general election voters who do not "reside" in the "geographical unit" applicable to the primary, subject only to the forgiving rational

basis standard.[2]  This formulation of "residency requirements," however, reduces

the holding of *Gray* to a mere circular syllogism that exerts no independent

constitutional force constraining state action.  Specifically, *Gray* instructs that the

"geographical unit" is static and defined by the office to be elected (in this case, a

citywide representative).  Under the City's paradigm, however, the "geographical

unit" is a fluid construct that can mutate in the *same* election cycle for the *same*

office; the government is free to exclude any portion of the electorate by devising a

"geographical unit" tailored to the disenfranchised segment, and then

denominating it a "residency requirement."  The Eighth Circuit rejected precisely

this view when it invalidated under heightened scrutiny a South Dakota law

providing that unorganized counties would be governed by, but not participate in

the election of, officials in adjacent organized counties.  *See Little Thunder v. State

of S.D.*, 518 F.2d 1253 (8th Cir. 1975).  Discounting the state's contention that the

law was "nothing more than a geographic residency requirement," *id.* at 1255, the

court concluded that the state "may not, through residency requirements,

---

[2]      Indeed, the City expressly contends that such deprivations of the franchise
based on electors' location of residence should be afforded *more* judicial deference
than measures that only incidentally burden suffrage (for example, voter ID
requirements), which typically must satisfy the more rigorous *Burdick* balancing
test.  *See* Response at 19; *Ohio State Conference of N.A.A.C.P. v. Husted*, 768 F.3d
524, 541 (6th Cir. 2014) (distinguishing *Burdick* from the strict scrutiny and
rational basis standards, adding that it governs cases "that fall between those two
extremes").

disenfranchise citizens who have a substantial interest in the choice of those who will function as their elected officials.  Such unequal application of fundamental rights we find repugnant to the basic concept of representative government." *Id.* at 1258.

As discussed in Appellants' Opening Brief, the City's reasoning would license electoral arrangements that are inherently dissonant with prevailing understandings of Equal Protection.  For example, the City could, in its view, declare a single precinct as the "geographical unit" for a City Council primary election; likewise, a state could limit participation in a Senate primary to residents of only one congressional district and rationalize it as a "residency requirement." Notably, the City's Response does not address these hypotheticals or posit any limiting principle that would effectuate *Gray*'s directive that homesite categorically is not "a permissible basis for distinguishing between qualified voters."  372 U.S. at 380.

For the same reason, the City's reliance on *Holt* (which upheld the exclusion from city elections of an unincorporated area outside the city's boundaries) is unavailing.  As an initial matter, the *Holt* Court itself cautioned that its holding was largely limited to the facts presented, noting that it may have reached a different conclusion if the city were "exercising precisely the same governmental powers over residents of surrounding unincorporated territory as it does over those residing

within its corporate limits," and citing approvingly *Little Thunder* and other cases that had invalidated denials of the franchise cast as residency restrictions. *See* 439 U.S. at 72 n.8. More fundamentally, the most expansive possible reading of *Holt* is simply that it reiterated the established principle that states and localities bear no antecedent obligation to make public offices elected positions. Thus, the City could, for example, provide for a City Council appointed entirely by the mayor. "Nevertheless, once citizens are granted the right to vote on a matter, the exercise of that vote becomes protected by the Constitution even though the state was not obligated to allow any vote at all." *Hussey v. City of Portland*, 64 F.3d 1260, 1263 (9th Cir. 1995). By rendering Council offices subject to a citywide vote in the general election, however, the City disclaimed any prerogatives *Holt* may have conferred to deny the primary election franchise, and bound itself to the strictures of Equal Protection.[3]

---

[3]     The City likewise cites *Sailors v. Bd. of Educ. of Kent Cnty.*, 387 U.S. 105 (1967), which upheld a Michigan law permitting county school boards to be appointed by elected local school boards. The Court emphasized, however, that because the school board office was appointive and "administrative" rather than legislative, "one man, one vote" concerns necessarily were not germane. *See id.* at 111 ("If we assume arguendo that where a State provides for an election of a local official or agency—whether administrative, legislative, or judicial—the requirements of Gray v. Sanders and Reynolds v. Sims must be met, no question of that character is presented….Since the choice of members of the county school board did not involve an election and since none was required for these nonlegislative offices, the principle of 'one man, one vote' has no relevancy.").

