*Appeal No. 15-16142*

# IN THE UNITED STATES COURT OF APPEALS

# FOR THE NINTH CIRCUIT

PUBLIC INTEGRITY ALLIANCE, INC.,
an Arizona nonprofit membership corporation, *et al.*

*Plaintiffs and Appellants,*

vs.

CITY OF TUCSON,
a chartered city of the State of Arizona, *et al.*,

*Defendants and Appellees.*

On Appeal From the United States District Court
for the District of Arizona
Hon. Cindy K. Jorgenson
Case No. 4:15-cv-00138-CKJ

## APPELLANTS' RESPONSE TO PETITION FOR REHEARING AND FOR REHEARING EN BANC



Kory A. Langhofer – Arizona Bar No. 024722
Thomas J. Basile – Arizona Bar No. 031150
Roy Herrera Jr. – New York Bar No. 4772430
649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
Telephone: 602.382.4078
*Attorneys for Plaintiffs-Appellants*

# **Table of Contents**

I.     Introduction……………………………………………………………1

II.    Abandoned Arguments……………………………………………2

III.   Standard of Review ........................................................................ 3

    A.  The Court Need Not Apply a Standard of Review, Because the Hybrid System Is Categorically Unconstitutional ...................................... 3

    B.  The Lower Tier of *Burdick* Scrutiny Does Not Apply to Direct Denials of the Franchise………………………………………………….……..3

    C.  Under *Burdick*, Vote Denial or Dilution on the Basis of Geography Triggers Strict Scrutiny ................................................................. 5

IV.  The Primary and General Elections Are Coequal Components of a Unitary Election ................................................................................ 8

V.   First Amendment Cases Are Inapposite ...................................... 13

VI.  Conclusion ................................................................................. 15

# Table of Authorities

*Alaskan Independence Party v. Alaska*
   545 F.3d 1173 (9th Cir. 2008) ............................................................ 13

*Am. Civil Liberties Union of Nev. v. Lomax*
   471 F.3d 1010 (9th Cir. 2006) ……………………………………………………..6

*Balsam v. Sec'y of State of N.J.*
   607 F. App'x 177 (3d Cir. 2015) .......................................................... 8

*Bullock v. Carter*
   405 U.S. 134 (1972) ............................................................................ 9

*Burdick v. Takushi*
   504 U.S. 428 (1992) ............................................................................ 4

*Carrington v. Rash*
   380 U.S. 89 (1965) .............................................................................. 7

*City of Tucson v. State*
   273 P.3d 624 (Ariz. 2012) ................................................................. 10

*Common Cause Ind. v. Indiv. Members of the Ind. Election Comm'n*
   800 F.3d 913 (7th Cir. 2015) ............................................................ 10

*Crawford v. Marion Cnty.*
   553 U.S. 181 (2008) ....................................................................... 5, 8

*Dudum v. Arntz*
   640 F.3d 1098 (9th Cir. 2011) ............................................................ 5

*Gaunt v. Brown*
   341 F. Supp. 1187 (S.D. Ohio 1972) .................................................. 7

*Gray v. Sanders*
   372 U.S. 368 (1963) .................................................................. 1, 7, 11

*Green v. City of Tucson*
   340 F.3d 891 (9th Cir. 2003) .............................................................. 6

*Harper v. Va. Bd. of Elections*
383 U.S. 663 (1966) ........................................................................ 7

*Harris v. McRae*
448 U.S. 297, 322 (1980) ............................................................... 15

*Hussey v. City of Portland*
64 F.3d 1260 (9th Cir. 1995) ........................................................... 6

*Idaho Coal. United for Bears v. Cenarrusa*
342 F.3d 1073 (9th Cir. 2003) ......................................................... 6

*Korematsu v. United States*
323 U.S. 214, 216 (1944) ................................................................. 3

*Kramer v. Union Free Sch. Dist. No. 15*
395 U.S. 621 (1969) ........................................................................ 5