**B.  The City's Argument Depends upon an Outmoded Theory of the Primary Election's Constitutional Status**

Integral to the City's reasoning is its presupposition that the primary election is a mere "nominating device" (Response at 26) and thus stands on a different – and evidently lesser – constitutional plane than the general election.  The doctrinal cornerstone of the City's argument in this respect is the Supreme Court's decision in *Newberry v. United States*, 256 U.S. 232 (1921), in which a four justice plurality concluded that party primaries were not "elections" within the meaning of Article I, Section 4 of the Constitution.  Quoting the *Newberry* plurality at length, the City urges that primaries "are no in sense elections for an office but merely methods by which party adherents agree upon candidates whom they intend to offer and support for ultimate choice by all qualified electors," and that selection of a candidate in a primary "is in no real sense part of the manner of holding the election."  Response at 26-27 (quoting *Newberry*, 256 U.S. at 250, 257).  Indeed, *Newberry* represented the regnant understanding of primary elections at the time of the Hybrid System's adoption, and at the time might have served as a valid predicate for its disenfranchisement of otherwise eligible voters in primary elections for citywide representatives.

Crucially, however, the Supreme Court has since decisively and expressly repudiated *Newberry*'s conception of the nominating process.  The fifth vote in *Newberry* itself was supplied by Justice Pitney, who concurred with the plurality's

specific disposition of the case, but "upon grounds fundamentally different." 256

U.S. at 275 (Pitney, J., concurring). In stark contrast to the plurality, Justice Pitney

articulated a conception of the primary process that is far more consonant with the

contemporary understanding. Rhetorically querying "why should the primary

election (or nominating convention) and the final election be treated as things so

separate and apart"?, Justice Pitney observed that "[t]he former has no reason for

existence, no function to perform, except as a preparation for the latter; and the

latter has been found by experience in many states impossible of orderly and

successful accomplishment without the former." *Id.* at 281-82. Pitney concluded

that the two contests "are essentially but parts of a single process," and that "[a]s a

practical matter, the ultimate choice of the mass of voters is predetermined when

the nominations have been made." *Id.* at 285-86.

Two decades later, Pitney's view counted a majority of the Justices among

its adherents; revisiting the same constitutional question in *United States v.*

*Classic*, 313 U.S. 299 (1941), the Court agreed that the

> primary is made by law an integral part of the procedure of choice,
> [and] the right to choose a representative is in fact controlled by the
> primary . . . . [W]e cannot close our eyes to the fact already mentioned
> that the practical influence of the choice of candidates at the primary
> may be so great as to affect profoundly the choice at the general
> election even though there is no effective legal prohibition upon the
> rejection at the election of the choice made in the primary and may
> thus operate to deprive the voter of his constitutional right of choice.

*Id.* at 318-19; *see also McConnell v. Fed. Election Comm'n*, 251 F. Supp. 2d 176, 191 (D.D.C. 2003), *aff'd in part, rev'd in part on other grounds*, 540 U.S. 93 (2003) (noting that "[t]he Supreme Court in *Classic* disregarded *Newberry*" and that "*Classic* overruled the *Newberry* plurality" on the constitutional significance of primary elections).