*Lassiter v. Northampton Cnty. Bd. of Elections*
360 U.S. 45 (1959) .......................................................................... 4

*Lightfoot v. Eu*
964 F.2d 865 (9th Cir. 1992) ......................................................... 14

*Luther v. Borden*
48 U.S. 1 (1849) ............................................................................... 3

*McConnell v. FEC*
251 F. Supp. 2d 176 (D.D.C. 2003)……………………………………13

*Mixon v. State of Ohio*
193 F.3d 389 (6th Cir. 1999) ........................................................... 6

*Moore v. Ogilvie*
394 U.S. 814 (1969) ................................................................... 7, 10

*Morse v. Republican Party of Va.*

   517 U.S. 186 (1996) ................................................................ 9

*N.Y. State Board of Elections v. Lopez Torres*
   552 U.S. 196 (2008) ...................................................... 13, 14

*Public Integrity Alliance, Inc. v. City of Tucson*
   805 F.3d 876 (9th Cir. 2015) .................................... passim

*Richardson v. Ramirez*
   418 U.S. 24 (1974) ................................................................ 5

*Shannon v. Jacobowitz*
   394 F.3d 90 (2d Cir. 2005) .................................................. 6

*Smith v. Allright*
   321 U.S. 649 (1944) ........................................................ 1, 9

*Storer v. Brown*
   415 U.S. 724 (1974) .......................................................... 10

*United States v. Classic*
   313 U.S. 299 (1941) ........................................................ 1, 9

*Weber v. Shelley*
   347 F.3d 1101 (9th Cir. 2003) ............................................ 4

## I.    <u>Introduction</u>

The panel opinion embodies a straightforward application of two foundational precepts of modern voting rights jurisprudence.  First, animated by a recognition that deprivation or dilution of the the franchise on the basis of geography is intrinsically irreconcilable with the "one person, one vote" rule, the United States Supreme Court long ago held that "[o]nce the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote…wherever their home may be in that geographical unit." *Gray v. Sanders*, 372 U.S. 368, 379 (1963).  Second, because the primary and general elections are, in both practice and in doctrine, "fus[ed]…into a single instrumentality of choice," "the same tests to determine the character of discrimination or abridgement should be applied to the primary as are applied to the general election."  *Smith v. Allright*, 321 U.S. 649, 660, 664 (1944); *see also United States v. Classic*, 313 U.S. 299 (1941). The import of *Gray* and *Smith/Classic* is unmistakable: Denying a Tucson elector the opportunity to participate on equal terms in either the primary or the general election for a citywide representative, solely on the basis of his geographic location within the City, contravenes the constitutional mandate of Equal Protection.

The City's hybrid election system categorically bans voters from participating in the primary elections for five-sixths of their representatives on the Tucson City Council.  To sustain it, the City attempts to resituate an anachronistic conception of

the primary election long ago repudiated by the Supreme Court, while concomitantly advocating that this Court disregard a pillar of the "one person, one vote" rule – *i.e.*, that geographic discrimination in the extension or exercise of the franchise triggers strict scrutiny. To advance this argument, the City relies heavily on a fundamentally erroneous conflation of the Equal Protection analysis attaching to geographic discrimination with the wholly distinct (and entirely irrelevant) doctrinal tests governing First Amendment claims in the primary election context.

The theories espoused by the City would license states and municipalities a nearly unfettered ability to deny the right to vote in the primary election to large swaths of a representative's constituency solely because of their geographic location. This profoundly retrogressive understanding of Equal Protection doctrine would severely undermine *Gray*, *Classic* and the long lineage of case law they begot, inject deep uncertainty into the constitutional status of the primary election franchise, and engender conflicts with decisions in other Circuits that adhere to the modern jurisprudential framework. Accordingly, the Petition should be denied.