Courts have in the succeeding decades consistently invalidated legislative efforts to abrogate Equal Protection rights in the primary process, even when such enactments did not encumber participation in the general election. *See, e.g.*, *Bullock v. Carter*, 405 U.S. 134 (1972) (holding that filing fee applicable only to primary election candidates failed strict scrutiny); *see also Andress v. Reed*, 880 F.2d 239, 241 (9th Cir. 1989) ("The role of the primary election process . . . is underscored by its importance as a component of the total electoral process" (quoting *Lubin v. Panish*, 415 U.S. 709 (1974)); *Morse v. Republican Party of Va.*, 517 U.S. 186, 205 (1996) (finding that entrance fee requirement for delegates to nominating convention was actionable under Voting Rights Act, noting that "[a]s an elementary fact about our Nation's political system, the significance of the nominating convention to the outcome in the general election was recognized as long ago as Justice Pitney's concurrence in *Newberry*").

In sum, whatever its merits in 1930, the City's legal theory of the primary election – and its attendant conclusion that the disenfranchisement of otherwise qualified City voters in primary elections for citywide representatives is a valid exercise of its ostensible "plenary power over elections" (Response at 28) – is founded in a discredited doctrinal relic that no longer carries any constitutional force.[4]

## II. The Summary Affirmance of *Holshouser* Is Not Controlling of the Issues in this Case

Despite the City's extensive reliance upon it, a federal district court's opinion forty-four years ago in *Holshouser v. Scott*, 335 F. Supp. 928 (M.D.N.C. 1971), carries no relevant precedential force either in its own right or as a consequence of its summary affirmance by the Supreme Court. Despite the City's attempt to confound the *Holshouser* court's actual holding – *i.e.*, that the "one man, one vote" principle is inapplicable to judicial offices – with its commentary in *dicta*, the distinction is of critical importance. The plaintiffs in *Holshouser* contended that North Carolina's method of electing judges, which coupled primaries in each judicial district with at-large statewide general elections,

---

[4]    The City also invokes *Kyle v. Daniels*, 9 P.3d 1043 (Ariz. 2000), a decision interpreting Arizona statutes relating to the requirements for candidate nomination petitions. Response at 26. The case presented no constitutional question and the court never purported to opine on the constitutional status of primary elections in relation to individual voting rights.

contravened "one man, one vote." While acknowledging the directives of *Gray*, *Baker*, and *Reynolds*, the district court reasoned that:

> None of these cases dealt with the apportionment or election of the judiciary. We find no case where the Supreme Court, a Circuit Court, or a District Court has applied the 'one man, one vote' principle or rule to the judiciary. To hold with the plaintiff here and invalidate the election procedure permitted by these statutes, this court would be plowing new ground, and extending the 'one man, one vote' principle far beyond the fields heretofore entered by the Supreme Court.

*Id.* at 930-31. Because the inapplicability of "one man, one vote" precepts insulated the hybrid arrangement from heightened scrutiny, the state need only have had a "reasonable basis" for its use. *Id.* at 933. In support of its conclusion, the court cited another district court's disposition of a similar claim in *Stokes v. Fortson*, 234 F. Supp. 575 (N.D. Ga. 1964), "in which it was held the one man, one vote doctrine does not extend to the judiciary." *Holshouser*, 335 F. Supp. at 931. The *Holshouser* court proceeded to quote at length *Stokes'* meditations on what it viewed as the hybrid system's essential fairness and equity. The U.S. Supreme Court subsequently summarily affirmed the district court's holding in *Holshouser* pursuant to what was then mandatory appellate jurisdiction conferred by 28 U.S.C. § 2281 (1970).