## II.    <u>**Abandoned Arguments**</u>

As an initial matter, the City appears to have abandoned its earlier assertions that (a) notwithstanding U.S. Supreme Court cases applying the "one person, one vote" principle to state and local elections, municipalities hold "plenary" power in local elections, *see* Answering Brief at 1, 9, 28; and (b) the Fourteenth Amendment

claims in this case are inconsistent with pre-Civil War decisions of the U.S. Supreme Court, *see id.* at 50 (citing *Luther v. Borden*, 48 U.S. 1 (1849) (Taney, C.J.)). The Appellants therefore will not rebut those arguments anew in this filing, and will instead rely on the rebuttals set forth in their opening and reply briefs.

## III. Standard of Review
### A. The Court Need Not Apply a Standard of Review Because the Hybrid System Is Categorically Unconstitutional

The dissenting opinion faults the majority for not expressly explicating the standard of review. *See Public Integrity Alliance, Inc. v. City of Tucson*, 805 F.3d 876, 883 (9th Cir. 2015) (Tallman, J., dissenting). The panel's analysis, however, aligns with that of *Gray*, in which the Supreme Court directly disposed of Georgia's county-weighted primary election system as *per se* unconstitutional without parsing the variants of Equal Protection review. The *Gray* Court seems to have eschewed intentionally those standards of review because, when *Gray* was decided, the basic contours of the standards of review had been apparent in Supreme Court case law for nearly twenty years and were obviously well known by the Court. *See Korematsu v. United States*, 323 U.S. 214, 216 (1944).

### B. The Lower Tier of *Burdick* Scrutiny Does Not Apply to Direct Denials of the Franchise

As noted in the dissenting opinion, the Supreme Court has devised a two-tiered approach for evaluating encumbrances on the franchise. When a regulatory burden on voting rights is "severe," "it must be 'narrowly drawn to advance a state

3

interest of compelling importance.'" *Burdick v. Takushi*, 504 U.S. 428, 434 (1992) (internal citation omitted). By contrast, "when a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify' the restrictions." *Id.* (internal citation omitted); *see also Weber v. Shelley*, 347 F.3d 1101, 1106 (9th Cir. 2003).

The dissenting opinion contended that the City's hybrid electoral system be afforded the more lenient facet of *Burdick*'s sliding scale analysis, which countenances restrictions "that are generally applicable, even-handed, politically neutral, and protect the reliability and integrity of the election process." 805 F.3d at 884 (9th Cir. 2015) (internal quotation omitted).

The approach urged in the dissenting opinion fundamentally subverts the *Burdick* framework. *Burdick*'s lesser tier of scrutiny attaches only to voting practices and procedures that erect procedural barriers to voting or ballot access – not legislative enactments that by their express terms *per se* deny the franchise. For example, *Burdick* itself featured restrictions on write-in voting, which did not withhold the franchise from any voter but rather merely required candidates and their supporters to "act in a timely fashion" if they wished to secure a position on the printed ballot. *See* 504 U.S. at 438. Two of the other cases cited by the dissenting opinion – *Lassiter v. Northampton Cnty. Bd. of Elections*, 360 U.S. 45 (1959) and

*Crawford v. Marion Cnty.*, 553 U.S. 181 (2008) – likewise evaluated the constitutionality of literacy tests and voter identification requirements, respectively; both legislative devices withstood Supreme Court review in large part because while they may have hindered some electors' exercise of their voting rights, they did not entirely dispossess any citizen of the franchise.[1]

In this case, the hybrid system presents far more than a mere procedural hurdle; it categorically bars every Tucson voter from casting a nomination ballot for five-sixths of her own representatives. The *Burdick* test is therefore inapposite.