Importantly, the next year a federal district court in Louisiana likewise held that "one man, one vote" did not govern judicial elections, and relied

14

upon "several cases [which] have specifically held that that principle does not apply to the judiciary," to include *Stokes* and *Holshouser*. *Wells v. Edwards*, 347 F. Supp. 453, 455 (M.D. La. 1972). The U.S. Supreme Court summarily affirmed *Wells*, but over the dissent of three Justices, who invoked *Gray* and contended "[n]owhere did we suggest that the county unit system was any less unconstitutional for the election of judges than for the election of governor." *Wells v. Edwards*, 409 U.S. 1095, 1097 (1973) (White, J., dissenting). Lest there was any lingering doubt as to the nature and ambit of the Court's summary affirmance of *Wells* – and, by extension, *Holshouser* and other cases upon which *Wells* relied – a majority of the Court subsequently clarified that "we have held the one-person, one-vote rule inapplicable to judicial elections, *see Wells v. Edwards*." *Chisom v. Roemer*, 501 U.S. 380, 402-03 (1991).[5] Indeed, *Stokes* and *Holshouser* consistently have been characterized as holding only "that the 'one man one vote' principle does not apply to the election of Judges." *Voter Info. Project, Inc. v. City of Baton Rouge*, 612 F.2d 208, 210 (5th Cir. 1980); *see also Republican Party of N.C. v. Martin*, 980 F.2d 943, 954 (4th Cir. 1992); *Ripon Soc., Inc. v. Nat'l Republican Party*, 525 F.2d 567, 579 (D.C. Cir.

---

[5] The *Chisom* Court went on to hold that vote dilution claims in the judicial election context could be actionable under the Voting Rights Act.

1975). No court has relied on their statements in *dicta* that hybrid voting arrangements may satisfy the dictates of "one man, one vote."

Thus, any ruminations by the *Stokes* or *Holshouser* courts concerning those hybrid systems' conformance to the "one man, one vote" rule if that principle hypothetically were to apply are quintessential *obiter dicta* – *i.e.*, "a judicial comment made while delivering a judicial opinion, but one that is unnecessary to the decision in the case and therefore not precedential." BLACK'S LAW DICTIONARY (10th ed. 2014). An inevitable corollary is that the Supreme Court's summary affirmance ratified only the holding of *Holshouser* – *i.e.*, that "one man, one vote" is categorically inapplicable to judicial elections. The Supreme Court itself in a case involving the ballot access rights of candidates recognized "the limited precedential effect to be accorded summary dispositions," explaining:

> The Court of Appeals quite properly concluded that our summary affirmances in [earlier cases] were 'a rather slender reed' on which to rest its decision. We have often recognized that the precedential effect of a summary affirmance extends no further than "the precise issues presented and necessarily decided by those actions." A summary disposition affirms only the judgment of the court below, and no more may be read into our action than was essential to sustain that judgment.

*Anderson v. Celebrezze*, 460 U.S. 780, 784 & n.5 (1983) (internal citation omitted). The Court further chastised a district court for having "improperly relied on a prior summary affirmance by this Court . . . and fail[ing] to undertake an independent examination of the merits." *Id.* at 784 n.5 (citing

16

*Mandel v. Bradley*, 432 U.S. 173 (1977)); *see also Davis v. Bandemer*, 478 U.S. 109, 121 (1986) ("[T]o the extent that our summary affirmances indicate the nonjusticiability of political gerrymander cases, we are not bound by those decisions. As we have observed before, '[i]t is not at all unusual for the Court to find it appropriate to give full consideration to a question that has been the subject of previous summary action.'" (internal citation omitted)); *Edelman v. Jordan*, 415 U.S. 651, 671 (1974) (noting that summary affirmances "are not of the same precedential value as would be an opinion of this Court treating the question on the merits. Since we deal with a constitutional question, we are less constrained by the principle of stare decisis than we are in other areas of the law"). Indeed, this Court likewise has observed that "[a] summary affirmance without opinion in a case within the Supreme Court's obligatory appellate jurisdiction has very little precedential significance." *Dillenburg v. Kramer*, 469 F.2d 1222, 1225 (9th Cir. 1972).