### C.     Under *Burdick*, Vote Denial or Dilution on the Basis of Geography Triggers Strict Scrutiny

This Court has instructed that "severe" restrictions are denoted by measures that deny an eligible voter "an opportunity to cast a ballot at the same time and with the same degree of choice among candidates available to other voters." *Dudum v. Arntz*, 640 F.3d 1098, 1109 (9th Cir. 2011); *see also Kramer v. Union Free Sch.*

---

[1]     The dissenting opinion also cites *Richardson v. Ramirez*, 418 U.S. 24 (1974), as an instance in which "the Supreme Court has applied a lesser burden" to alleged infringements of the right to vote. 805 F.3d at 884. *Richardson*, which was decided nearly two decades before the Court formulated the *Burdick* standard, affirmed the constitutionality of felon disenfranchisement laws on the basis of directly applicable language of the Fourteenth Amendment. Recognizing that its decision was a *sui generis* byproduct of the constitutional text and its attendant historical understanding, the Court expressly distinguished contemporary voting rights cases, explaining that "the exclusion of felons from the vote has an affirmative sanction in [section 2] of the Fourteenth Amendment, a sanction which was not present in the case of the other restrictions on the franchise which were invalidated in the cases on which respondents rely." *Richardson*, 418 U.S. at 54.

*Dist. No. 15*, 395 U.S. 621, 626 n.6 (1969) (distinguishing cases "involv[ing] an absolute denial of the franchise" from laws "which made casting a ballot easier for some" voters rather than others). And even more specifically, this Court has held that laws denying the vote to some residents of a geographic unit from voting within unit-wide elections are *per se* strictly scrutinized. *See Green v. City of Tucson*, 340 F.3d 891, 899-900 (9th Cir. 2003); *accord Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2d Cir. 2005) ("Infringements of voting rights that have risen to the level of constitutional violation include…purposeful or systematic discrimination against voters of a certain…geographic area…."); *Mixon v. State of Ohio*, 193 F.3d 389, 402 (6th Cir. 1999) ("[When legislation] grants the right to vote to some residents while denying the vote to others, then [courts] must subject the legislation to strict scrutiny and determine whether the exclusions are necessary to promote a compelling state interest.").

And in a closely analogous line of cases, this Court pronounced that "strict scrutiny applies to state laws treating nomination signatures unequally on the basis of geography," *Idaho Coal. United for Bears v. Cenarrusa*, 342 F.3d 1073, 1077 (9th Cir. 2003); *Am. Civil Liberties Union of Nev. v. Lomax*, 471 F.3d 1010 (9th Cir. 2006), a conclusion that extends with equal force to voters themselves.[2] *Cf. Hussey*

---

[2] The case upon which *Cenarrusa* relied likewise invalidated under heightened scrutiny an Illinois statute that imposed a county-based geographic distribution requirement for nomination petition signatures, reasoning that "[a]ll procedures used

*v. City of Portland*, 64 F.3d 1260, 1263 (9th Cir. 1995) (consents to annexation signed by electors were the "constitutional equivalent" of votes).

More broadly, the panel opinion also comports with the Supreme Court's settled edict that geographic homesite is within the canonical catalogue of classifications that warrant strict scrutiny when employed to deny or dilute the right to vote. As distilled succinctly by the *Gray* Court:

> Once the geographical unit for which a representative is to be chosen is designated, all who participate in the election are to have an equal vote —whatever their **race**, whatever their **sex**, whatever their **occupation**, whatever their **income**, and wherever their **home[site]** may be in that geographical unit.

372 U.S. at 379 (emphasis added). Consistent with this formulation, federal courts consistently have extended heightened scrutiny to any abrogation of the franchise premised on any of the criteria articulated in *Gray*. *See, e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 668 (1966) (invalidating poll tax, explaining that "[l]ines drawn on the basis of wealth or property, like those of race, are traditionally disfavored"); *Carrington v. Rash*, 380 U.S. 89 (1965) (statute denying vote to military personnel deemed unconstitutional). By contrast, measures that condition voting eligibility on age, *see Gaunt v. Brown*, 341 F. Supp. 1187 (S.D. Ohio 1972),

---

by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgment of the right to vote." *Moore v. Ogilvie*, 394 U.S. 814, 818 (1969).

or party affiliation (in the case of primary elections), *see Balsam v. Sec'y of State of N.J.*, 607 F. App'x 177 (3d Cir. 2015), or compliance with various procedural prerequisites governing ballot access or the manner of voting, *see Crawford*, 553 U.S. 181, generally receive more deferential review.