In sum, the Supreme Court's summary affirmance imbues *Holshouser* with precedential effect only to the extent of its holding, *i.e.*, that "one man, one vote" principles do not encompass judicial elections. And any gratuitous commentary by the district court concerning whether and to what extent hybrid voting arrangements might in theory be consonant with "one

man, one vote" directives is not only pure *dicta* but also unpersuasive on its own terms. *See* Opening Brief at 34-35.

## III. Cases Concerning the Associational Rights of Political Parties Are Irrelevant

As discussed *supra* Section I.B, the modern framework conceives of the primary and general elections as coequal components of a unitary process for electing representatives; they stand in constitutional parity and are governed to the same extent by Equal Protection commands. Primary elections are, however, distinct from the general election in one critical respect: Because they ultimately are mechanisms for selecting the nominees of political party organizations, they intersect with unique First Amendment considerations. As a consequence, a line of federal cases has grappled with the dueling objectives of sustaining associational freedom while respecting governmental interests in ensuring orderly and democratic nominating processes, and the integrity of the party system.

The City's heavy reliance on these First Amendment cases is, in short, puzzling. While the City appears to interpret them as imparting a judicial tolerance of enactments that restrict or abrogate participation in primary elections, closer examination confirms that they reflect only an attempt to temper political parties' associational freedoms with states' regulatory needs; they in no sense license discriminatory restrictions on primary voting based solely on the geographical location of electors' residence. For example, this Court rejected a challenge to an

Alaska statute mandating direct party primaries, reasoning that the law's deference to parties' determinations concerning whether to allow participation by non-party members ensured the vitality of its First Amendment associational freedoms. *See Alaskan Indep. Party v. Alaska*, 545 F.3d 1173 (9th Cir. 2008). While the City suggests the case somehow fortifies a governmental prerogative to curtail individual voting rights in primary elections, the Court actually vindicated Alaska's "interest in *enhancing* the democratic character of the election process" by entrusting nominating decisions to rank and file party members. *Id.* at 1178 (emphasis added). Similarly, this Court resolved a conflict between state law and the Libertarian Party's internal rules in favor the former, explaining that "the State's interest in enhancing the democratic character of the election process [through direct primaries] overrides whatever interest the Party has in designing its own rules for nominating candidates." *Lightfoot v. Eu*, 964 F.2d 865, 873 (9th Cir. 1992).[6] Thus, even if *Alaska Independence Party* and *Lightfoot* had any relevance to questions of Equal Protection (and they do not), they surely are incongruous authorities for the City's argument that it may *abridge* "the democratic character of

---

[6] Conversely, the Supreme Court has held that a political party's desire to open its nominating processes to independent voters supersedes the state's putative interests in ensuring the administrability of elections, preventing so-called "party raiding," and minimizing voter confusion. *See Tashjian v. Republican Party of Conn.*, 479 U.S. 208 (1986).

the election process" by denying the primary election franchise based on electors' wards of residence.

Finally, the City places heavy emphasis on *N.Y. State Board of Elections v. Lopez Torres*, 552 U.S. 196 (2008), in which the Supreme Court upheld a New York law providing that party nominees for trial judge positions would be nominated in judicial district conventions attended by delegates elected from state assembly districts; the nominees then would compete in an at-large general election in the judicial district. The Court reasoned that the associational interests at stake were modest, noting that the state parties had intervened in defense of the law and that the statute contemplated alternative avenues to the ballot (*e.g.*, nomination petitions). *See id.* at 203-04. Although the Court's disposition of the case pivoted entirely on its appraisal of the plaintiff candidates' associational rights in relation to the state's interests, the City nevertheless divines a *sub silentio* rejection by the Court of Equal Protection claims that were never raised or considered. Response at 43. As a preliminary matter, inferring that the Court would have ratified a proposition not even remotely apposite to its reasoning is a tenuous doctrinal foundation upon which to sustain the Hybrid System. More fundamentally, the obvious reason why the *Lopez Torres* plaintiffs never interposed a "one person, one vote" claim is that the principle is *per se* inapplicable to judicial elections. *See Chisom*, 501 U.S. at 402-03; *supra* Section II. Thus,

even to the extent an asymmetry between the delegate selection and general election geographical units may have transgressed Equal Protection guarantees, such a claim would not have been cognizable in the context of judicial elections in any event.