If the majority opinion had explicated a standard of review, it would have applied strict scrutiny—and because the City has never suggested or argued that its hybrid system is the least restrictive means of advancing a compelling governmental interest, the disposition of the case would have not have changed.

## IV.  The Primary and General Elections Are Coequal Components of a Unitary Election

As the panel's ruling correctly noted, the fulcrum of this constitutional dispute is whether the primary and general election contests are properly conceived as two independent and discrete elections, or rather as two deeply entwined and constitutionally coequal facets of a single electoral system.  Central to the dissenting opinion's and the City's defense of the hybrid system is the notion that "primary and general elections are not on the same constitutional footing." 805 F.3d at 885; Petition at 14.

The constitutional parity of the primary and general elections, however, was confirmed by the Supreme Court in *United States v. Classic*, 313 U.S. 299 (1941), and remains a cornerstone of modern voting rights jurisprudence.  As the *Classic* Court explained:

8

> [T]he…primary is made by law an integral part of the procedure of choice, [and] the right to choose a representative is in fact controlled by the primary . . . . [W]e cannot close our eyes to the fact already mentioned that the practical influence of the choice of candidates at the primary may be so great as to affect profoundly the choice at the general election even though there is no effective legal prohibition upon the rejection at the election of the choice made in the primary and may thus operate to deprive the voter of his constitutional right of choice.

*Id.* at 318-19. The Court reaffirmed this precept three years later, commenting in *Smith v. Allwright* that *Classic* had "fus[ed]…the primary and general elections into a single instrumentality of choice for officers" and recognized "the unitary character of the electoral process." 321 U.S. at 660. While the City suggests that *Smith* merely established the illegality of racial discrimination in the conduct of primary elections (*see* Petition at 10), this constricted reading is belied by the reasoning of *Classic* and *Smith*, which impart a broader recognition of the intrinsic interconnections that inevitably meld the primary and general elections into a unitary mechanism for exercising democratic choice – a proposition heeded by subsequent cases. *See Bullock v. Carter*, 405 U.S. 134, 146 (1972) (invalidating filing fee requirement that applied only to primary election candidates, noting that "the primary election may be more crucial than the general election"); *Morse v. Republican Party of Va.*, 517 U.S. 186, 205, 207 (1996) (deeming challenge to party convention fee actionable under Voting Rights Act, reasoning that plaintiffs' exclusion from the nominating process "weakens the 'effectiveness' of their votes cast in the general election itself" and "does not merely curtail their voting power, but abridges their right to vote

itself"); *cf. Moore*, 394 U.S. at 818 ("All procedures used by a State as an integral part of the election process must pass muster against the charges of discrimination or of abridgment of the right to vote.").

Notably, the *Classic* paradigm undergirded a recent decision of the Seventh Circuit invalidating an Indiana county's so-called "partisan balance" statute for local judicial elections, whereby major parties were permitted to nominate candidates for only half of the open seats in the general election. *See Common Cause Ind. v. Indiv. Members of the Ind. Election Comm'n*, 800 F.3d 913 (7th Cir. 2015). Reasoning that the restriction "burdens the right of voters to have an effective voice in the general election," the court grounded its analysis in the maxim that "[t]he direct party primary…is not merely an exercise or warm-up for the general election but an integral part of the entire election process, the initial stage in a two-stage process by which the people choose their public officers." *Id.* at 917-18 (quoting *Storer v. Brown*, 415 U.S. 724, 735 (1974)).

In this vein, while the dissenting opinion is correct that the City retains discretion to define who is a "qualified" voter in the primary election, this prerogative is constrained by the anterior obligations of Equal Protection. Specifically, because the City has chosen to conduct the general election on a citywide basis and thereby provide that "Tucson city council members…represent the entire city," *City of Tucson v. State*, 273 P.3d 624, 631 (Ariz. 2012), every voter

in that geographical unit (*i.e.*, the City) is constitutionally "qualified" to participate on equal terms in the primary election. Any abridgement of this constitutional entitlement on the basis of the geographic location of an elector's residence *within* the City must satisfy the dictates of strict scrutiny. *See Gray*, 372 U.S. at 379.