## IV. The City Has Waived Any Additional Argument that the Hybrid System Satisfies Strict Scrutiny

The City's contention that the Hybrid System satisfies strict scrutiny is constructed solely on a symbiotic argument that depends entirely on the inference that First Amendment freedom of association cases implicitly dispose of Equal Protection claims in the voting rights context. Response at 46-47 (stating that "this Court can apply its cases analyzing challenges to the state's chosen nomination process to reject either a freedom of association claim under the First Amendment or, as here, Plaintiffs' Equal Protection claim under the Fourteenth Amendment"). For the reasons discussed in Section III above, the First Amendment cases upon which the City relies are factually, logically and doctrinally untethered from the issue presented in this appeal, to wit, whether the Equal Protection Clause permits the City to deny the primary election franchise for citywide representatives to otherwise eligible voters based solely on their geographic homesite within the City. The City accordingly has waived any additional arguments bearing on whether the Hybrid System adheres to the demands of strict scrutiny.

In the same vein, the City has not controverted in its Response the Appellants' argument that the Charter's provision for a separate primary in each ward cannot remediate the disenfranchisement of any given voter in any other ward's primary election. *See* Opening Brief at 36-37. Any potential defense of the Hybrid System that is predicated on a theory of aggregating and "canceling out" voters' Equal Protection injuries is therefore waived. *See Clem v. Lomeli*, 566 F.3d 1177, 1182 (9th Cir. 2009) ("[Appellee] has failed to address prejudice in his answering brief, declining to advance any argument or identify any evidence . . . . He has therefore waived the argument."); *United States v. Gamboa-Cardenas*, 508 F.3d 491, 502 (9th Cir. 2007) ("Appellees . . . did not raise the estoppel argument in their briefs and thus they have waived it."); *Aguilar-Turcios v. Holder*, 740 F.3d 1294, 1302 (9th Cir. 2014) ("By failing to raise this argument in any of its several briefing opportunities before this court, the government waived its argument.").

## CONCLUSION

For the reasons discussed herein and in Appellants' Opening Brief, Appellants respectfully request that the judgment of the district court be reversed and, to the extent necessary, the case be remanded for expedited proceedings concerning the fashioning of equitable relief in connection with the November 2015 Tucson City Council elections.

Dated: July 27, 2015

BROWNSTEIN HYATT FARBER
SCHRECK, LLP


By: *s/ Thomas J. Basile*
    Kory A. Langhofer
    Thomas J. Basile
    Roy Herrera Jr.
    One East Washington Street
    Suite 2400
    Phoenix, AZ  85004
    *Attorneys for Plaintiffs-Appellants*

## CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE APPELLATE PROCEDURES 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 5,276 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count of the word-processing system used to prepare this brief in preparing this certificate.

The undersigned also certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14 point Times New Roman font.

Dated: July 27, 2015                    BROWNSTEIN HYATT FARBER
                                        SCHRECK, LLP


                                        By: *s/ Thomas J. Basile*
                                            Kory A. Langhofer
                                            Thomas J. Basile
                                            Roy Herrera Jr.
                                            One East Washington Street
                                            Suite 2400
                                            Phoenix, AZ  85004
                                            *Attorneys for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on July 27, 2015, I electronically filed the foregoing with the Clerk of the Court for the United States District Court of Appeals for the Ninth Circuit using the appellate CM/ECF System.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system to the following registrants:

Richard M. Rollman – rollman@bossefunklaw.com

Michael G. Rankin – mike.rankin@tucsonaz.gov

Dennis McLaughlin – dennis.mclaughlin@tucsonaz.gov

By:  *s/ Thomas J. Basile*