While the City insists that *Gray* has no application to this dispute, a careful review of the Court's opinion ineluctably reveals that *Gray* is irreconcilable with the theory of primary elections advanced by the City and the dissenting opinion. At issue in *Gray* was the constitutionality of Georgia's "county unit" primary election system for statewide offices, which accorded votes cast in sparsely populated rural counties proportionately greater weight. If, as the City maintains, a state or municipality can constitutionally untether the primary election from the general and denote a separate "geographical unit" for the former, Georgia could have simply conceptualized a single rural county as the geographical unit for the primary and entirely denied (rather than merely diluted) the franchise to electors residing in other, heavily populated counties. The impermissibility of the county unit system, however, necessarily derived from the Court's recognition that every elector permitted to vote in the statewide general election likewise was vested with a right to an equal voice in the nominating process, irrespective of the location of his residence within the state.

Similarly, the City has never proffered any limiting principle that would

prevent a state from, for example, permitting only a single congressional district or political subdivision (perhaps on a rotating basis) to participate in the primary election for a statewide officer. While the dissenting opinion dismisses such hypotheticals as unlikely to "pass constitutional muster," 805 F.3d at 886, they easily could find refuge in the same rationale that the dissenting opinion employed to sustain the City's hybrid system, *i.e.*, ensuring candidates have support in, and are adequately attuned to the needs of, particular subsets of the larger geographical unit. *See id.* at 887-88. Further, if the City can designate a single ward as the "geographical unit" for the primary election, there is no apparent constitutional compulsion that the wards bear equal populations. Under the City's reasoning, so long as each voter within a ward is treated equally, the primary election franchise can be denied to voters residing in other wards; if deprivation of suffrage is permissible, however, then so too must be its dilution.

To be sure, long abandoned case law once would have buttressed attempts to disassociate the nomination process from the general election and relegate the former to a lesser constitutional plane. Indeed, the City doggedly appeals to the Supreme Court's plurality opinion in *Newberry v. United States*, 256 U.S. 232 (1921), in support of its depiction of the primary election's inferior constitutional standing. As the Appellants have pointed out repeatedly, however, "*Classic* overruled the *Newberry* plurality" with respect to the constitutional significance of

primary elections.  *See McConnell v. FEC*, 251 F. Supp. 2d 176, 191 (D.D.C. 2003),

*rev'd in part on other grounds*, 540 U.S. 93 (2003).  The City's inexplicable reliance

on a long defunct holding provides a scant basis for revisiting the panel's entirely

correct application of the modern conception of the primary and general elections'

unitary status.

## V.      First Amendment Cases Are Inapposite

The City and the dissenting opinion contend that the primary election is more

accurately envisaged as "nothing more than the means political groups use to choose

the standard bearers who will face off in the general election," 805 F.3d at 885, rather

than a true election clothed with the panoply of constitutional protections that attach

to the general election contest.  This argument, however, posits a false dichotomy;

the primary election is both a constitutionally coequal component of a unitary

electoral instrumentality as well as a device for political associations to select their

nominees.

While the partisan character of primary elections does not detract from their

constitutional dignity under the Equal Protection Clause, it does imbue them with

unique First Amendment properties.  The City has confounded this distinction to

contrive a purported conflict between the panel decision and various precedents of

this Court and the Supreme Court, including *N.Y. State Bd. of Elections v. Lopez*

*Torres*, 552 U.S. 196 (2008); *Alaskan Indep. Party v. Alaska*, 545 F.3d 1173 (9th

Cir. 2008); and *Lightfoot v. Eu*, 964 F.2d 865 (9th Cir. 1992). *See* Petition at 1-2.

Remarkably, however, **not a single one of those cases adjudicated an Equal Protection claim**. To the contrary, all of them pivoted on the First Amendment freedom of association, and embodied judicial attempts to temper political parties' associational rights with legitimate governmental aspirations of preserving the integrity of the electoral system and promoting democratic methods of candidate selection. Notably, *Lightfoot* and *Alaskan Independence Party* both subordinated the party's restrictions on voter participation to "the State's interest in enhancing the democratic character of the election process," *Eu*, 964 F.2d at 873; they certainly are incongruous authorities for a legislative abrogation of the franchise solely on the basis of geography. *Cf. Lopez Torres*, 552 U.S. at 204 (when a state has provided for a primary, courts have "acknowledged an individual's associational right to vote in a party primary without undue state-imposed impediment").

The City attempts to extract from the First Amendment cases a general dispensation for state and local governments to fashion or even forego primary elections in accordance with their own predilections. These repeated invocations of local autonomy in the operation of primary elections, however, misapprehend the locus of the dispute. The City certainly enjoys wide latitude to devise its electoral arrangements – to include entirely ward-based or entirely at-large methods of election – and indeed is not constitutionally required to render the City Council open

to popular election at all. Rather, the Appellants seek only enforcement of the directive that "if a State adopts an electoral system, the Equal Protection Clause of the Fourteenth Amendment confers upon a qualified voter a substantive right to participate in the electoral process equally with other qualified voters." *Harris v. McRae*, 448 U.S. 297, 322 (1980).

By permitting all qualified voters in the City to participate in the general election for all City Council members, the City incurred a constitutional obligation to ensure that all electors in that geographical unit (*i.e.*, the City as a whole) likewise could partake equally in the primary election for their Citywide representatives. The panel's decision appropriately recognizes and applies this axiom of Equal Protection.

## VI.    <u>Conclusion</u>

For the foregoing reasons, the Appellees' Petition for Rehearing and for Rehearing En Banc should be denied.

 Dated: January 5, 2016                            STATECRAFT PLLC

                                                   By: *s/ Thomas J. Basile*
                                                       Kory A. Langhofer
                                                       Thomas J. Basile
                                                       Roy Herrera Jr.
                                                       649 North Fourth Avenue
                                                       First Floor
                                                       Phoenix, AZ  85003
                                                       *Attorneys for Plaintiffs-Appellants*

# CERTIFICATE OF COMPLIANCE WITH FEDERAL RULE APPELLATE PROCEDURES 32(a)

Pursuant to Fed. R. App. P. 32(a)(7)(C), the undersigned certifies that this brief contains 3,647 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  As permitted by Fed. R. App. P. 32(a)(7)(C), the undersigned has relied upon the word count of the word-processing system used to prepare this brief in preparing this certificate.

The undersigned also certifies that this brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14 point Times New Roman font.


 Dated: January 5, 2016                    STATECRAFT PLLC


                                    By: *s/ Thomas J. Basile*
                                        Kory A. Langhofer
                                        Thomas J. Basile
                                        Roy Herrera Jr.
                                        649 North Fourth Avenue
                                        First Floor
                                        Phoenix, AZ 85003
                                        *Attorneys for Plaintiffs-Appellants*

**CERTIFICATE OF SERVICE**

I hereby certify that on January 5, 2016, I electronically filed the foregoing with the Clerk of the Court for the United States District Court of Appeals for the Ninth Circuit using the appellate CM/ECF System.  I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system to the following registrants:

Richard M. Rollman – rollman@bossefunklaw.com

Michael G. Rankin – mike.rankin@tucsonaz.gov

Dennis McLaughlin – dennis.mclaughlin@tucsonaz.gov

Tim Donaldson – tdonaldson@wallawallawa.gov

Rebecca Glasgow – RebeccaG@atg.wa.gov

Pamela Beth Loginsky – pamloginsky@waprosecutors.org

By: *s/ Thomas J. Basile*